FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTER DISTRICT OF VIRGINIA

2007 MAY 29 P 4: 38

CLERK US DISTRICT COURT
ALEXANDRIA. VIRGINIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>**EX REL. PAUL FRASCELLA**<br><br>- and -<br><br>**PAUL FRASCELLA**<br>c/o Christopher B. Mead, Esquire<br>London & Mead<br>1225 19th St., N.W., Suite 320<br>Washington, D.C. 20036<br><br>**Plaintiffs**<br><br>v.<br><br>**ORACLE CORPORATION**<br>500 Oracle Parkway<br>Redwood City, California 94065<br><br>- and -<br><br>**ORACLE USA, INC.**<br>500 Oracle Parkway<br>Redwood City, California 94065<br><br>**Defendants** | **FILED *IN CAMERA* AND**<br>**UNDER SEAL**<br><br><br><br>**CIVIL ACTION NO.** 1.07CV529<br><br>**JURY TRIAL DEMANDED** LMB/TRJ |

## COMPLAINT

This lawsuit is based on a scheme by Defendant Oracle Corporation ("Oracle") to defraud the United States by failing to disclose deep discounts Oracle offered to commercial customers when Oracle sold software products to federal government agencies through a General Services Administration Multiple Award Schedule. Oracle's failure to disclose the discounts it offered to its most favored customers resulted in overcharges to the federal Government totaling tens of millions of dollars. Plaintiff Paul Frascella, by undersigned counsel, and acting on behalf of and in the name of the United

States of America, brings this civil action under the <u>qui</u> <u>tam</u> provisions of the False

Claims Act, and alleges as follows:

## JURISDICTION AND VENUE

1.      This is a civil action by Plaintiff Paul Frascella, acting on behalf of and in

the name of the United States, against Oracle under the False Claims Act, 31 U.S.C.

3729-33. This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. 1345 and 31

U.S.C. 3732(a).

2.      Oracle transacted business in this District through its federal government

sales group, which was headquartered in Oracle's Reston, Virginia office. Venue in this

District is proper pursuant to 28 U.S.C. 1391(c) and 31 U.S.C. 3732(a).

## PARTIES

3.      Plaintiff Paul Frascella is currently employed with Oracle. Frascella

began working for Oracle in the Fall of 1997 as a contract specialist in Oracle's

commercial sales department. Frascella has worked continuously for Oracle since then,

and in the course of his employment has obtained direct personal knowledge of the

schemes and conduct described in this Complaint.

4.      Oracle is a Delaware public corporation with its headquarters in Redwood

City, California. Defendant Oracle USA, Inc. is a Colorado corporation with its principal

place of business in Redwood City, California. Oracle USA, Inc. is a wholly-owned

subsidiary of Oracle. After Oracle's merger with PeopleSoft, Inc., Oracle USA, Inc.

became the operating entity responsible for all United States operations, including

contracts with the federal government and U.S. commercial customers, and, upon

information and belief, pursuant to an assignment contract between Oracle and Oracle

2

USA, Inc., Oracle USA, Inc. has assumed all rights and obligations of Oracle for

Oracle's contracts with U.S. government and commercial customers. Collectively,

Oracle and Oracle USA, Inc. are responsible for Oracle's fraud and false claims on the

federal government described in this Complaint, and will be referred to collectively in

this Complaint as "Oracle." Oracle's stock trades on the NASDAQ exchange. Oracle

designs and sells computer software. For its fiscal year ending May 30, 2006, Oracle

reported $14 billion in total revenues. At all times relevant to this Complaint, officers

and employees of Oracle, acting within the scope of their duties and employment as

agents of Oracle, directed Oracle's unlawful and fraudulent activities as described below.

Oracle benefitted financially from the unlawful and fraudulent activities described in this

Complaint.

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

5.     Through the General Services Administration ("GSA"), the United States

negotiates Multiple Award Schedule ("MAS") contracts with suppliers of commercially-

available products in competitively structured industries. MAS contracts offer significant

advantages for a company attempting to sell commercially-available products to the

federal government. Once GSA approves an MAS contract for a company's products,

GSA will allow the company to list their products and prices in a catalogue, or "GSA

schedule," available to all federal agencies. Individual government agencies may place

orders for any products in the GSA schedule without going through the elaborate

procedures and paperwork that other government procurement programs require.

6.     At all times relevant to this Complaint, the Federal Acquisition

Regulations required GSA contract officers negotiating MAS contracts "to obtain the

3

offeror's best price (the best price given to the most favored customer)." 48 C.F.R.

538.270(a). Under the regulations, contract officers must "compare the terms and

conditions of the MAS solicitation with the terms and conditions of agreements with the

offeror's commercial customers." 48 C.F.R. 538.270©). The forms for submitting MAS

solicitations to GSA also required an offeror to disclose relevant terms and conditions

offered to its most favored customers, and GSA contract officers relied on the accuracy

of those disclosures in negotiating MAS contracts and in determining whether to accept

or reject MAS solicitations. GSA's policy statement for MAS contracts, issued October

25, 1982, and published at 47 CFR 50242, states that "the Government's goal when

negotiating MAS contract pricing arrangements is to obtain a discount from a firm's

established catalog or commercial price list which is equal to or greater than the discount

given to that firm's most favored customer. The most favored customer (MFC) discount

is equal to the best discount given by a firm to any entity with which that firm conducts

business . . . ." GSA reaffirmed its requirement that the government receive most

favored customer pricing in amendments to its acquisition regulations governing MAS

contracts published in the Federal Register on August 21, 1997. 62 FR 44518, August

21, 1997. 48 C.F.R. 552.238-75(b) requires an MAS contractor "to report to the

Contracting Officer all price reductions to the customer (or category of customers) that

was the basis of the award" during the entire period that MAS contract is in place.

　　　　7.　　　　Within weeks of joining Oracle, Frascella attended a two-week contracts

training class at Oracle's headquarters in Redwood City, California. That training

included a review of Oracle's Business Practices ("BP") Handbook. Oracle issued each

employee a copy of the BP Handbook, and required each employee to sign for it upon

receipt. When employees leave Oracle's employ, they are required to return the BP

Handbook. The BP Handbook informed Oracle employees that they could not offer

commercial customers discounts beyond what the Handbook described as "GSA [General

Services Administration] rules." Frascella was taught that the "GSA rules" referred to

the discounts offered to the U.S. government on the GSA schedule.

8.     The sales training course that Frascella attended in California also warned

against allowing greater discounts to commercial customers than the discounts offered

the government on the GSA schedule. The trainer, Denise Green, emphasized that

contract specialists should not allow discounts beyond the GSA discount levels.

9.     During his training, Frascella was told that Oracle had list prices for each

of its licensed software products. The list prices went up by thresholds according to the

number of authorized users, or the numbers or the types of servers or platforms on which

the software would be deployed. During his training, Frascella was told that the

allowable discounts were governed by the dollar thresholds of an overall transaction with

a particular customer.

10.     In addition, Oracle had list prices for annual subscription updates and

technical support for each of its licensed products, typically calculated as 22% of the

price for the licensed software. Customers had to pay that subscription and support fee

every year to receive product updates and continue Oracle's technical support.

11.     Oracle's Authorized Federal Supply Service Information Technology

Schedule Price List for contract number GS-35F-0108J was in place from at least as early

as December 1, 1998, and was initially written to extend through November 30, 2003

("the 1998-2003 GSA Contract"). Oracle modified that contract repeatedly over the

5

years as it added new products to the GSA schedule.  On each modification to the

schedule, an Oracle executive signed a document certifying that "Oracle's Business

Products for these product additions are identical to those business practices applicable to

prices applicable to Oracle product currently on the GSA contract."  Through a series of

modifications, Oracle and GSA extended the term of the contract, through October, 2006.

      12.    Oracle updated most of its products to fit an "e-Business" platform.  In

approximately late 1999, Oracle adopted a policy that the new e-Business platform

software would be sold for any new applications or new customers, and that the older,

non-e-Business software would be sold only to customers who already had non-e-

Business products installed, and who merely wanted to add to, or modify, their existing

software.  Oracle also had policies and offered prices to "migrate" existing, non-e-

Business software to the new e-Business software.  Frascella understood at the time from

conversations with Oracle employees and the differences in licensing fee structures that

the e-Business model was designed at least in part, if not primarily, to allow Oracle to

change the way it calculated license fees. Previously, Oracle had based its pricing on a

"concurrent" usage model.  The concurrent usage model allowed a customer to obtain a

number of licenses to allow any number of employees to use a software product so long

as their concurrent use did not exceed the number of licenses purchased at any one point

in time.  The e-Business pricing structure charged licensing fees based on the number of

authorized named users, or the number of computers or platforms that would use the

software.

## INITIAL GSA SCHEDULE PRICING FOR NON-e-BUSINESS PRODUCTS

13.     Based on documents that he has reviewed available to him as an Oracle employee, Frascella believes that the original discounting schedule, before modifications made to the 1998-2003 GSA contract at least as early as 2001, was for non-e-Business products.  That initial pricing schedule offered tier discounts for software licenses and technical support separately.  That initial pricing schedule offered discounts based on the aggregate net price of all software licenses purchased in the transaction (total list prices of all software licenses acquired during the transaction minus the discount percentage). The price list for non-e-Business products listed different prices for the same item by tiers.  Tier I applied to aggregate software purchases of $75,000 or less; Tier II to aggregate software purchases from $75,001-$200,001; and Tier III to purchases over $200,001.  Tier IV included single license prices for other software products.

14.     The initial pricing schedule for non-e-Business products also included tiered discounts for Oracle technical support.  Tier A applied to aggregate technical support purchases of $20,000 or less; Tier B to aggregate purchases between $20,001-$39,000, and Tier C to aggregate support purchases over $39,001.

## NEW GSA SCHEDULE PRICING FOR E-BUSINESS PRODUCTS

15.     Based on documents available to him as an Oracle employee, Frascella has learned that at least as early as 2000, Oracle proposed to move GSA schedule transactions to the new e-Business products and pricing format.  Oracle successfully applied to GSA to modify the 1998-2003 GSA Contract to include a new tiered discount structure for e-Business software.  That new discount structure was based on the aggregate list price, rather than the net price after discount, and combined the list prices

7

for both software licenses and support when calculating the aggregate list price for the transaction. The GSA schedule provided the following discounts for aggregate Oracle e-Business purchases: Tier 1 offered a 24.25% discount off list for aggregate transactions of $100,000 or less; Tier 2 offered 29.3% off list for transactions with aggregate list prices for software licenses and support between $100,001 and $250,000; Tier 3 offered 34.35% off list for transactions with aggregate list prices for software licenses and support between $250,001 and $375,000; and Tier 4 offered 39.4% off list for transactions with aggregate list prices for software licenses and support between $375,001 and $1,000,000.

16.     The list price for update subscription was 15% of the license fee, and the list price for support was 7% of the license fee. From documents available to him as an Oracle employee and conversations with other Oracle employees, Frascella is aware that 98% of Oracle customers buy annual updates and support at 22% of the net license fee.

## ORACLE KNOWLEDGE OF LEGAL OBLIGATION TO INFORM GOVERNMENT OF DEEPER DISCOUNTS TO COMMERCIAL CUSTOMERS

17.     In conversations and emails, Oracle employees discussed the need to ensure that commercial customers not receive discounts greater than those offered the government on the GSA schedule. Those conversations and emails included the concept that Oracle would have to retroactively lower the prices on the GSA schedule and reimburse the government for the differences on previous sales if a commercial customer received a discount greater than that offered on the GSA schedule, and would have to offer those greater discounts on all future government contracts.

18.     Frascella's manager, Catherine Baillie, also reinforced Oracle's maximum allowable discounts. She told Frascella that the sales force needed to stay within the

8

written maximum allowable discounts in order to comply with Oracle's GSA pricing and contract obligations.

## ORACLE'S CONTRACT APPROVAL PROCESS

19.     Frascella learned that Oracle essentially divided its licensed software products into two categories: technology products (database and computer tools programs) and applications (enterprise software).  Initially, Frascella was told that the GSA rules, or restrictions on discounts, applied to technology products, but did not apply to applications products.

20.     When salespeople had negotiated the terms of potential contracts, they would use an email template to create a document called a contract approval form.  The approval form would include the customer's name, products to be sold, negotiated discounts, prices for technical support, and an outline of terms and conditions.  Oracle salespeople sent the electronic approval forms to the contract specialist for their region, and to the appropriate sales manager.  In general, higher dollar value transactions and higher discounts required approvals of sales executives higher up the organizational ladder. Oracle had a department called America's Approvals ("AMAPP") that reported to the sales organization.  AMAPP employees reviewed and approved the forms sent in by Oracle salsepeople.

21.     Starting in December, 1999, the office of Oracle's CEO was required to approve all non-standard discounts and business terms, and took over AMAPP's function.  Brian Lindsay, Mike Seaman, Rich Allison, and Saintley Wong managed contract approvals for the office of Oracle's CEO.  All four remain in Oracle's senior management.

## ORACLE SCHEMES TO AVOID GSA DISCOUNT RESTRICTIONS FOR COMMERCIAL CUSTOMERS

22.     As a contract specialist, Frascella reviewed the contract approval forms from the salespeople. At first, for technology products, he would determine whether the negotiated discounts on the forms were within GSA rules. Frascella quickly learned that Oracle had various procedures for avoiding the written maximum allowable discounts. Those procedures included selling to a reseller at a deep discount, such as Mythics, Inc., Avnet, Alliance Technologies, Commercial Data Systems, Mid Wave Corporation, Continental Resources, Inc., or Agilisis, and having the reseller sell the product to the end user at a price below the written maximum allowable discounts. Oracle also got around the written maximum allowable discounts by selling a limited use license or a term license that varied in some way from the licenses sold on the GSA schedule.

23.     Another scheme to avoid the GSA discounting restrictions was to sell full use applications licenses (which Frascella and other Oracle employees mistakenly believed at the time were not subject to GSA discounting restrictions) in conjunction with technology products that were subject to GSA discounting restrictions. Oracle would issue a limited use license for the technology product (for example, a database program), and a full license for the applications product.

24.     Frascella understood that Oracle allowed its employees to tell customers that the limitations on licenses used to avoid the discounting restrictions would not be enforced, and Frascella heard Oracle salespeople tell commercial customers that the restrictions or limited uses would not be enforced. Frascella believes that the terms of those limited use and term licenses were negotiated by the parties initially as though they were full use licenses, and that Oracle only imposed the limited use terms in the

10

negotiations when the negotiated discounts exceeded the GSA discounting restrictions. Frascella understood that there was no economic reality to the limitations on licenses. Oracle knowingly and recklessly employed these techniques to offer commercial customers deeper discounts without offering those deeper discounts to the U.S. government.

25.     When important customers were not willing to accept restricted licenses with a wink and a nod, Oracle employed another scheme to avoid GSA discounting practices. Nora Moseley in AMAPP and other supervisors instructed contract specialists to white out the list prices and/or discounts on contracts, leaving only a net fee visible. Mosely and others told Frascella that the purpose of whiting out the list prices and/or discounts was to conceal discounts in excess of the GSA discounting restrictions in the event of a government audit. Oracle employees repeatedly talked about the possibility of a government audit.

26.     Oracle had employees assigned to a GSA government contracts department located in Reston, Virginia. Daniel McMurrer has worked in Oracle's GSA government contracts division for many years, and is currently Manager, GSA Contract Management Department. On October 17, 2002, McMurrer wrote an email memorializing the various schemes Oracle used to give commercial customers deeper discounts than the GSA schedule provided:

> The penalty to Oracle would be that if we offered a commercial customer a discount greater than that offered in the table above (for a deal less that $200k in NLF [Net Licensing Fee]) GSA, under the price reduction clause, would make Oracle pay the difference between what the discount should be and what was offered for ALL deals within the transaction band. Given the amount of business that is funneled through the GSA contract that could end up being a substantial amount of money that is rebated.

Alternatives would be as follows:

1.   Stick to the discounts listed above for deals less than $200k in NLF.
2.   Go through resellers (you could seek higher discounts for partners as well)
3.   Sell term licenses
4.   Make the licenses limited use (i.e. application specific)

27.    Sales managers and AMAPP employees repeatedly told Frascella that these techniques were allowable under Oracle business policy. Frascella was told by his boss and others that it was not his job to ultimately approve discounting terms; his job was only to advise sales whether the proposed discounts fit within the written maximum allowable discounts. Nora Moseley of AMAPP approved many of the transactions that Frascella worked on initially. When the office of the CEO assumed responsibility for approving non-standard discounts in December, 1999, the managers of that process in the office of the CEO also encouraged Frascella to employ the same schemes to avoid the GSA discount restriction.

## FRASCELLA LEARNS APPLICATIONS PRODUCTS SUBJECT TO GSA DISCOUNTS

28.    Until early 2002, Frascella was told and understood that applications products were not subject to the written maximum allowable discount restrictions. In early 2002, Frascella attended a global business practices and contracts meeting at Oracle's headquarters in Redwood City, California. Michelle Howell, then the senior manager of Oracle's GSA government contracts department, made a presentation to the contract management and business practice supervisors. Howell emphasized the importance of abiding by the GSA discount restrictions, explaining the company would have to retroactively offer the government the same deeper discounts given to Oracle's most favored commercial customers. During her presentation, Howell said that

12

applications programs on Oracle's price list were subject to the same written discount

restrictions as the technology products. This came as a surprise to Frascella and others in

the room. An uproar followed Howell's remarks, as people expressed their surprise and

concern, saying that they had provided deeper discounts to commercial customers on

applications products than were allowed on the GSA Schedule. Brian Lindsay, the

director of global practices in the office of the CEO, who helped manage the process of

approving non-standard discounts, told the Oracle employees in the meeting to continue

the current discounting practices on applications products without submitting deeply-

discounted applications contracts as non-standard discounts for his office to review.

Lindsay acknowledged in the meeting that if every applications contract that exceeded

the GSA discounting restrictions was submitted as a non-standard discount requiring his

office's approval, the office of the CEO would be flooded with contract approvals. Ellen

Edder, Vice President of global business practices, quieted the room, and said she would

look into the situation.

29.    Frascella was concerned enough about what was said in the meeting that

he typed an email to himself summarizing it. The email, dated January 16, 2002, said:

> Michelle Howell spoke and it was determined in meeting that
> Oracle was violating the GSA schedule. There was discussion on
> whether to continue discounting under our current practices. Brian
> Lindsey [sic] said to continue the process of our current
> discounting practices instead of sending all deals to HQAPP for
> determination of violations. Ellen Edder agreed that we should
> continue to remain under current practices until she has an
> opportunity to review the issue. She specifically told us to stop
> saying we are violating GSA and quashed the conversation of the
> topi. [sic] KC also brought up the fact that some line items on
> products have been discounted at 98%. This emails was written
> off-line on Wednesday January 16, 2000 at 1:30 Pm PST.
>
> Paul Frascella

30.     Brian Lindsay confirmed his decision at the meeting in an email written

January 17, 2002 to Frascella's boss, Craig Guarente, director of Oracle's contracts

department. Lindsay wrote:

> Craig–Just wanted to follow up on the GSA issue. For now,
> continue as we have currently been handling it. No new approvals
> or process required. After Ellen goes out to Reston next week and
> meets with Michelle there may be changes, but let's wait until she
> has had a chance to assess the clause. Until then, we are not going
> to make any changes to how we currently handle.

31.     After the meeting, Frascella and other contract managers and business

practice managers continued to seek guidance and clarification regarding Oracle's

discounting practices on applications products. On March 6, 2002, Frascella wrote an

email to HQINFO, Ellen Edder's team, seeking guidance on discounting policies:

> About a month ago we raised the issue regarding our discounting
> practices and possible GSA violations. Has it been determined
> whether discounting deals above the e-Biz discount, including
> applications, violates GSA?
>
> Thank you for your assistance.
>
> Regards,
> Paul

32.     Frascella does not recall receiving a written response. Ellen Edder and

Michelle Howell and Dan McMurrer orally told the contracts managers to stop asking

whether Oracle was violating the GSA schedule. They said they would not respond in

writing to any GSA questions because it would create a paper trail. GSAINFO would

routinely respond to emails asking questions related to GSA discounting issues by phone,

instead of in writing. Edder told Frascella that an attorney for Oracle had advised her not

to answer questions about the GSA schedule in writing.

33.     Eventually, Oracle applied the GSA discounting restrictions to

14

applications products. In 2004, Oracle began to reduce some of the schemes to evade

GSA discounting practices. That crackdown began as Oracle negotiated to acquire

PeopleSoft, which later settled a case involving allegations that it had sold products to

commercial customers at deeper discounts than provided on the GSA schedule for Oracle

products. Oracle eventually explicitly applied the GSA discounting restrictions to

limited use licenses and term licenses, indicating that Oracle eventually acknowledged

the reality that the use of limited use and term license schemes as described in paragraph

22 above was not a legitimate way to avoid Oracle's GSA discounting obligations.

## USE OF "PRICE HOLDS" TO EVADE GSA DISCOUNTING RESTRICTIONS

34.     In response to that crackdown, Oracle increased the use of "price hold"

contracts with existing customers to evade GSA discounting restrictions. For years,

Oracle had allowed customers who closed large purchases that Oracle contended were

not subject to the GSA discounting restrictions to provide for future purchases of

additional licenses as part of the contract for the larger, deeply discounted deals. Oracle

referred to these contract provisions as "price holds." These "price holds" allowed

customers to continue to benefit from discounts in excess of the GSA discounting

restrictions. As Oracle cracked down on other schemes that allowed deeper discounts to

commercial customers, Oracle salespeople began allowing customers to amend the "price

holds" in older contracts to include deeply discounted prices for new or additional

products not covered by the original "price holds" in older contracts.

35.     Allowing customers to take advantage of "price holds" as a result of deep

discounts offered on prior contracts is an example of the kind of discounts that the federal

government, as a large purchaser, was intended to benefit from under the spirit and legal

requirements of the GSA schedule. The whole idea of GSA schedule discounts is that the

government, in the aggregate, is likely to be one of the largest purchasers of a company's

products, and is entitled to take advantage of the discounts that its large buying power

should command. Individual government agencies negotiating smaller purchases should

have been treated just as if they were a large customer entitled to deep discounts because

of the aggregate value of the government's previous contracts. As just one example, in

or about 2001, Oracle offered a 65% discount to the Chicago Mercantile Exchange

("CME") for aggregate purchases between $0-$2,000,000, with a minimum purchase

requirement of $100,000. Oracle offered a discount of 70% if CME's aggregate

purchases exceeded $2,000,000. From 2001 to the present, the federal government's

aggregate purchases from Oracle have greatly exceeded $2,000,000. At a minimum, the

federal government was entitled to a discount of 70% on its aggregate purchases, because

it was a far more significant aggregate purchaser of Oracle's products than CME.

Oracle's senior management, including Safra Katz, Oracle's President and COO,

specifically approved the CME 70% discount on aggregate purchases over $2,000,000.

If Oracle was willing to retroactively amend previous contracts to allow commercial

customers to take advantage of the deeper discount levels in the previous contracts,

Oracle should have offered that same opportunity to each government agency. Frascella

raised this issue with Oracle's senior management, providing them with examples of

deals where price hold provisions were amended to add new products. Oracle eventually

issued a policy change prohibiting amending contracts to add new products to an existing

price hold, but, upon information and belief, Oracle did not disclose the previous price

hold amendment discounts to the government as required by GSA regulations.

16

## ORACLE'S ARTIFICIAL $200,000 CEILING ON GSA DISCOUNTING RESTRICTIONS

36.     As described above, Oracle's initial pricing structure in the 1998-2003

GSA Contract, prior to modifications made at least as early as 2001, was based on the

older non-e-Business concurrent user model, before Oracle modified the 1998-2003 GSA

Contract to include e-Business products and pricing.  For non-e-business products, that

initial pricing structure had tiered pricing, and any contracts with aggregate net license

fees over $200,000 received Tier III pricing.  There were no tiers for higher discounts for

transactions above $200,001 in net license fees under that initial pricing structure.  Oracle

offered Tier III pricing to commercial customers on transactions above $200,000 in net

license fees as a starting point, and then negotiated additional discounts.

37.     The 1998-2003 GSA Contract also had a provision entitled "Maximum

Order (MO)."  At least as early as the time Oracle added e-Business pricing to the GSA

schedule, the Maximum Order provision read:  "The maximum dollar value per order

will be $500,000 for all perpetual software licenses."  That Maximum Order provision

conflicted with the discount tiers offered for e-Business products, because Tier 4 for e-

Business products included transactions between $375,001 and $1,000,000 at a discount

of 39.4%, which would have included transactions of aggregate net license fees of

slightly more than $600,000.

38.     This contradiction between the Maximum Order amount and Tier 4 of the

e-Business products discounting schedule was unlikely to have been noticed by GSA

employees administering the 1998-2003 GSA Contract.  That contradiction appears to

have been intended by Oracle to limit the company's legal obligations under  48 C.F.R.

552.238-75(b), which contains the following clause:

17

> During the contract period, the Contractor shall report to the Contracting Officer   all price reductions to the customer (or category of Customers) that was the basis   of the award. The Contractor's report shall include an explanation of the conditions under which the reductions were made.

However, 48 C.F.R. 552.238-75 (d)(1) provides that there "shall be no price reduction for sales – (1) to commercial customers under firm, fixed-price definite quantity contracts with specified delivery in excess of the maximum order threshold specified in this contract."

39.     Adding to the contradictions between Oracle's tiered discounts for e-Business products and the Maximum Order threshold in the contract, Frascella and other Oracle employees were repeatedly told that the GSA discounting restrictions applied only to transactions with an aggregate net fee for software licenses of $200,000 or less. Oracle employees had to employ various schemes to avoid the GSA discounting restrictions under $200,000, but were told they could negotiate larger discounts for deals above $200,000 for commercial customers without incurring any disclosure or rebate obligations to the government. As an example of this advice, Daniel McMurrer's email of October 17, 2002, in addition to listing various schemes to avoid discounting restrictions on deals under $200,000 NLF, also said:

> If the NLF [Net License Fees] on the deal are above $200k the Price Reduction Clause in the GSA schedule does not apply and you can discount at your discretion. If the NLF drop below 200k then the Price Reduction Clause comes into play and we have to abide by the terms of the GSA schedule . . . that no customer (commercial or govt.) would get better than the following pricing table:
> 0-100k (list/support): 25%
> 100,001-250,000: 30%
> 250,001-375,000: 35%
> 375,001-1M: 40%
> Above 1M: Negotiable

18

40.     The concept of setting a Maximum Order threshold at a level lower than the published tier thresholds for discounts under Oracle's GSA contract in order to evade Oracle's obligation to tell the government that it was offering larger discounts to commercial customers for deals above the Maximum Order amount, but within the published tier discount thresholds, violated the intent of the GSA schedule regulations. Government contracting official relied on the representations implicit in Oracle's published tier discounts that those discounts were the best prices offered to Oracle's most favored commercial customers. As the 1998-2003 GSA Contract said, "When an agency order exceeds [the Maximum Order] amount, it is recommended that the ordering activity contact Oracle for a reduced price."

41.     Because Oracle did not disclose the schemes it used to evade GSA discount restrictions for its commercial customers for orders under the Maximum Order threshold, and did not disclose the much deeper discounts that it offered to favored commercial customers, government contracting officials seeking a reduced price for transactions above the Maximum Order amount began with a false premise–that Oracle's published tier discounts were the best prices available for transactions below and slightly above the Maximum Order amount. The result was that Oracle's fraud cost the taxpayers millions of dollars.

**REPRESENTATIVE DEEPER DISCOUNTS OFFERED TO COMMERCIAL CUSTOMERS**

42.     Predictably, the schemes described above to evade GSA discount restrictions on smaller transactions, and Oracle's knowingly or recklessly inaccurate guidance to its employees that the GSA restrictions did not apply to transactions with net licensing fees of $200,000 or less, resulted in numerous contracts that were far more

19

favorable to commercial customers than Oracle's published tier discounts in its GSA

schedule.  Some representative samples include:

A contract with a net license amount of $0.00 and a total order amount of $5,700.00 in April, 1998 with 1-800 Flowers to give technical products away at a 100% discount so that the customer could serve as a reference for the products; a technologically oriented government agency could also have served as a valuable reference for Oracle's products.

A contract with a net license amount of $64,000.00 and a total order amount of $78,080.00 in May, 2002 with Cintas Corporation giving an 80% discount on technical products using the scheme of offering limited use licenses to evade GSA discount restrictions.

A contract with a net license amount of $110,000.00 and a total order amount of $134,239.95 in May, 2002 with Precision Response Corporation giving an 80% discount on applications products after the early 2002 meeting where Michelle Howell of Oracle acknowledged that applications products were subject to GSA discounting restrictions.

A contract with a net license amount of $48,000.00 and a total order amount of $58,599.95 in May, 2002 with Integrated Marketing Solutions Inc. giving a 70% discount using the scheme of offering limited use licenses to evade GSA discounting restrictions, even though the purported limited use, for "back up" purposes, was a use for which Oracle typically charged full price.

A contract with a net license amount of $71,400.00 and a total order amount of $87,108.00 in May, 2002 with Look Smart giving a 65% discount for technical products, where Oracle salespeople evaded the GSA discounting restrictions by claiming that the contract was for limited use licenses, but the contract itself removed the restrictions on the licenses.

A contract with a net license amount of $68,940.00 and a total order amount of $84,106.80 in June, 2002 with Computer Science Corporation giving a 70% discount on applications products after the early 2002 meeting where Michelle Howell of Oracle acknowledged that applications products were subject to GSA discounting restrictions.

A contract with a net license amount of $26,400.00 and a total order amount of $31,680.00 in August, 2002 with Fannie Mae

giving a 67% discount on technical products, using the scheme of amending an older contract to include the products to be purchased in the August, 2002 contract in a list of products to be purchased under a discounted "price hold."

A contract with a net license amount of $1,250.00 and a total order amount of $339,042.34 in August, 2002 with Tessco Technology Inc. Giving a 95% discount on applications products after the early 2002 meeting where Michelle Howell of Oracle acknowledged that applications products were subject to GSA discounting restrictions.

A contract with a net license amount of $134,400.00 and a total order amount of $163,968.00 in August, 2002 with Lycos giving a 70% discount for technical products using a "price hold" from an earlier contract.

A contract with a net license amount $147,672.10 and a total order amount of $244,495.57 in August, 2002 with Trx Technology giving a 70.76% discount on technical products involving a migration to e-Business products.

A contract with a net license amount of $132,400.00 and a total order amount of $156,271.95 in April, 2003 with General Electric Speciality Materials giving a 75% discount on technical products.

A contract in May, 2003 with the Mayo Foundation giving an 80% discount on technical products where the contract specifically referred to charging $200,000 net license fees to make it GSA compliant, even though Oracle's published discounting tiers on the GSA schedule applied to contracts with net license fees in excess of $200,000, and even though it appears that the Maximum Order threshold under the contract was at least $500,000.

A contract with a net license amount of $14,400 and a total order amount of $17,568 in April, 2004 with Vanguard Car Rental USA giving a 76% discount on applications products using the scheme of amending a "price hold" from an earlier contract.

A contract with a net license amount of $139,500.00 and a total order amount of $172,039.80 in May, 2004 with the American Cancer Society giving a 55% discount on technical products using the scheme of amending a "price hold" from an earlier contract.

43.    Based on his personal knowledge of Oracle's schemes to avoid GSA

discounting practices, which were actively in use when he joined Oracle in 1997, and his

memory of those practices being used for contracts he worked on over the years of his employment, Frascella has direct personal knowledge that the above-listed contracts in paragraph 42 are representative examples only, and that commercial contracts exist where Oracle gave even larger discounts to commercial customers on transactions that fit within the published GSA schedule tiered discounts.

## LISTS OF GOVERNMENT CONTRACTS AND DAMAGES CALCULATIONS

43.     Based on documents available to him as an Oracle employee, Frascella provides the attached lists of Oracle contracts with federal government agencies from 2001 to the present. The lists are organized by Oracle fiscal years, which run from June 1-May 30. Frascella believes that the list of government contracts for FY2001 is incomplete, and believes that the lists from subsequent fiscal years, while more complete, may still be missing some federal contracts.

44.     For each fiscal year, the spreadsheets organize the contracts according to the discounting tiers for e-Business products. Frascella sampled the contracts on the list, and determined that virtually all of the contracts he sampled were for e-Business products. That sampling result was consistent with Frascella's memory of the company's business practice to sell e-Business products for all new orders after 1999.

45.     The spreadsheets used the tiered discount schedules from the 1998-2003 GSA Contract to calculate the aggregate list prices for the contract items without a discount. The spreadsheets then calculate the prices the government should have paid if Oracle had disclosed the more favorable discounts it gave commercial customers. The spreadsheets calculate the difference between what the government paid using the GSA schedule tiered discounts versus what it would have paid if Oracle had disclosed

22

commercial discounts at percentages varying from 60% to 95%.

46.     In some instances, a government contracting official may have negotiated a discount below the published GSA schedule tiered discounts for purchases within those tiers. Regulations encourage contracting officials to seek discounts below the GSA schedule. However, any such negotiated discounts below the published tiered discounts were affected by a fraudulent starting point. The government contracting official seeking a discount below the GSA schedule discounts started by relying on Oracle's representations that its GSA schedule discounts were the best prices it offered to commercial customers. It is certainly more likely than not that any government contracting official who negotiated prices below the GSA schedule discounts on any purchase would have negotiated a proportional discount if Oracle had truthfully reported its commercial discounts and the starting point in the negotiations had been a 70-80% discount, rather than the maximum 39.4% discount that Oracle published for e-Business products.

## CALCULATIONS FOR ANNUAL SUBSCRIPTION UPDATES AND TECHNICAL SUPPORT

47.     The government's overpayment at the beginning of each contract also resulted in overpayments for every year of update subscriptions and technical support purchased by each government customer. Because the 22% price for subscription updates and technical support was calculated on the net license fees under the contract, the government paid an additional 22% of its initial overpayment every subsequent year. The spreadsheets assume that each government customer bought the annual subscription updates and technical support, based on Frascella's personal knowledge that 98% of Oracle's customers purchase those items.   In practice it appears that Oracle deducted the

23

discount before the 22% subscription update and support fee was added. This methodology was used in calculating damages on the spreadsheets.

**DAMAGES FOR CONTRACTS ABOVE THE $1M CEILING FOR TIERED DISCOUNTS**

48.    The spreadsheets calculate damages for only those contracts that fit within the discounted tiers for e-Business products in the 1998-2003 GSA Contract. Because contracts with list prices of $1,000,000 would receive a 39.4% discount, contracts of $600,000 or more would be above the discounted tiers, and "negotiable" under the contract. However, government contracting officials negotiating contracts for products with aggregate list prices in excess of $1,000,000 were at a disadvantage because of Oracle's fraudulent and reckless failure to disclose the deeper discounts it gave to commercial customers on contracts with aggregate list prices below $1,000,000. Those government contracting officials would have relied on Oracle's published top discount of 39.4% as the best price offered to commercial customers for contracts below $600,000 in value. Accordingly, those contracting officials were deprived of vital information that Oracle knowingly and recklessly failed to disclose that would have assisted them in negotiating even deeper discounts than they did.

49.    By way of representative example only, in May, 2003 the Department of Homeland Security entered into a contract to purchase over $3.8 million in software license and subscription updates and support from Oracle. The government contracting official negotiated a discount of 80% off list pricing, and probably felt that he had negotiated a good contract for his agency. He might have felt differently about agreeing to an 80% discount had he known that Oracle offered that same discount level on much smaller contracts with commercial customers. Armed with knowledge of Oracle's actual

24

discounts to commercial customers on smaller contracts, government contracting officials negotiating larger contracts with Oracle would have obtained even greater discounts than they actually did, and would have paid less for subscription updates and technical support every year thereafter.

**COUNT I (False Claims Act)**
**(Knowingly Presenting False and Fraudulent Claims For**
**Payment Without Required Disclosure of Commercial Pricing Practices)**

50.      Plaintiff realleges and incorporates by reference paragraphs 1-49 as though fully set forth herein.

51.      Oracle had actual knowledge of, acted in deliberate ignorance of, and acted in reckless indifference to, its statutory, regulatory, and contractual obligations to disclose to the United States the discounts and other pricing practices it offered to its most favored commercial customers under its MAS contract with the United States.

52.      Oracle acted knowingly, with actual knowledge, in deliberate ignorance, and in reckless indifference, in failing to disclose to the United States the discounts and other pricing practices that it routinely offered to commercial customers for its software products.

53.      Oracle knowingly, with actual knowledge, deliberate ignorance, and reckless indifference, submitted materially false or fraudulent claims for payment, or caused materially false or fraudulent claims for payment to be submitted, to officials of the United States government, in violation of 31 U.S.C. 3729(a)(1) and ©). Each claim for payment submitted by Oracle to federal government agencies for sales of software and software maintenance, including but not limited to the invoices submitted for each of the contracts listed in the attached spreadsheet, was a false claim for payment based on

25

material failures to disclose the discounts and other pricing practices that Oracle offered its most favored commercial customers.

54.    Because of Oracle's conduct set forth above, the United States has suffered actual damages.   The United States overpaid for each Oracle software product by the amount of discounts and reductions from other commercial pricing practices that should have applied to each such purchase.   The United States overpaid for subscription updates and technical support on Oracle's software, because subscription updates and technical support fees were calculated as a percentage of Oracle's overpriced software sales to the government.

## COUNT II (False Claims Act)
### (Knowingly Making and Using False Records and
Statements Without Required Disclosure of Commercial Pricing Practices)

55.    Plaintiff realleges and incorporates by reference paragraphs 1-49 as though fully set forth herein.

56.    Oracle knowingly, with actual knowledge, deliberate ignorance, and reckless indifference, made, used, and caused to be made and used, false records and statements, including but not limited to the discount information submitted with Oracle's MAS contract proposal, applications to modify Oracle's MAS contract that included documents signed by Oracle executives certifying that "Oracle's Business Products for these product additions are identical to those business practices applicable to prices applicable to Oracle product currently on the GSA contract," and the pricing proposals and bills submitted to each government agency that purchased Oracle's software, to get false or fraudulent claims paid or approved by the Government.

57.    Because of Oracle's conduct set forth above, the United States has suffered

26

actual damages.  The United States overpaid for each Oracle software product by the amount of discounts and reductions from other commercial pricing practices that should have applied to each such purchase.  The United States overpaid subscription updates and technical support on Oracle's software, because those fees were calculated as a percentage of Oracle's overpriced software sales to the government.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Paul Frascella, acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States against Defendant on each count of the Complaint as follows:

1. For treble the amount of the United States' damages, plus civil penalties of $10,000 or $11,000 for each false claim;

2. For all costs of this civil action; and

3. For prejudgment interest and for such other and further relief as the Court deems just and equitable.

MOREOVER, Plaintiff Paul Frascella, on his own behalf, demands and prays that an award be made in his favor as follows: for 25 percent (25%) of the proceeds collected by the United States if the United States intervenes in and conducts this action, or for 30 percent (30%) of the proceeds if the United States does not intervene; for an amount for reasonable expenses necessarily incurred by the relator in the prosecution of this action; for all reasonable attorney's fees and costs incurred by the relator; and such other and further relief to which the relator may show himself justly entitled.

## DEMAND FOR JURY TRIAL

Plaintiff Paul Frascella demands that this case be tried before a jury.

Respectfully submitted,

Christopher B. Mead    VSB#39304
London & Mead
1225 19th Street, N.W.
Suite 320
Washington, D.C.  20036
(202) 331-3334

Of Counsel:

Mark London
London & Mead
1225 19th Street, N.W., Suite 320
Washington, D.C.  20036
(202) 331-3334

Counsel for Plaintiffs