FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

2010 JUL 29 P 3: 09

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* PAUL FRASCELLA, | ) | |
| | ) | |
| | ) | |
| Relator, | ) | |
| | ) | CASE NO.: 1:07cv529 (LMB/TRJ) |
| v. | ) | |
| | ) | False Claims Act Violations |
| ORACLE CORP., ORACLE | ) | Breach of Contract |
| AMERICA, *et al.,* | ) | Fraud in the Inducement |
| | ) | Constructive Fraud |
| | ) | Fraud By Omission |
| Defendants. | ) | Payment by Mistake |
| | ) | Unjust Enrichment |
| | ) | |
| | ) | JURY TRIAL DEMANDED |

## UNITED STATES' COMPLAINT IN INTERVENTION

Plaintiff, the United States of America, by its undersigned counsel, represents as follows:

### INTRODUCTION

1.       This is an action brought by Plaintiff, the United States of America ("United States" or "Government"), to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33 (FCA), and to recover damages under common law theories of breach of contract, fraud in the inducement, constructive fraud, fraud by omission, payment by mistake, and unjust enrichment.

2.       Relator, Paul Frascella, originally filed this action, on behalf of the United States, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b)(1).  The United States files this Complaint in Intervention pursuant to 31 U.S.C. § 3730(b)(4)(A).

3.       This action arises out of Defendants' false or fraudulent conduct in providing false information to the General Services Administration of the United States (GSA) about their

commercial pricing practices.  As a result of Defendants' false representations and the

Government's reliance upon those false representations, GSA was induced to enter into and

maintain contract terms and conditions to which it would not have agreed had Defendants

accurately and truthfully disclosed their commercial sales practices to the Government.

     4.     As discussed in detail herein, Defendants' false and fraudulent statements and

conduct took several interconnected forms.  First, Defendants provided false, incomplete, and

inaccurate information to the Government regarding their commercial pricing practices during

the negotiation of a Multiple Award Schedule (MAS) contract with GSA in 1997 and 1998.

Second, during the performance of the contract Defendants breached their contractual obligations

to 1) report to GSA that they had offered higher discounts to commercial customers than had

been disclosed to GSA during the contract negotiations, and 2) provide these higher discounts to

Government purchasers.  Third, Defendants manipulated their commercial sales in order to avoid

a contractual obligation to reduce the prices offered to Government agencies consistent with

reduced prices given to commercial customers.  Finally, in order to obtain modifications to the

contract, Defendants reiterated and confirmed false statements that they had made during the

contract negotiations and breached their affirmative duty to inform the Government of higher

discounts that they were offering to commercial customers.

     5.     As a result of Defendants' false and fraudulent statements and conduct,

Defendants knowingly submitted and caused to be submitted false or fraudulent claims for

payment to the United States for products that they sold to the United States.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action under 31 U.S.C. §§ 3730 and 3732.

7.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact business and are found in this District.

8.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a).

## PARTIES

9.      Plaintiff in this action is the United States of America.

10.      Relator Paul Frascella is a former Oracle employee.  Mr. Frascella began working at Oracle in the fall of 1997.  When Mr. Frascella left Oracle in late 2008 he was Senior Director of Contract Services.

11.      Defendants are Oracle Corp. and Oracle America, Inc., and any and all of their predecessors in interest, successors in interest or assigns.

12.      Defendant Oracle Corp. is a Delaware corporation with its headquarters in Redwood City, California.

13.      Defendant Oracle America, Inc. is a Delaware Corporation with its headquarters in Redwood City, California.

14.      On information and belief, Oracle USA, Inc. was a wholly owned subsidiary of Oracle Corp.  On February 15, 2010, Oracle USA, Inc. merged with Sun Microsystems, Inc.  The surviving corporation, Sun Microsystems, Inc., was then renamed Oracle America, Inc.  Oracle America, Inc. is the legal successor in interest to Oracle USA, Inc.

15.    Defendants are referred to collectively herein as "Oracle."

16.    During all relevant time periods, Oracle has been doing business in the Commonwealth of Virginia, throughout the United States, and within the geographical limits of the United States District Court for the Eastern District of Virginia. Oracle manufactures and sells information technology products – hardware, software, maintenance, and services. During the relevant time period, Oracle sold its products to the United States pursuant to GSA MAS Contract GS-35F-0108J (the Contract).

## STATEMENT OF FACTS

**A.    The GSA Multiple Award Schedule Program**

17.    Executive agencies of the United States may procure products and services only through full and open competition, unless they meet certain exceptions. 41 U.S.C. § 253(a)(1).

18.    The competitive bidding process, and the negotiation of contractual terms, is a lengthy and costly process. In order to expedite the procurement process for executive agencies and contractors wishing to sell products to executive agencies, the GSA, through the Federal Acquisition Service, solicits, negotiates, awards, and administers MAS contracts to procure products and services for federal agencies. 41 U.S.C. § 251, *et seq.*; 40 U.S.C. § 501(b).

19.    Under the MAS program, GSA negotiates prices and contract terms that will apply to subsequent orders placed for all of the items that are covered by the MAS contract. The list of products or services that are available for purchase under a particular MAS contract is referred to as the contract "schedule." The pre-negotiation of the terms of sale for a large number of products and services under the MAS program saves a significant amount of administrative time for Government agencies ordering off of MAS contract schedules and for contractors

-4-

wishing to sell products to the Government.

20.     The MAS program allows the Government to obtain commercial supplies and
services at prices associated with volume buying. 41 U.S.C. § 259(b)(3). Additionally, agencies
placing orders under MAS contracts are considered to meet the requirements of full and open
competition. 48 C.F.R. § 8.404(a). Contractors also benefit from the MAS program, because
they do not have to compete in sealed bidding or negotiated acquisitions, and their products are
more widely available to federal agencies, thus making it easier for the agencies to place orders.

21.     The Administrator of GSA establishes the procedures that govern the MAS
program, including the requirements that contractors must follow in order to participate in the
program. 40 U.S.C. §§ 121(c), 501(b)(2). These rules and regulations are set forth in the Federal
Acquisition Regulations (FAR) and the General Services Administration Acquisition Manual
(GSAM).

22.     GSA initiates the MAS process by publishing a contract solicitation. Interested
contractors then submit responses to the solicitation to GSA. Any contractor that enters into an
MAS contract with the United States Government must abide by 1) the obligations that are
outlined in the Government's solicitation; 2) the FAR and GSAM clauses that are incorporated
into the contract; 3) any additional requirements negotiated between the parties; and 4) any other
general federal contracting requirements set forth in the applicable regulations.

23.     The MAS contract solicitation requires prospective contractors to provide GSA
with extensive information about their commercial sales and practices, including price and
discount information. GSA contracting officers use this information to negotiate MAS contract
prices. Pursuant to 48 C.F.R. § 538.270(a), GSA contracting officers are required to "seek to

-5-

obtain the offeror's best price (the best price given to the most favored customer)." In negotiating

the terms of an MAS contract, the contracting officer must determine whether the price offered to

GSA is reasonable by "compar[ing] the terms and conditions of the [offeror's response to the]

MAS solicitation with the terms and conditions of agreements with the offeror's commercial

customers." 48 C.F.R. § 538.270(c). GSA contracting officers therefore rely heavily on the

accuracy and truthfulness of the information provided by the offeror regarding its commercial

sales in negotiating the terms of an MAS contract. *Id.*

24.     The MAS contract provides that if, subsequent to formation of the contract, GSA

discovers that the information provided to the contracting officer at the time of negotiation was

not current, accurate, and complete, the Government is entitled to a reduction in the price of each

order issued pursuant to the MAS contract. The amount of the reduction is the amount by which

the Government orders were inflated as a result of the inaccurate or undisclosed information. 48

C.F.R. § 552.215-72; GSAM 552.238-75(c).

25.     The regulations governing MAS contracts include a mechanism that is known as

the "Price Reductions clause" (PRC). GSAM 552.238-75 states as follows:

Price Reductions

(a) Before award of a contract, the Contracting Officer and the Offeror will agree
upon (1) the customer (or category of customers) which will be the basis of award,
and (2) the Government's price or discount relationship to the identified customer
(or category of customers). This relationship shall be maintained throughout the
contract period. Any change in the Contractor's commercial pricing or discount
arrangement applicable to the identified customer (or category of customers)
which disturbs this relationship shall constitute a price reduction.

(b) During the contract period, the Contractor shall report to the Contracting
Officer all price reductions to the customer (or category of customers) that was the
basis of award. The Contractor's report shall include an explanation of the

-6-

conditions under which the reductions were made.

26.     As set forth above, the regulations require the contracting officer and the offeror to agree upon 1) the customer or category of customers which will be known as the "Basis of Award" (BOA) customer, and 2) a fixed relationship between the prices that the offeror gives to the BOA customer and those that it gives to the Government. If, during the period that the contract is in effect, the Contractor offers the BOA customer prices, discounts, or other terms that are better than those previously offered to the BOA customer, the prices that are offered to the Government must be adjusted accordingly. Any such change offered by the Contractor to the BOA customer must be reported to the Government no later than 15 days after its effective date, and the resulting change in prices on products sold to the Government is effective retroactive to the date on which the change in price was offered to the BOA customer.  GSAM 552.238-75(f)

27.     In addition to the requirement that the Contractor inform the Government of any changes in prices offered to the BOA customer, the PRC also requires the Contractor to report any changes in the commercial pricing practices or policies that were disclosed to GSA during pricing negotiations:

(1)     A price reduction shall apply to purchases under this contract if, after the date negotiations conclude, the Contractor--

 (i)     Revises the commercial catalog, pricelist, schedule or other document upon which the award was predicated to reduce prices;

 (ii)    Grants more favorable discounts or terms and conditions than those contained in the commercial catalog, pricelist, schedule or other documents upon which contract award was predicated;

  *    *    *

(2)     The Contractor shall offer the price reduction to the Government with the same

> effective date, and for the same time period, as extended to the commercial
> customer (or category of customers).

GSAM 552.238-75(c).

28.     Orders under MAS contracts are submitted by executive agencies directly to
contractors such as Oracle.  48 C.F.R. § 8.406-1.

29.     Oracle participated in the GSA MAS program beginning in the early 1990s.  At
that time, the Oracle MAS contracts were awarded for a one-year period of time and eligible for
renewal annually.  In early 1994, for example, Oracle was participating through MAS Contract
number GS00K 94 AGS 5694.

**B.     Oracle Induces GSA To Enter Into A Contract In 1998**

30.     In 1997, GSA issued Solicitation Number FCI-96-DL0001B (the Solicitation).

31.     On August 5, 1997, Oracle provided its initial proposal to GSA in response to the
Solicitation.  As required by the Solicitation and the regulations, this proposal purported to
provide GSA with information regarding the pricing policies and practices that Oracle followed
with its commercial customers.  Oracle provided additional information to GSA regarding its
commercial practices on September 30, 1997.  Following its review of these disclosures, GSA
requested additional information regarding Oracle's commercial practices.  By letter dated
November 4, 1997, Oracle's Contract Negotiator, Patrick Burch, provided GSA Contracting
Officer (CO) Yvonne Jones with additional information regarding Oracle's commercial sales
practices.

32.     As set forth in paragraphs 33-37 below, in this series of disclosures to GSA in the
summer and fall of 1997, Oracle made numerous representations regarding its commercial

-8-

pricing and discounting practices.

33.     Oracle represented that its discounts were based on the class of customer to whom

the products were sold. Oracle's September 30, 1997, and November 4, 1997, submissions both

include a chart in which the first column is titled "Type of Customer," the second column is titled

"Standard Discounts and Pricing Policies," and the third column is titled "Non-Standard

Discounts, incl[uding] deg[ree] of freq[uency]." This chart includes the following entries:

| Type of Customer | Standard Discounts and Pricing Policies | Non-Standard Discounts, incl. deg. of freq. |
|---|---|---|
| State and Local Governments | 20% [to] 30% | see Exhibits (1) & (4) |
| National and Corporate Accounts | 20% to 70% | see Exhibits (1) & (3) |
| Commercial End Users | 15% to 20% | see Exhibit (1) |

Oracle defined "National and Corporate Accounts" as "major accounts" such as "AT&T Corp. &

Boeing Company," and defined "Commercial End Users" as "'general business accounts' where

companies are less than $250 million in size."

34.     Oracle represented that it offered "Standard Discounts" to non-GSA customers

and that these discounts fell within certain specified ranges. The chart set forth above led the

GSA CO to believe that it was Oracle's standard practice to provide State and Local

Governments with 20 to 30 percent discounts, National and Corporate Accounts with 20 to 70

percent discounts and Commercial End Users with 15 to 20 percent discounts.

35.     Oracle represented that it only departed from its standard discounts in 5 percent of

commercial transactions. Exhibit 1 of Oracle's November 4, 1997 disclosures is titled "Oracle

Corporation Summary of Business Practices" and, under the subheading "Frequency of Non-Standard Discounts," states:

> Oracle uses non-standard discounts in unique situations where an individual transaction/contract size warrants additional considerations, generally in the form of additional concessions to the end user customer. Oracle estimates that non-standard discounts are used in less than five percent (5%) of the total number of commercial transactions.

36.     Oracle represented that the discounts for single license orders were based primarily on the dollar value of the order. Under the subheading "End User Software License Discounts," Exhibit 1 of Oracle's September 30, 1997, and November 4, 1997, disclosures include the following language and chart:

> Oracle bases its standard Business Practices on stated business guidelines for the sale of perpetual software licenses to end users. Individual single order discounts, comparable to acquisitions by Federal agencies, are based on the discount guidelines stated below for customers who acquire Oracle Programs.

| Single License Order Size (list) | Single Order Percentage Discount |
|---|---|
| $0 - $49,999 | 6% |
| $50,000 – $99,999 | 9% |
| $100,000 – $249,999 | 12% |
| $250,000 – $499,999 | 15% |
| $500,000 – $649,999 | 17% |
| $650,000 – $799,999 | 20% |
| $800,000 – $999,999 | 23% |
| $1,000,000 – $1,399,999 | 26% |
| $1,400,000 – $1,999,999 | 28% |
| $2,000,000 – $2,249,999 | 30% |
| $2,250,000 – $2,999,999 | 33% |

| $3,000,000 – $3,999,999 | 36% |
|---|---|
| $4,000,000 – $4,999,999 | 38% |
| $5,000,000+ | 40% |

37.     Oracle represented that the discounts offered to GSA were better than the

discounts offered to commercial customers or state/local customers.  Oracle's September 30,

1997, and November 4, 1997, disclosures both state at Exhibit 1 that the "total effective discount

of 26.7% to 40% for single orders" offered to GSA is "significantly above those single order

discounts offered to commercial or state/local customers."  Similarly, Exhibit 1 of the September

30, 1997 disclosures and Exhibit 2 of the November 4, 1997, disclosures both represent that

"[b]ased on materially different terms and conditions and firm commitments, Oracle offers

additional non-standard discounts to its commercial customers. The importance of the GSA IT

Schedule to Oracle results in the *offering of single order initial discounts that are superior to*

*those generally extended to commercial customers* and are fair and reasonable to the Federal

Government customer based on net order size." (Emphasis added).

38.     For the reasons discussed in Section C. *infra*, each of Oracle's  representations to

the GSA CO set forth in ¶¶33-37 was false, each of these representations was material to the

government's decision to enter into the contract, and each of these representations was made for

the purpose of inducing the government to enter into the contract and pay the resulting claims.

Moreover, the natural and foreseeable result of Oracle's false disclosures regarding its

commercial sales practices was that the United States would overpay for Oracle products under

the Contract.

39.     Oracle and GSA conducted in person negotiations over the terms of the MAS

-11-

Contract on December 15, 1997, January 13 and 29, 1998, February 10, 1998, March 11, 1998,

October 6 and 8, 1998, November 10 and 30, 1998 and through numerous telephone conferences.

On November 30, 1998, the GSA CO requested Oracle's Best and Final Offer (BAFO) proposal

for the Contract.

40.     Oracle sent its BAFO to the GSA CO on December 1, 1998.

41.     The BAFO certified that "Oracle Corporation acknowledges that all data

submitted in response to Solicitation Number FCI-96-DC0001B is accurate, complete, and

current."

42.     Oracle's BAFO offered the Government the following discounts on orders for

Perpetual Software Licenses:

| List Price | Discount |
|---|---|
| $0-$100,000 | 25% |
| $100,001-$273,972 | 27% |
| $273,973-$735,924 | 32% |

Oracle also offered a guarantee of 40 percent off orders at list for Perpetual Software Licenses

"[b]ased on a 12-month contract period with a $15 million minimum volume commencing upon

contract award." Oracle's BAFO stated that, "[c]onsistent with commercial practices, [this offer]

establishes multi-tiered discount for software licenses by providing a ramped discount for orders

up to the Maximum Threshold."

43.     Oracle's BAFO proposed "Oracle's U.S. commercial end-user customers" as the

BOA customer for the Contract. Thus, Oracle proposed to align the Government with the

category of customers designated "Commercial End Users," for the purposes of monitoring

Oracle's compliance with the Contract's Price Reductions clause. Oracle proposed to "monitor and administer all requirements of the Price Reduction Clause of the contract," but specified that the PRC, "will not apply to Oracle's commercial end-user customers under firm-fixed price definite quantity contracts for software licenses with specified delivery in excess of $200,000 per order."

44.    Under this proposal, any sale at or under the amount of $200,000 net price made to "commercial end-user customers" that was discounted at a greater percentage than was provided to the Government was required to be reported to the Government and would have the effect of automatically discounting sales to the Government to the same extent. In addition, Oracle would be obligated to refund the difference to the Government between the greater discounts provided to the BOA customer and the price which had been paid by the Government.

45.    Oracle was awarded GSA MAS contract number GS-35F-0108J on December 15, 1998, effective December 1, 1998, through November 30, 2003. The Contract was subsequently temporarily extended through October 2006 to allow time for an audit and negotiation of a follow-on contract. Oracle's last report to GSA of sales made under the Contract covered the period ending December 31, 2006.

46.    Based on Oracle's disclosures and its certification that these disclosures were accurate, complete and current, GSA agreed to discounts of 20 to 40 percent under the contract terms set forth by Oracle in its BAFO, believing that Government customers would be receiving prices that were better than the prices received by Oracle's Commercial End Users who purchased similar items in similar quantities under similar terms and conditions.

47.    When GSA agreed to the Contract it relied to its detriment on false statements by

-13-

Oracle that:

> 1) Oracle's discounts were based on distinctions between classes of customers;

> 2) Oracle offered "standard discounts" that fell within specified ranges to its non-GSA customers, and the "standard discount" for commercial end users was 15 to 20 percent off of list prices;

> 3) "non-standard discounts are used in less than five percent (5%) of the total number of commercial transactions" and that "Oracle uses non-standard discounts [only] in unique situations where an individual transaction/contract size warrants additional considerations;"

> 4) the discount percentage for single license orders was based on the dollar value of the order;

> 5) the "total effective discount of 26.7% to 40% for single orders" offered to the Government was "significantly above those single order discounts offered to commercial or state/local customers," and that Oracle had offered the Government "single order initial discounts that are . . . fair and reasonable to the Federal Government customer based on net order size"; and

> 6) the information submitted in the negotiations for the Contract was "accurate, complete, and current."

48.     In reliance on Oracle's false statements and its misrepresentations of its commercial sales practices, GSA was induced to believe that Oracle's negotiations were honest and forthright, which they were not, that Oracle's certifications of its overall commercial sales practices were accurate, complete, and current, which they were not, and that Oracle's certifications of its commercial sales practices with regard to the BOA customer were accurate, complete, and current, which they were not.

C.     **Oracle's True Undisclosed Commercial Sales Practices**

49.     Despite Oracle's express certifications to the contrary, the information that Oracle provided to GSA regarding its commercial sales practices was not accurate, complete, or current,

and its actual commercial discounting and pricing policies were not consistent with Oracle's disclosures to the Government.

      **1.**      **Oracle Provided False, Incomplete, And Inaccurate Information To The Government During the Negotiation Of The Contract in 1997 and 1998.**

      50.      Internal Oracle documents and data demonstrate that Oracle withheld significant information from the GSA during the formation of the Contract, and that if this information had been disclosed, the GSA would not have agreed to the pricing structure in the Contract.

      **a.**      **Oracle's Discounts Were Not Based On Customer Classifications.**

      51.      In its disclosures to the Government Oracle expressly represented that its discounts varied depending on whether the customer was classified as 1) National and Corporate Accounts ("major accounts"); 2) State and Local Government; or 3) Commercial End Users ("'general business accounts' where the companies are less than $250 million in size").

      52.      In fact, the distinction Oracle presented to GSA between "National and Corporate Accounts" and "Commercial End Users" did not provide the basis for Oracle's discounting policy. In an internal Oracle document titled "USA Business Practices Handbook," dated October 1, 1998 ("1998 Handbook"), the only time "major accounts" and "general business accounts" are mentioned are in its "DISTRIBUTION STRATEGY" section describing Oracle's North America market segmentation and in its APPROVALS/SALES SUPPORT section describing Oracle's sales support group organization. Nowhere in the 1998 Handbook do these classifications relate to Oracle's discounting policy, despite Oracle's representation to the contrary to the GSA CO. Further, the threshold referenced in the 1998 Handbook for distinguishing between "major accounts" and "general business accounts" is $500 million, not

-15-

$250 million as was represented to GSA.

53.     Oracle's internal guidelines for monitoring compliance with the Price Reductions clause also demonstrate that Oracle's actual discounting practices were not based on the customer classifications presented to GSA. As discussed above, during the negotiations for the Contract, Oracle informed GSA that its standard discounts to Commercial End Users were 15 to 20 percent, and proposed to align the Government with these purchasers for purposes of the PRC. The GSA CO relied on Oracle's representations in agreeing to the purportedly higher discount rates that were offered to the Government. An internal Oracle document titled "GSA Schedule Discount Restrictions & Guidelines" dated April 23, 2003 states, however, that the GSA Discount Restrictions employed by Oracle because of the PRC apply to "Commercial End Users" (General Business Accounts) *and* may apply to National and Corporate Accounts (Major and Vertical Accounts). If, as Oracle told GSA, it made a distinction in its non-GSA sales between discounts given to "Commercial End Users" and those given to "National and Corporate Accounts," there would be no need to apply these restrictions to those deals that fell into the "National and Corporate Accounts" category. Accordingly, these internal documents show that Oracle's actual discounting policy was not consistent with the information that it disclosed to GSA.

54.     Similarly, Oracle's "GSA Schedule Discount Restrictions & Guidelines" dated May 4, 2006, notes with regard to both "State and Local Government" and "National and Corporate Accounts" that "For Purposes of Managing the GSA we apply the discount restrictions to these categories of customer." This document also defines Commercial End Users as companies with annual revenues under $1 billion. In short, Oracle's internal documents

-16-

demonstrate that its discounting policies were not based on customer classifications, despite its express representation to GSA that this was the case.

**b.    Oracle Did Not Offer Standard Discounts In The Ranges Disclosed to GSA.**

55.    During the negotiations for the Contract, Oracle's disclosures expressly represented that its standard policy was to provide certain classes of customers with discounts within specified ranges.  These disclosures, which the GSA CO relied on in agreeing to the terms of the Contract, were false.

56.    For example, Oracle's September 30, 1997, and November 4, 1997 disclosures state expressly that Oracle's standard practice was to provide its commercial end user customers with discounts between 15 and 20 percent.  Yet Oracle's 1998 Handbook – which is dated October 1, 1998, only two months prior to the effective date of the Contract – specifically authorized discounts to Commercial End Users ranging from 40 to 70 percent and greater with approvals.  The existence of this formalized policy for discounts of 40 percent and above contradicts Oracle's assertion that 20 percent was the highest "standard discount" for commercial end users.

57.    In addition, the Government's preliminary analysis of data provided by Oracle to its outside consulting firm, KPMG, for the period December 1998, through May 2004 ("the KPMG data") shows that Oracle routinely provided discounts to all classes of customer that were outside the ranges set forth in its disclosures.

**c.    Oracle Used "Non-Standard" Discounts More Frequently Than It Disclosed to GSA.**

58.    In its November 4, 1997 disclosures Oracle asserted that "non-standard discounts

-17-

are used in less than 5 percent of the total number of commercial transactions." Once again, however, Oracle's own documents and data show that this statement was false.

59.     Consistent with the authorization set forth in the 1998 Handbook of discounts to commercial end users well in excess of Oracle's purported 20 percent ceiling, the KPMG data reveals that Oracle routinely sold software licenses to "General Business Account" customers, i.e. Commercial End Users, at discounts greater than 20 percent. Indeed, the KPMG data shows that the vast majority of non-E-Business software license sales were provided at discounts greater than the range that was disclosed to GSA during the Contract negotiations. These discounts flatly contradict Oracle's express representation that "non-standard discounts are used in less than five percent (5%) of the total number of commercial transactions."

60.     The 1998 Handbook also demonstrates that Oracle did not use non-standard discounts only in "unique situations." In fact, Oracle routinely offered "Price Holds" to its commercial customers as part of an initial order. Under a price hold, a customer could purchase additional products at a reduced price or discount percentage on future orders for a specified period of time. This effectively allowed a customer to "lock-in" a price or discount for future orders regardless of order size. Oracle manipulated its price holds such that Oracle's commercial end user customers received discounts that were 1) larger than the discounts Oracle had disclosed to GSA and 2) larger than the discounts that government customers received under the Contract. Oracle did not reveal to GSA the ways it used price holds in sales to its commercial end user customers during the negotiations for the Contract.

           **d.     Single License Discounts Were Not Based On Dollar Value.**

61.     Contrary to Oracle's express representation in its September 30, 1997, and

-18-

November 4, 1997, disclosures to GSA, Oracle did not base its single license order discounts on the dollar value tiers set forth in the disclosures.

62.    Based on the KPMG data provided by Oracle, the Government has done a preliminary analysis of Oracle's sales of software licenses on the GSA schedule to non-GSA customers during the first seven months that the Contract was in effect.  The first two columns of the chart below show the tiered discounting structure that Oracle disclosed to GSA.  The third column indicates the percentage of actual transactions within that tier that exceeded the disclosed discount:

| Sales of Schedule Non-E-Business Products to All Non-GSA Customers Where the Line Item Discount Exceeds the Disclosed Discounts December 1, 1998 – May 31, 1999 | | |
|---|---|---|
| Disclosed Tier | Disclosed Discount | % of Transactions Exceeding Disclosed Discounts |
| $0 - $49,999 | 6% | 88.21% |
| $50,000 – $99,999 | 9% | 97.68% |
| $100,000 – $249,999 | 12% | 96.74% |
| $250,000 – $499,999 | 15% | 97.78% |
| $500,000 – $649,999 | 17% | 98.31% |
| $650,000 – $799,999 | 20% | 94.96% |
| $800,000 – $999,999 | 23% | 97.21% |
| $1,000,000 – $1,399,999 | 26% | 95.99% |
| $1,400,000 – $1,999,999 | 28% | 97.16% |
| $2,000,000 – $2,249,999 | 30% | 95.97% |
| $2,250,000 – $2,999,999 | 33% | 96.89% |
| $3,000,000 – $3,999,999 | 36% | 88.71% |
| $4,000,000 – $4,999,999 | 38% | 96.17% |
| $5,000,000+ | 40% | 96.62% |
| Total | | 91.76% |

63.     This chart shows that in the seven month period after the contract was awarded, 91.76 percent of Oracle's sales of non-E-Business licenses on the GSA schedule to customers other than GSA included discounts that exceeded the discounts that Oracle had disclosed to GSA.

**2.      Oracle Failed To Accurately Report Its Commercial Discounting During Performance Of The Contract And Manipulated Transactions To Avoid Its PRC Obligations.**

64.     The Price Reductions clause states that "A price reduction shall apply to purchases under this contract if, after the date negotiations conclude, the Contractor . . . [r]evises the commercial catalog, pricelist, schedule or other document upon which contract award was predicated to reduce prices" and requires the Contractor to offer the same price reductions to the Government.  GSAM 552.238-75(c)

65.     As discussed above, after award of the Contract, Oracle routinely granted discounts to all categories of customers that exceeded the discounts that were disclosed to GSA, and were inconsistent with the discounting methodology that Oracle had represented to GSA. Yet Oracle failed to inform GSA of the discrepancy between 1) the actual discounts it was providing to non-GSA customers and its description of those discounts in its disclosures; or 2) the actual discounting methodologies it was using for non-GSA customers and the discounting methodology it had disclosed to GSA, as it was expressly required to do under the PRC.

66.     Oracle repeatedly certified during performance of the contract that "[t]here have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation," *see* ¶¶ 79, 87 *infra*, even though Oracle knew that this statement was not true because its actual practices were not consistent with its

-20-

disclosures.

67.     Moreover, during the performance of the Contract, Oracle consistently

manipulated its sales of software licenses to Commercial End Users so that it would not have to

report these sales to GSA and would not have to provide Government purchasers with the same

discounts.

68.     Under the terms of the Contract, Oracle agreed to monitor all sales of software

licenses to Commercial End Users worth $200,000 or less to ensure that GSA received as high a

discount on such sales as the BOA customer. In practice, Oracle turned this requirement upside

down. Instead of informing GSA whenever a commercial end user received a discount greater

than 20 percent on a sale under $200,000, and providing the same discount to the Government,

Oracle established a mechanism to ensure that any proposed deal that fit these criteria was

reworked so that it no longer met the criteria and GSA would not have to be informed of, or

provided with, the higher discount. Oracle's manipulation of its commercial sales to avoid the

contractual requirement to reduce the prices offered to the Government dramatically increased

the cost to the Government of purchases that were made under the Contract.

69.     The small group of Oracle managers authorized to grant non-standard discounts

routinely suggested to Oracle sales personnel how to manipulate discounts for sales of software

licenses to evade the assurances of equity of discounts between the BOA customer and the

Government. If a BOA customer sought to purchase a software license and requested a discount

beyond that permitted by the Contract's PRC, Oracle's "America's Approvals" group (AMAPP,

later known as the HQAPPS group), would suggest ways to manipulate the sale so that it could

be distinguished from the sales to the Government.

-21-

70.     Examples of this manipulation included the following: 1) increasing the order size to just over $200,000; 2) if there was a proposed deal for a perpetual software license that was similar to an item on the MAS schedule, Oracle would change the terms to represent that the software license was not perpetual, but limited in terms or access; 3) if a BOA customer had a prior sale that was subject to a future discount Price Hold, Oracle would amend and extend the discount Price Hold to grant the customer a greater discount than the Government purchaser would get for the same product; and 4) Oracle would sell the same license through a reseller.

71.     Internal Oracle emails show that this type of manipulation of the terms of a sale by Oracle management became a commonplace method of avoiding Oracle's obligation to offer higher discounts to Government purchasers.

72.     In a February 2004 internal Oracle email seeking permission to offer a discount to a customer, the response from Oracle's approval chain suggested that the sales representative, "grow this deal and make it GSA compliant... Let's just make this clean and get them over the required deal size."

73.     A May 2004 Oracle email chain requested approval for a 60 percent discount for a net license fee (NLF) of $170,280. The Oracle HQAPPS responded that "This is not approved unless the current deal is raised above 200K to make this GSA compliant." The deal was subsequently raised to $200,040 "to meet GSA guidelines" and approved.

74.     A September 2006 Oracle email chain which approved a transaction for $201,465 in Net License Fees at a 67 percent discount states, "Assuming the $201K NLF reflects final NLF . . . this does not violate the Price Reductions clause."

75.     A September 2003 email from an Oracle salesperson requesting approval

-22-

discussed, "a possible workaround" to provide a discount above the discount being provided to Government purchasers under the Contract. The response from the approval chain rejected the proposed solution while instead suggesting, "going through a reseller, restricting the licenses, using exclusivity commitment language."

76.     In a July 31, 2002 email to Oracle employee Michelle Howell from Oracle employee Wendy Smith, the two discussed a deal that involved a 66.6 percent discount on a commercial transaction of less than $50,000. Ms. Smith states that:

> I feel very uncomfortable being told to ignore issues regarding GSA when we have been trained on them and have always enforced them. I would like a note from Ellen stating that we are supposed to ignore what we know and allow these deals to go through in order to cover myself if this becomes an issue between GSA and Oracle.

Ms. Smith then quotes an earlier email in which she wrote to another Oracle employee:

> I feel very uncomfortable blatantly ignoring rules that in place [sic] that I have been previously trained on, especially knowing the ramifications to Oracle when GSA finds out that *60% of the company has been ignoring the contractual terms we have in place with them.* (Emphasis added).

77.     Email guidance provided by Oracle's Daniel McMurrer in October 2002, discussed the Contract's PRC liability and outlined specific methods for transforming a standard transaction into a non-standard transaction. Mr. McMurrer advised the sales person to consider alternative methods of discounting to circumvent the Contract's PRC, such as:

- "Stick to the discounts listed above for deals less than $200k in NLF. "

- "Go through resellers (you could seek higher discounts for partners as well)"

- "Sell term licenses"

- "Make the licenses limited use (i.e. application specific)."

78.    A number of other internal Oracle communications demonstrate that Oracle sales personnel and those above them in the chain of command who were responsible for approving sales were well aware of the various schemes available to them to provide deeper discounts to commercial customers while evading their obligations to GSA under the Price Reductions clause. In a July 1998 email Hilarie Koplow-McAdams, VP DMD Western Region/Verticals, discussed changes to discounts offered under a prior Oracle GSA schedule contract. The email includes discussions of "workarounds" used by the sales department such as 1) the use of Network Licenses as a licensing vehicle because Network Licenses are not on the schedule; 2) sending business through partners to provide greater discounts; 3) providing application specific licenses instead of perpetual licenses to prevent the licenses from being too broad, and 4) excluding internal journal entries in calculations of the total net fees to increase the $200,000 net price and evade the Contract's PRC.  These workarounds are substantially similar to the alternatives advised by Daniel McMurrer in his October 2002 email, which demonstrates that Oracle's practice of circumventing PRC obligations to GSA was in place at the outset of the 1998 Contract.

**D.    Oracle Reiterated And Confirmed False Statements Over the Life of the Contract.**

79.    Oracle repeatedly reaffirmed its false statements and misrepresentations of its commercial sales practices to induce the GSA CO to continue to accept the discounts that Oracle had proposed under the Contract.  The reaffirmed false statements included the following:

a.    On September 20, 1999, Oracle certified over the signature of Group Vice President and General Manager Government Solutions Sales, Joseph E. Duffy, that "[t]here have been no changes in commercial discount/pricing policies and

-24-

practices from that originally provided in response to Section M.1 of the solicitation." (Modification PA0003, effective October 1, 1999.)

b.     On October 19, 1999, Oracle certified over the signature of Group Vice President for Sales Operations, Joseph E. Duffy, that "[t]here have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PO0005, effective October 20, 1999.)

c.     On November 20, 2000, Oracle certified over the signature of Ronald W. Police, Group Vice President, Government Sales, that "Oracle's Business Practices for these product additions are identical to those business practices applicable to prices for Oracle product [sic] currently on the GSA Contract." (Modification PO0008.)

d.     On November 20, 2000, Oracle certified over the signature of Ronald W. Police, Group Vice President, Government Sales, that "[t]here have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PO0017, effective May 17, 2001.)

e.     On November 20, 2000, Oracle certified over the signature of Ronald W. Police, Group Vice President, Government Sales, that "[t]here have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PO0019, effective May 17, 2001.)

f.     On November 20, 2000, Oracle certified over the signature of Group Vice President, Government Sales, Ronald W. Police, that "[t]here have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PO0020, effective May 17, 2001.)

g.     On November 20, 2000, Oracle certified over the signature of Group Vice President, Government Sales, Ronald W. Police, that "[t]here have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PO0022, effective May 18, 2001.)

h.     In its proposal for Modification PO0009, effective January 10, 2001 Oracle stated that "Oracle's Business Practices for these product additions are identical to those business practices applicable to prices for Oracle product [sic] currently on the GSA Contract."

**Oracle's False E-Business Disclosures**

80.   In May 2001 Oracle informed GSA that it wished to modify the Contract to include upgraded versions of many of the software licenses on the MAS schedule which Oracle was now marketing as part of its "E-Business" suite of products. In a letter dated May 2, 2001 Oracle provided the GSA CO with disclosures regarding the pricing of its E-Business products.

81.   In its May 2, 2001, letter, Oracle makes several false statements regarding its commercial discounting practices for its E-Business products. Attachment 2 to this letter is titled "Oracle Commercial Business Practices" and, consistent with the false statements that Oracle had made in negotiating the Contract, states that E-Business discounts are determined by the dollar value of the Order:

> Discounting Policy
> Order Size (list price of Software License and first year Software Maintenance) determines the discount offered. The larger the order, the larger the discount.

This representation is confirmed in Attachment 4 to the May 2, 2001 letter, which is titled "Comparison of Commercial and Federal Discounts" and includes the following chart:

Comparison of Standard Discounts

| List Transaction Size | Commercial Discount | GSA Offer |
|---|---|---|
| $0-$5,000 | 0% | 25% |
| $5,001-$10,000 | 5% | 25% |
| $10,001-$25,000 | 10% | 25% |
| $25,001-$50,000 | 15% | 25% |
| $50,001-$100,000 | 20% | 25% |
| $100,001-$250,000 | 25% | 30% |

| | | |
|---|---|---|
| $250,001-$375,000 | 30% | 35% |
| $375,001-$1,000,000 | 30% | 40% |

82.     The representations in Oracle's May 2, 2001, disclosures were false because

Oracle engaged in numerous E-Business transactions with non-GSA customers in which Oracle

granted discounts that were inconsistent with the "Commercial Discounts" that are represented

on the chart presented to GSA. The chart set forth above was particularly misleading in that it

suggested that GSA would be receiving better discounts than commercial customers for each of

the price tiers set forth in the chart, when, in fact, Oracle repeatedly granted discounts to

commercial customers that were greater than those represented on this chart and greater than the

discounts that were offered to GSA.

83.     Based on the KPMG data provided by Oracle, the Government has done a

preliminary analysis of Oracle's sales of E-Business software licenses on the GSA schedule to

non-GSA customers from June 1, 2000 to May 31, 2001. The first two columns of the chart

below show the tiered discounting structure for E-Business products that Oracle disclosed to

GSA. The third column indicates the percentage of actual transactions within that tier that

exceeded the disclosed discount:

| Sales of Schedule E-Business Products to All Non-GSA Customers Where the Line Item Discount Exceeds the Disclosed Discounts, June 1, 2000 – May 31, 2001 | | |
|---|---|---|
| Disclosed Tier | Disclosed Discount | % of Transactions Exceeding Disclosed Discounts |
| $0-$5,000 | 0% | 51.23% |
| $5,001-$10,000 | 5% | 71.23% |
| $10,001-$25,000 | 10% | 63.71% |
| $25,001-$50,000 | 15% | 57.62% |
| $50,001-$100,000 | 20% | 67.03% |
| $100,001-$250,000 | 25% | 75.92% |
| $250,001- $1,000,000 | 30% | 84.14% |
| Total | | 68.51% |

84.     This chart shows that from June 1, 2000 through May 31, 2001, (i.e. the period immediately preceding Oracle's E-Business disclosures to GSA) 68.51 percent of Oracle's sales of E-Business licenses on the GSA schedule to customers other than GSA included discounts that exceeded the discounts that Oracle had disclosed to GSA.

85.     For E-Business products on the MAS schedule, Oracle charged the Government a standard amount of 22 percent of the license fee for maintenance.  Accordingly, to the extent that Oracle failed to grant discounts to the Government for E-Business product license fees that were consistent with its commercial discounts for these products, Oracle also overcharged the Government for maintenance on E-Business licenses.

86.     In its E-Business disclosures, Oracle did not amend its previous false disclosures, including its false statements that "non-standard discounts are used in less than five percent (5%) of the total number of commercial transactions" and that "Oracle uses non-standard discounts

[only] in unique situations where an individual transaction/contract size warrants additional

considerations."

87.    Following its May 2001 E-Business disclosures, Oracle continued to reaffirm its

false statements to induce the CO to continue to accept the discounts that Oracle had proposed

under the Contract. The reaffirmed false statements included the following:

a.    On July 27, 2001, Oracle certified over the signature of Kevin J. Fitzgerald, Senior Vice President, Public Sector, that "[e]xcept as previously discussed and identified in previous modification submissions, there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PO0023, effective June 29, 2001.)

b.    On July 27, 2001, Oracle certified over the signature of Kevin J. Fitzgerald, Senior Vice President, Public Sector, that "[e]xcept as previously discussed and identified in previous modification submissions, there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PO0024, effective August 2, 2001.)

c.    On July 27, 2001, Oracle certified over the signature of Kevin J. Fitzgerald, Senior Vice President, Public Sector, that "[e]xcept as previously discussed and identified in previous modification submissions, there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PO0025, effective August 2, 2001.)

d.    On July 27, 2001, Oracle certified, over the signature of Kevin J. Fitzgerald, Senior Vice President, Public Sector, that "[e]xcept as previously discussed and identified in previous modification submissions, there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PA0027, effective August 2, 2001.)

e.    On September 25, 2001, Oracle certified over the signature of Terrence P. Ford, Vice President, OSI Operations, that "[e]xcept as previously discussed, there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PO0029, effective September 1, 2001.)

-29-

    f.    On October 10, 2001, Terrence P. Ford, Vice President, OSI Operations certified on Oracle's behalf that "Except as previously discussed, there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PA0030, effective October 18, 2001.)

    g.    On May 22, 2002, Oracle certified, over the signature of Kevin J. Fitzgerald, Senior Vice President, Public Sector, that "[e]xcept as previously discussed and identified in previous modification submissions, there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification P00034.)

    h.    On August 5, 2002, Oracle certified, over the signature of Kevin J. Fitzgerald, Senior Vice President, Public Sector, that"[e]xcept as previously discussed and identified in previous modification submissions, there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PO0039, effective August 5, 2002.)

**E.    Specific Transactions By Oracle In Violation Of The False Claims Act**

    88.    As set forth above, Oracle's false statements and fraudulent conduct in the negotiation and performance of the Contract led to the submission of false claims for payment to the United States. The claims were false by reason of the fact that the Government would not have agreed to the discount levels in the Contract had Oracle 1) made accurate, complete, and current disclosures of its discounting practices during the negotiations for, and performance of, the Contract, or 2) fulfilled its obligations under the PRC during performance of the Contract.

    89.    As set forth in detail above, the Government relied on false statements made by Oracle in deciding to award the Contract to Oracle, and Oracle knew that these statements were false at the time that it made them. Because the United States was fraudulently induced to enter into the Contract, each claim for payment made by Oracle under the Contract was a false claim.

    90.    The United States was damaged on each claim on which the ordering agency

received a discount that was less than it would have received had Oracle made accurate, complete, and current disclosures regarding its non-GSA pricing during the negotiation and performance of the Contract.

91.     Oracle reported total sales under the Contract of $1,081,440,702 for software licenses and maintenance.

92.     The executive agencies of the United States Government that made purchases from Oracle under the Contract included, but were not limited to the following:

1.      The Department of Agriculture

2.      The Department of Air Force

3.      The Department of the Army

4.      The Department of Commerce

5.      The Department of Corrections

6.      The Department of Defense

7.      The Department of Education

8.      The Department of Energy

9.      The Department of Environmental Protection

10.     The Drug Enforcement Administration

11.     The Department of Health and Human Services

12.     The Department of Homeland Security

13.     The Department of Housing and Urban Development

14.     The Department of Interior

15.     The Department of Justice

16.    The Department of Labor

17.    The Department of Navy

18.    The Department of State

19.    The Department of Treasury

20.    The Department of Transportation

21.    The Department of Veterans Affairs

93.    As discussed above, GSA negotiated the prices to be applied to orders placed by Government customers under the Contract, in an effort to obtain the best price for the Government. GSA, however, is not involved in the ordering process by Government customers. As a result, GSA is generally not aware of particular purchases by Government customers, and GSA does not receive any of the transaction documents related to particular purchases.

94.    Oracle maintains all such data and was required under the Contract to provide full cooperation with GSA auditors to verify that Oracle was pricing its sales to the Government as required by the 1999 Contract.

95.    GSA also does not routinely receive details of Oracle's commercial transactions. That data is maintained by Oracle and not generally disclosed to the Government.

96.    In response to inquiries related to this *qui tam*, Oracle provided certain limited data to GSA auditors. Based upon that data, the following, provided by way of example only, are illustrations of Government purchases that are similar to commercial transactions, and where, based on the information made available to it, the Government was overcharged. Oracle submitted to the Government invoices for payment on the following transactions, all of which, based upon the information provided by Oracle, were inflated.

-32-

(1)

|  | GSA | Commercial A | Commercial B | Commercial C |
|---|---|---|---|---|
| Order Number | 5756600 | 5756789 | 5833707 | 5803539 |
| Order Date | 1/13/1999 | 1/13/1999 | 5/11/1999 | 3/31/1999 |
| Order Total (Net) | $ 10,532.00 | $ 2,990.00 | $ 16,982.00 | $ 3,960.00 |
| Order Total (List) | $ 14,360.00 | $ 44,512.00 | $ 28,980.00 | $ 14,840.00 |
|  |  |  |  |  |
| List License Fees-Line Item | $ 11,960.00 | $ 37,375.00 | $ 22,000.00 | $ 11,960.00 |
| Net License Fees-Line Item | $ 8,771.78 | $ 2,990.00 | $ 11,000.00 | $ 1,200.00 |
| Discount-Line Item | 26.66% | 92.00% | 50.00% | 89.97% |

(2)

|  | GSA | Commercial A | Commercial B | Commercial C |
|---|---|---|---|---|
| Order Number | 5783287 | 5844923 | 5824836 | 5809663 |
| Order Date | 2/25/1999 | 5/23/1999 | 4/30/1999 | 4/9/1999 |
| Order Total (Net) | $ 15,447.00 | $ 16,920.00 | $ 2,544.80 | $ 28,467.57 |
| Order Total (List) | $ 14,345.00 | $ 25,830.00 | $ 29,363.00 | $ 48,915.00 |
|  |  |  |  |  |
| List License Fees-Line Item | $ 7,475.00 | $ 17,940.00 | $ 25,415.00 | $ 37,375.00 |
| Net License Fees-Line Item | $ 5,660.00 | $ 8,970.00 | $ 2,544.80 | $ 20,257.25 |
| Discount-Line Item | 24.28% | 50.00% | 89.99% | 45.80% |

(3)

|  | GSA | Commercial A | Commercial B | Commercial C |
|---|---|---|---|---|
| Order Number | 5783909 | 5747201 | 5799802 | 5818762 |
| Order Date | 2/26/1999 | 12/22/1998 | 3/25/1999 | 4/22/1999 |
| Order Total (Net) | $ 114,120.00 | $ 12,143.50 | $ 50,000.00 | $ 61,500.00 |
| Order Total (List) | $ 154,020.00 | $ 199,620.00 | $ 78,950.00 | $ 92,750.00 |
|  |  |  |  |  |
| List License Fees-Line Item | $ 89,700.00 | $ 7,475.00 | $ 44,850.00 | $ 74,750.00 |
| Net License Fees-Line Item | $ 66,120.00 | $ 747.00 | $ 22,425.00 | $ 48,587.50 |
| Discount-Line Item | 26.29% | 90.01% | 50.00% | 35.00% |

(4)

|  | GSA | Commercial A | Commercial B | Commercial C |
|---|---|---|---|---|
| Order Number | 5846559 | 5811584 | 5832807 | 5843566 |
| Order Date | 5/25/1999 | 4/13/1999 | 5/10/1999 | 5/21/1999 |
| Order Total (Net) | $ 64,900.00 | $ 50,000.00 | $ 73,532.15 | $ 58,884.00 |
| Order Total (List) | $ 92,750.00 | $ 78,950.00 | $ 115,645.00 | $ 86,160.00 |
|  |  |  |  |  |
| List License Fees-Line Item | $ 74,750.00 | $ 44,850.00 | $ 14,950.00 | $ 71,760.00 |
| Net License Fees-Line Item | $ 52,300.00 | $ 22,425.00 | $ 9,134.45 | $ 46,644.00 |
| Discount-Line Item | 30.03% | 50.00% | 38.90% | 35.00% |

(5)

|  | GSA | Commercial A | Commercial B | Commercial C |
|---|---|---|---|---|
| Order Number | 1087665 | 1087359 | 5806474 | 5783517 |
| Order Date | 5/27/1999 | 5/25/1999 | 4/5/1999 | 2/25/1999 |
| Order Total (Net) | $ 669,496.00 | $ 108,326.00 | $ 243,269.00 | $ 31,239.01 |
| Order Total (List) | $1,072,000.00 | $ 1,150,410.00 | $ 817,135.00 | $ 214,000.00 |
|  |  |  |  |  |
| List License Fees-Line Item | $ 673,200.00 | $ 18,700.00 | $ 560,625.00 | $ 149,500.00 |
| Net License Fees-Line Item | $ 431,503.00 | $ 1,664.00 | $ 168,188.00 | $ 22,425.00 |
| Discount-Line Item | 35.90% | 91.10% | 70.00% | 85.00% |

(6)

|  | GSA | Commercial A | Commercial B | Commercial C |
|---|---|---|---|---|
| Order Number | 1086046 | 1084265 | 1083963 | 1089176 |
| Order Date | 4/9/1999 | 1/28/1999 | 1/4/1999 | 5/17/1999 |
| Order Total (Net) | $ 145,925.00 | $ 74,223.00 | $ 86,048.00 | $ 133,736.04 |
| Order Total (List) | $ 224,500.00 | $ 524,035.00 | $ 275,100.00 | $ 3,339,836.00 |
|  |  |  |  |  |
| List License Fees-Line Item | $ 93,500.00 | $ 29,920.00 | $ 98,175.00 | $ 53,295.00 |
| Net License Fees-Line Item | $ 60,775.00 | $ 4,022.00 | $ 17,193.00 | $ 17,549.01 |
| Discount-Line Item | 35.00% | 86.56% | 82.49% | 67.07% |

(7)

| | GSA | Commercial A | Commercial B | Commercial C |
|---|---|---|---|---|
| Order Number | 5819862 | 5816495 | 5846944 | 5847085 |
| Order Date | 4/23/1999 | 4/20/1999 | 5/25/1999 | 5/25/1999 |
| Order Total (Net) | $ 68,185.00 | $ 3,220.00 | $ 351,143.00 | $ 800.00 |
| Order Total (List) | $ 105,000.00 | $ 10,181.00 | $ 696,255.00 | $ 1,295.00 |
| | | | | |
| List License Fees-Line Item | $ 9,750.00 | $ 7,375.00 | $ 1,995.00 | $ 995.00 |
| Net License Fees-Line Item | $ 6,337.50 | $ 1,200.00 | $ 997.50 | $ 500.00 |
| Discount-Line Item | 35.00% | 83.73% | 50.00% | 49.75% |

(8)

| | GSA | Commercial A | Commercial B | Commercial C |
|---|---|---|---|---|
| Order Number | 1085621 | 5816516 | 5835041 | 5768950 |
| Order Date | 3/18/1999 | 4/20/1999 | 5/12/1999 | 2/4/1999 |
| Order Total (Net) | $ 49,446.00 | $ 10,113.50 | $ 105,850.00 | $ 205,143.00 |
| Order Total (List) | $ 51,670.00 | $ 23,781.00 | $ 194,400.00 | $ 661,637.00 |
| | | | | |
| List License Fees-Line Item | $ 1,990.00 | $ 995.00 | $ 79,900.00 | $ 1,995.00 |
| Net License Fees-Line Item | $ 1,292.00 | $ 100.00 | $ 39,950.00 | $ 1,016.00 |
| Discount-Line Item | 35.08% | 89.95% | 50.00% | 49.07% |

(9)

| | GSA | Commercial A | Commercial B | Commercial C |
|---|---|---|---|---|
| Order Number | 6599193 | 6355470 | 6515444 | 6421003 |
| Order Date | 10/24/2001 | 12/21/2000 | 5/31/2001 | 1/29/2001 |
| Order Total (Net) | $ 64,950.00 | $ 2,903.95 | $ 30,471.60 | $ 1,198.50 |
| Order Total (List) | $ 97,639.95 | $ 7,848.95 | $ 81,698.30 | $ 4,108.19 |
| | | | | |
| List License Fees-Line Item | $ 80,000.00 | $ 6,400.00 | $ 32,000.00 | $ 3,995.00 |
| Net License Fees-Line Item | $ 60,000.00 | $ 1,408.00 | $ 9,024.00 | $ 1,198.50 |
| Discount-Line Item | 25.00% | 78.00% | 71.80% | 70.00% |

(10)

|  | GSA | Commercial A | Commercial B | Commercial C |
|---|---|---|---|---|
| Order Number | 6804132 | 6477786 | 6304466 | 6514669 |
| Order Date | 2/28/2003 | 4/10/2001 | 8/31/2000 | 5/31/2001 |
| Order Total (Net) | $ 69,540.00 | $ 26,840.00 | $ 8,782.17 | $ 19,166.08 |
| Order Total (List) | $ 92,720.00 | $ 107,360.00 | $ 29,273.90 | $ 24,271.90 |
|  |  |  |  |  |
| List License Fees-Line Item | $ 30,000.00 | $ 48,000.00 | $ 15,000.00 | $ 3,995.00 |
| Net License Fees-Line Item | $ 22,500.00 | $ 12,000.00 | $ 4,500.00 | $ 1,349.25 |
| Discount-Line Item | 25.00% | 75.00% | 70.00% | 66.23% |

(11)

|  | GSA | Commercial A | Commercial B | Commercial C |
|---|---|---|---|---|
| Order Number | 6623893 | 6515685 | 6504817 | 6330250 |
| Order Date | 12/14/2001 | 5/31/2001 | 5/18/2001 | 10/27/2000 |
| Order Total (Net) | $ 93,940.00 | $ 106,066.00 | $ 70,064.45 | $ 54,667.80 |
| Order Total (List) | $ 134,200.00 | $ 181,243.20 | $ 108,849.95 | $ 121,644.60 |
|  |  |  |  |  |
| List License Fees-Line Item | $ 80,000.00 | $ 40,800.00 | $ 13,500.00 | $ 96,800.00 |
| Net License Fees-Line Item | $ 56,000.00 | $ 6,120.00 | $ 3,307.50 | $ 38,720.00 |
| Discount-Line Item | 30.00% | 85.00% | 75.50% | 60.00% |

(12)

|  | GSA | Commercial A | Commercial B | Commercial C |
|---|---|---|---|---|
| Order Number | 6690643 | 6297338 | 6346188 | 6513156 |
| Order Date | 5/15/2002 | 8/18/2000 | 11/30/2000 | 5/30/2001 |
| Order Total (Net) | $ 80,762.00 | $ 45,460.55 | $ 119,928.82 | $ 59,658.66 |
| Order Total (List) | $ 131,329.85 | $ 267,219.95 | $ 180,615.50 | $ 165,946.00 |
|  |  |  |  |  |
| List License Fees-Line Item | $ 3,750.00 | $ 36,500.00 | $ 15,980.00 | $ 19,975.00 |
| Net License Fees-Line Item | $ 2,651.00 | $ 6,205.00 | $ 4,946.00 | $ 8,888.75 |
| Discount-Line Item | 29.31% | 83.00% | 69.05% | 55.50% |

(13)

|  | GSA | Commercial A | Commercial B | Commercial C |
|---|---|---|---|---|
| Order Number | 6656485 | 6515753 | 6511062 | 6501271 |
| Order Date | 2/27/2002 | 5/31/2001 | 5/25/2001 | 5/14/2001 |
| Order Total (Net) | $ 191,113.70 | $ 135,192.00 | $ 154,554.35 | $ 215,806.45 |
| Order Total (List) | $ 291,110.00 | $ 307,440.00 | $ 352,516.85 | $ 380,679.95 |
|  |  |  |  |  |
| List License Fees-Line Item | $ 6,000.00 | $ 240,000.00 | $ 187,500.00 | $ 297,000.00 |
| Net License Fees-Line Item | $ 3,939.00 | $ 87,984.00 | $ 93,750.00 | $ 163,350.00 |
| Discount-Line Item | 34.35% | 63.34% | 50.00% | 45.00% |

(14)

|  | GSA | Commercial A | Commercial B | Commercial C |
|---|---|---|---|---|
| Order Number | 6699055 | 6503896 | 6511239 | 6471864 |
| Order Date | 5/30/2002 | 5/17/2001 | 5/25/2001 | 3/30/2001 |
| Order Total (Net) | $ 137,171.50 | $ 159,973.70 | $ 164,739.95 | $ 201,300.00 |
| Order Total (List) | $ 269,315.00 | $ 319,787.60 | $ 329,439.95 | $ 366,000.00 |
|  |  |  |  |  |
| List License Fees-Line Item | $ 120,000.00 | $ 120,000.00 | $ 270,000.00 | $ 300,000.00 |
| Net License Fees-Line Item | $ 77,640.00 | $ 60,000.00 | $ 135,000.00 | $ 165,000.00 |
| Discount-Line Item | 35.30% | 50.00% | 50.00% | 45.00% |

(15)

|  | GSA | Commercial A | Commercial B | Commercial C |
|---|---|---|---|---|
| Order Number | 6669525 | 6477952 | 6514806 | 6481542 |
| Order Date | 3/28/2002 | 4/10/2001 | 5/31/2001 | 4/16/2001 |
| Order Total (Net) | $ 354,522.39 | $ 332,716.23 | $ 696,864.34 | $ 172,569.00 |
| Order Total (List) | $ 585,020.50 | $ 752,421.25 | $ 4,984,425.15 | $ 505,080.00 |
|  |  |  |  |  |
| List License Fees-Line Item | $ 50,000.00 | $ 22,500.00 | $ 180,000.00 | $ 69,000.00 |
| Net License Fees-Line Item | $ 30,300.00 | $ 2,250.00 | $ 21,996.00 | $ 23,575.00 |
| Discount-Line Item | 39.40% | 90.00% | 87.78% | 65.83% |

(16)

| | GSA | Commercial A | Commercial B | Commercial C |
|---|---|---|---|---|
| Order Number | 6585180 | 6463450 | 6762396 | 6277036 |
| Order Date | 9/28/2001 | 3/21/2001 | 5/31/2001 | 7/6/2000 |
| Order Total (Net) | $ 160,677.00 | $ 117,708.49 | $ 264,996.00 | $ 798,302.16 |
| Order Total (List) | $ 535,320.00 | $ 722,642.45 | $ 821,549.00 | $ 3,117,727.15 |
| | | | | |
| List License Fees-Line Item | $ 60,000.00 | $ 20,000.00 | $ 325,400.00 | $ 2,416,800.00 |
| Net License Fees-Line Item | $ 36,360.00 | $ 2,071.40 | $ 48,810.00 | $ 391,750.72 |
| Discount-Line Item | 39.40% | 89.64% | 85.00% | 83.79% |

## Count 1

### Violation Of The False Claims Act: False Claims (31 U.S.C. § 3729(a) (2006))

97.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 96 above, as if fully set forth herein.

98.    In violation of 31 U.S.C. § 3729(a)(2006), Defendants knowingly presented, or caused to be presented, for payment or approval, false or fraudulent claims (i.e., invoices for payment for Oracle products sold under the Contract) to the United States, which the United States paid.

## Count 2

### Violation Of The False Claims Act: False Statements (31 U.S.C. § 3729(a) (1) (B) (2009))

99.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 96 above, as if fully set forth herein.

100.    In violation of 31 U.S.C. § 3729(a)(1)(B)(2009), Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim (i.e., invoices for payment of Oracle products sold under the Contract) and/or to get the

-38-

United States to pay or approve false or fraudulent claims.

## Count 3

### Breach Of Contract

101.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 96 above, as if fully set forth herein.

102.    By reason of the actions described above, Oracle materially breached the Contract by billing in violation of the contractual terms.

103.    Defendants further materially breached their Contract with the Government by failing to furnish accurate, complete, and current data regarding commercial prices and discounts during negotiations for, and over the life of, the Contract and by failing to comply with the Contract's PRC obligations.

104.    By reason of these breaches, the United States has suffered damages in the amount to be determined at trial.

## Count 4

### Fraud In The Inducement

105.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 96 above, as if fully set forth herein.

106.    As described above, Oracle falsely represented its commercial pricing and discounting practices in its negotiations with GSA prior to the formation of the Contract and in submissions made to GSA during the performance of the Contract.

107.    GSA relied on Oracle's false representations when it agreed to 1) enter into the Contract; 2) maintain the terms of the Contract during performance; 3) add E-Business products

to the Contract; and 4) the terms under which maintenance for E-Business products would be provided.

108.   Because Oracle's representations regarding its commercial pricing and discounting practices that were submitted to GSA for purposes of 1) obtaining the Contract; 2) maintaining the discount structure set forth in the Contract during performance; and 3) modifying the Contract, were false, each and every claim for payment submitted by Oracle to the United States under the Contract was a false claim.

109.   By reason of Oracle's false representations and false claims, the United States was damaged in an amount to be determined at trial.

### Count 5

### Constructive Fraud

110.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 96 above, as if fully set forth herein.

111.   Oracle falsely represented its commercial pricing and discounting practices in its negotiations with GSA prior to the formation of the Contract and in submissions made to GSA during the performance of the Contract. Oracle knew that these representations were false at the time that it made them.

112.   Oracle's false representations were made with the intent to induce the GSA representatives to believe that the representations were accurate and with the intent that GSA would rely on Oracle's representations in 1) agreeing to the original Contract terms; 2) keeping those terms in place during the performance of the Contract; and 3) modifying the Contract.

113.   By reason of its reliance on Oracle's false representations, the United States was

-40-

damaged in an amount to be determined at trial.

## Count 6

### Fraud By Omission

114.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 96 above, as if fully set forth herein.

115.   Under the terms of the Solicitation and the Contract, Oracle had a duty to disclose "accurate, complete, and current" information regarding its commercial discounting and pricing practices to the GSA during the negotiations for and performance of the Contract.

116.   Oracle concealed material facts from the GSA regarding its discounting and pricing policies during the negotiations for and performance of the Contract.

117.   At all times during the negotiation for and performance of the Contract, Oracle knew that if it did not disclose its actual sales practices for sales to non-GSA customers, GSA would be unaware of those practices, would rely on the inaccurate and incomplete information that Oracle was providing, and would not request that Government purchasers receive these higher discounts.

118.   By reason of Oracle's concealment of certain discounts that it was providing to non-GSA customers, and the United States reliance on the false commercial sales practices information that Oracle disclosed to the United States, the United States was damaged in an amount to be determined at trial.

## Count 7

### Payment by Mistake

119.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 96 above, as if fully set forth herein.

120.   Defendants caused the United States to make payments for Oracle products based upon the United States' mistaken beliefs that Oracle had 1) complied with the Contract; 2) provided the Government with "accurate, complete, and current" pricing and/or sales data; 3) submitted truthful certifications of compliance during performance of the Contract; and 4) was complying with its PRC obligations under the Contract. In such circumstances, the payments made by the United States to Oracle were made by mistake and not authorized.

121.   The Government awarded the Contract to Oracle, modified the Contract, and paid inflated payments on claims arising from the Contract in reliance on Oracle's representations.

122.   Oracle's representations were material both to the Government's decision to award the Contract to Oracle and to the payments it made to Oracle under the Contract.

123.   As a result of those mistaken payments, the United States has sustained damages in an amount to be determined at trial.

## Count 8

### Unjust Enrichment

124.   Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 96 above, as if fully set forth herein.

125.   By reason of the Government's payments under the Oracle GSA MAS Contract and other Contracts with Oracle, Oracle received money to which it was not entitled and has thereby been unjustly enriched in an amount to be determined at trial.

### Prayer for Relief

WHEREFORE, Plaintiff, the United States of America, prays for judgment against Oracle as follows:

A.   On Count 1, pursuant to the False Claims Act, for judgment against Defendants for statutory penalties and damages as provided in the False Claims Act and for such other relief as the Court deems just and proper;

B.   On Count 2,  pursuant to the False Claims Act, for judgment against Defendants for statutory penalties and damages as provided in the False Claims Act and for such other relief as the Court deems just and proper;

C.   On Count 3, for judgment against Defendants in an amount to be determined at trial.

D.   On Count 4, for judgment against Defendants in an amount to be determined at trial.

E.   On Count 5, for judgment against Defendants in an amount to be determined at trial.

F.   On Count 6, for judgment against Defendants in an amount to be determined at trial.

G.   On Count 7, for judgment against Defendants in an amount to be determined at trial.

H.    On Count 8, for judgment against Defendants in an amount to be determined at

trial.

## JURY TRIAL DEMAND

The United States demands trial by jury as to all issues so triable.

Respectfully submitted,

TONY WEST
Assistant Attorney General

NEIL H. MACBRIDE
United States Attorney

Dated: 07/29/2010

s/Richard Sponseller
RICHARD W. SPONSELLER
VSB: 39402
Assistant United States Attorney
United States Attorney's Office
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: 703.299.3700
Fax: 703.299.3898
Email: Richard.sponseller@usdoj.gov

s/David Wiseman
JOYCE R. BRANDA
SARA MCLEAN
DAVID B. WISEMAN
CHRISTELLE KLOVERS
Civil Division
U.S. Department of Justice
601 D Street, NW, Room 9032
Washington, DC 20004
Tel: 202.514.0132
Fax: 202.307.3852
Email: david.wiseman@usdoj.gov

Attorneys for the United States

-44-