UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,
*ex rel.* PAUL FRASCELLA,

     Relator,

  v.

ORACLE CORP., *et al.*,

     Defendants.

Case No. 1:07cv529 (LMB/TRJ)

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM</u>**

Respectfully submitted,

_____/s/_____
Kristen E. Ittig (VSB #74362)
ARNOLD & PORTER LLP
1600 Tysons Boulevard, Suite 900
McLean, VA  22102-4865
Direct:  703.720.7035
Facsimile:  703.720.7399
Email:  Kristen.Ittig@aporter.com

Drew Harker (admitted *pro hac vice*)
John N. Nassikas III (VSB #24077)
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C.  20004
Telephone:  202.942.5000
Facsimile:  202.942.5999
Email:  John.Nassikas@aporter.com
Email:  Drew.Harker@aporter.com

*Counsel for Defendants Oracle Corp., Oracle America , Inc.*

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT AND SUMMARY ........................................................2

II.  FACTUAL BACKGROUND ................................................................................4

    A.  GSA MAS Contracts ........................................................................4

    B.  Oracle's 1998 MAS Contract ............................................................5

        1.  Negotiations and Award ........................................................5

        2.  E-Business Modification ........................................................7

        3.  Oracle's PRC Compliance ......................................................7

    C.  Government's Allegations ..................................................................8

        1.  1997 Disclosures ...................................................................8

        2.  PRC Reporting .....................................................................9

        3.  PRC Compliance ...................................................................9

        4.  E-Business Disclosures ..........................................................9

III.  ARGUMENT ...................................................................................................9

    A.  The Government's Claims Are Barred in Part by the Statute of
        Limitations ....................................................................................10

        1.  All counts based upon the 1997 Disclosures are untimely ...............11

        2.  A portion of the claims based upon the PRC Reporting and
            PRC Compliance allegations are untimely ........................................21

    B.  The Complaint's Four Primary Allegations are "Naked Assertions of
        Wrongdoing" That Lack Fundamental Elements Required to State a
        Plausible Claim under any Theory of Liability ....................................21

        1.  The Government's claims may not rely upon the 1997
            Disclosures .............................................................................23

        2.  The PRC Reporting allegations are contradictory and fail to
            identify an actual PRC violation ...............................................26

        3.  The PRC Compliance allegations do not allege any
            wrongdoing .............................................................................27

        4.  The Government has improperly recast Oracle's disclosures
            regarding the 2001 E-Business Modification to support its
            claims .....................................................................................28

    C.  The Complaint's Four Primary Allegations Are Not FCA Violations ...............30

        1.  The Complaint alleges no affirmative misrepresentations
            related to PRC Reporting and PRC Compliance ...............................31

        2.  The Complaint does not identify a single false claim for
            payment arising out of the PRC Reporting and Compliance
            allegations ..............................................................................32

        3.  The 1997 and E-Business Disclosures do not relate to a claim
            for payment .............................................................................34

IV.  CONCLUSION ................................................................................................36

Defendants Oracle Corp. and Oracle America, Inc. (collectively "Oracle"), by and through undersigned counsel, respectfully submit this Memorandum of Law in support of their Motion to Dismiss the Complaint for Failure to State a Claim pursuant to Federal Rules of Civil Procedure ("FRCP") 12(b)(6).

## I.    PRELIMINARY STATEMENT AND SUMMARY

The Government's Complaint is a hodgepodge of inadequately pled, inconsistent, and, in many cases, untimely theories of liability that no set of facts can rescue.  In critical respects, the Government even misrepresents the content of documents in a desperate attempt to manufacture a case.  This Court should reject the Government's "throw it at the wall and see if it sticks" approach to pleading and dismiss the Complaint in its entirety.

The Complaint's most obvious problem is timeliness.  One of its primary allegations is that Oracle made false disclosures relating to discounting practices to the General Services Administration ("GSA") during 1997 contract negotiations.  But this allegation ignores a 1998 pre-award audit of Oracle's discounting practices, which was distributed to a host of responsible Government officials.  Rather than taking action then, the Government sat on its hands, and in the subsequent thirteen years, witnesses have died, memories have faded and documents have disappeared -- the very reasons that statutes of limitations exist. Claims based upon these allegations are out of time.  The Complaint also alleges that Oracle violated the GSA-mandated Price Reductions clause ("PRC").  These allegations are also time-barred.  Every alleged false claim or common law contract claim related to the PRC that occurred before May 29, 2001, and every alleged common law fraud related to the PRC that occurred before May 29, 2004 must be dismissed.

The Complaint's allegations have other fatal legal flaws that undermine any theory of liability.  The Government's 1997 disclosure allegations rest on Oracle's summary level

responses in an invalid, illegal form chart that GSA provided.  Unlike the other form charts used by GSA to obtain pricing information, this form did not go through notice and comment rulemaking.  The Government's claims cannot rely on a chart that it was not permitted to use in the first place.  The Complaint further alleges that Oracle made additional misrepresentations to GSA when negotiating a contract modification in 2001.  These allegations rely on selectively quoted portions of the relevant disclosure, which, when read in its entirety, are not false.  Such tactics should not be condoned and these allegations should be dismissed because these allegations do not support a claim for relief.

The Government's various PRC allegations are a hash of theories in search of supporting facts.  On the one hand, the Government complains that Oracle's PRC compliance program, which imposed a high degree of pricing discipline on its sales force, worked so well that "any proposed deal" that could trigger the PRC clause was "routinely" restructured to be compliant, thus not triggering the clause.  The Government spins good compliance into fraud.  On the other hand, the Government in the same part of the Complaint also declares that Oracle "routinely" granted discounts that in fact triggered the clause.  Uncertain about what "routine" worked best for it, the Government appears to be trying to cover all of its bases, relying on theories that are obviously incompatible.  The most glaring weakness in both theories, other than their inherent inconsistency, is the absence of any allegation that Oracle ever gave a deeper discount to a Basis of Award ("BOA") customer in violation of the PRC.  To add to the confusion, the Government also quotes the PRC provision regarding changes to price lists, but then never alleges that Oracle changed its price list.  This "tails I win, heads you lose" approach to pleading should be rejected.

The Complaint allegations also lack elements required to state a viable False Claims Act ("FCA") theory.  The 1997 and 2001 disclosure allegations reference no false claims for

payment, the *sine qua non* of False Claims Act liability.  The 1998 Contract with GSA was not a contract at all in the sense that the GSA was not bound to purchase an iota of goods or services under this document.  Rather, orders for goods and services, which then led to claims for payments and reimbursement by the Government, were placed later and constituted binding contracts.  GSA even encouraged agencies to negotiate lower prices on these orders than had been negotiated by GSA.  Thus, the critical nexus between the false statement and the request for payment simply does not exist in this case.

Moreover, the Government's PRC allegations do not contend that Oracle lied about or otherwise misrepresented its PRC compliance.  As such, these allegations boil down, at worst, to plain vanilla contract breaches masquerading as False Claims Act violations.  The Complaint also fails to identify a single false claim for payment related to the PRC allegations.

## II.      FACTUAL BACKGROUND

### A.      GSA MAS Contracts

GSA negotiates, awards, and manages Multiple Award Schedule ("MAS") contracts, which provide federal agencies with a simplified process for obtaining commercial supplies and services at fair and reasonable prices.  48 C.F.R. § 8.402; (*see also* Compl. ¶ 18.)  To evaluate whether offered prices are reasonable, GSA requires the offeror to disclose its commercial pricing policies and sales practices, and it conducts various analyses of those disclosures.  For example, GSA "compare[s] the terms and conditions of the MAS solicitation with the terms and conditions of agreements with the offeror's commercial customers."  48 C.F.R. § 538.270(c); (*see also* Compl. ¶ 23.)  If it believes the offeror's disclosed policies and practices do not accurately reflect the actual discounts offered in those commercial sales, GSA also reserves the right to request and audit transactional data reflecting an offeror's actual commercial sales.  *See* 62 Fed. Reg. 44,517, 44,519 (Aug. 21, 1997).

GSA contracts include the PRC, which requires contractors to maintain a static relationship between GSA's negotiated discounts or prices and those for a designated customer or category of customers, identified and agreed upon during contract negotiations and known as the BOA customer. (Compl. ¶¶ 25-26.) If that relationship changes during the life of the MAS contract, the contractor must disclose the change to GSA and offer discounts or prices that restore the relationship. (*Id.*)

### B.     Oracle's 1998 MAS Contract

#### 1.     Negotiations and Award

When Oracle responded to MAS solicitation number FCI-96-DL0001B ("Solicitation") on August 5, 1997, it already had a long-established relationship with the GSA MAS program. (Compl. ¶ 29-31.) Oracle was familiar with the previous disclosures and negotiations process. (*See* Compl. ¶ 29.) In 1997, GSA significantly revised the MAS negotiation regulations. *See* 62 Fed. Reg. 44,518 (Aug. 21, 1997). These changes brought new rules and disclosure forms with which neither Oracle nor GSA had experience.

Oracle's August 5, 1997 response to the Solicitation was the first correspondence in negotiations that ran approximately sixteen months, until December 1998. (Compl. ¶ 31, 45.) GSA required Oracle to complete a New Commercial Practices Chart ("CPC") as part of its initial disclosures. (*See* Compl. ¶¶ 31, 33; *see also* Ex. 1.) [1] The CPC was neither the newly drafted Commercial Sales Practices ("CSP") form made applicable by regulatory changes in

---

[1] This Court "may consider documents attached to the complaint, *see* FRCP 10(c), as well as those attached to [a] motion to dismiss, so long as they are integral to the complaint and authentic." *See Sec. of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). The attached Solicitation excerpts, which consist of the CPC and applicable instructions, are both. One act of fraud alleged in the Complaint is based exclusively upon selective CPC quotations. (*See* Compl. ¶¶ 33-34, 50-57.) Moreover, the Government created the attached documents and made them available to the public.

1996 and 1997, nor the standard Discount Scheduling and Marketing Data ("DSMD") form used in prior MAS contract negotiations.  (*Compare* Ex. 1 *with* 58 Fed. Reg. 32,085 (June 8, 1993); 61 Fed. Reg. 6164 (Feb. 16, 1996); 62 Fed. Reg. 44,517 (Aug. 21, 1997).)

Oracle completed the CPC in the form in which it was issued.  (*See* Compl. ¶ 33.) Although all of the alleged fraudulent disclosures that Oracle made were contained in the CPC, submission of that chart marked the *beginning* of the 16-month negotiation.  (*See* Compl. ¶ 39.) In addition to numerous Oracle submissions, there were at least nine subsequent in-person GSA-Oracle negotiations during the year following Oracle's November 4, 1997 submission (the last one that allegedly contained a false disclosure).  (*Id.*)

Although not mentioned in the Complaint, GSA conducted an audit of Oracle's commercial transactions and discounting.  On April 2, 1998, GSA requested a formal audit "to verify that the commercial practices information submitted in [Oracle's] offer [was] current, accurate, and complete."  (*See* Exs. 2, 3 at 2.)  GSA's Office of Inspector General ("OIG") audited transaction data for all of Oracle's Government and commercial sales over a six-month period, and issued a report on September 1, 1998.  (Ex. 3.)  The report included an analysis of the type, nature and extent of discounts that Oracle provided to commercial customers in software licensing transactions.  (*Id.* at 3, 4-5.)  At least seven copies of the audit report were distributed. (*Id.* at A-1.)

Negotiations culminated in a December 1, 1998 best and final offer ("BAFO").  (Compl. ¶¶ 40-41; Ex. 4.)  The BAFO language confirms that Oracle disclosed far more about its commercial practices during the 16-month negotiation than is reflected in the September 30,

1997 and November 4, 1997 CPC charts.  (*See* Exs. 4-5.)[2]  Indeed, in the BAFO, Oracle notes

that the details regarding its commercial practices "have been provided during negotiations and

have also been reviewed by GSA auditors."  (*Id.* at 2.)  This language refers to the 1998 GSA

OIG audit.  (*See* Ex. 3.)

### 2.   E-Business Modification

In May 2001, GSA and Oracle modified the 1998 Contract to reflect that Oracle had

recently overhauled the way in which it licensed software commercially.  (*See* Compl. ¶ 80.)

Oracle made new disclosures regarding its commercial sales practices.  (Compl. ¶ 81.)  In a May

2, 2001 letter to GSA, Oracle provided an overview of Oracle's E-Business discounting policies

(which were generally based upon order volume, but subject to a number of exceptions) and

explained that "[d]etailed application of Oracle business practices can be experienced on

Oracle's electronic commerce website, the Oracle Store."  (Ex. 6 at Att. 2.)[3]

### 3.   Oracle's PRC Compliance

GSA and Oracle agreed that the 1998 Contract BOA customer would be "sales of

Oracle's perpetual software licenses to Oracle's U.S. commercial end-user customers" (Compl. ¶

43; Ex. 4), and that the PRC would not apply to software license transactions "in excess of

$200,000 per order."  (Compl. ¶ 43.)  Therefore, the 1998 Contract bound Oracle to monitor and

---

[2] The BAFO, GSA's April 2, 1998 letter and the audit report are all integral to the Complaint and authentic.  The Complaint represents the BAFO to include Oracle's "certification" that all data provided to GSA was accurate complete and current, but ignores the BAFO's description of that information, which specifically references the GSA audit.  (*See* Compl. ¶ 41; Ex. 4.)  The Government drafted the letter and audit report, and there is no dispute regarding the authenticity of the BAFO.  The Court thus may properly consider these documents.  *See Trimble Navigation*, 484 F.3d at 705. Oracle customer names have been redacted from the audit report

[3] The May 2, 2001 letter, excerpts are attached at Exhibit 6, is integral to the Complaint and authentic.  The only false E-Business disclosures alleged are contained in the May 2, 2001 letter, from which the Government selectively quotes.  (*See* Compl. ¶¶ 80-83.)  As such, the Court may properly consider it when ruling on this Motion.  *Trimble Navigation*, 484 F.3d at 705.

report any price reductions that occurred as a result of transactions with net software license fees of $200,000 or less made to commercial end-users.  (Compl. ¶ 44.)

Oracle's PRC monitoring and compliance program exceeded its PRC obligations.  Oracle made the business decision to apply the program to software license transactions with net license fees of $200,000 or less to a broader set of transactions than merely those with commercial end users.  (Compl. ¶¶ 44, 53.)  This approach helped ensure that Oracle complied with the PRC, but it also meant that Oracle's comparable commercial license sales of $200,000 or less could not include a discount in excess of that on the 1998 Contract.  (Compl. ¶¶ 53, 77.)  As the internal e-mails cited in the Complaint illustrate, Oracle would not and did not approve transactions that triggered the PRC.  (Compl. ¶ 72-78.)

### C.    Government's Allegations

The Complaint contains four distinct acts of alleged wrongdoing, (*see* Compl. ¶ 4), but never links any of these acts to the eight counts in the Complaint.  This Motion adopts the Government's convention, and analyzes the four allegations independently:

#### 1.    1997 Disclosures

The Government alleges that Oracle fraudulently induced GSA to enter into the 1998 Contract by making the following false representations with regard to Oracle's commercial software licenses: (a) discounts were based upon customer category (Compl. ¶¶ 51-54), (b) discounts fell within certain disclosed ranges (Compl. ¶¶ 55-57), (c) "non- standard" discounts were used in less than five percent of the total number of commercial transactions," (Compl. ¶¶ 58-60), and (d) single license order discounts were based upon the value of the individual transaction (Compl. ¶¶ 61-63).  These allegedly fraudulent disclosures were all contained in the CPC (or explanatory notes thereto) that Oracle submitted on September 30 and November 4,

1997 during the initial stage of the negotiations and prior to numerous subsequent disclosures and GSA's own audit of Oracle's commercial discounting practices.  (Compl. ¶¶ 33-37.)

### 2.    PRC Reporting

Although the nature of the alleged breach is unclear, the Government seems to assert that Oracle breached the PRC by failing to report or offer to GSA certain software license discounts that Oracle purportedly gave to commercial customers.  (Compl. ¶¶ 65-66.)  The Complaint, however, does not allege that any software license discount that Oracle offered to a commercial customer disrupted the relationship between the BOA customer and the GSA price.  (*See generally* Compl.)  Similarly, the Complaint references obligations related to revised commercial price lists (*see* Compl. ¶ 27, 64), without alleging that Oracle made such revisions.

### 3.    PRC Compliance

Labeling Oracle's PRC compliance program as "manipulation," the Government alleges a second PRC breach.  (Compl. ¶¶ 67-78.)  Contrary to the PRC Reporting allegations, the Government alleges that Oracle routinely and improperly monitored its commercial transactions to prevent the PRC from being triggered.  (*Id.*)

### 4.    E-Business Disclosures

The Government alleges that Oracle fraudulently induced GSA to modify the 1998 Contract by (a) falsely representing that the E-Business pricing structure set discounts based entirely upon transaction size and pursuant to a discount chart, and (b) failing to correct previous false disclosures during the modification process.  (Compl. ¶¶ 80-86.)

## III.    ARGUMENT

The Complaint is a morass of untimely and legally deficient allegations.  Although it is unclear how the foregoing alleged acts relate to the Complaint's eight counts, it is clear that each alleged act suffers from irreparable and fundamental flaws, requiring dismissal of the entire

Complaint.  To survive dismissal under FRCP 12(b)(6), a complaint's factual allegations must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1950-51 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.3 (2007)).  This plausibility standard requires more than "a sheer possibility that a defendant has acted unlawfully."  *Id.* "This approach recognizes that 'naked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint to cross 'the line between possibility and plausibility of entitlement to relief.'"  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 129 S.Ct. at 1950).

Based upon the Complaint's factual allegations, and demonstrated by the very documents upon which the Complaint relies, none of its eight counts states a facially plausible claim.  Any claim based upon the 1997 Disclosures is barred by the applicable statute of limitations, as are portions of any claims based upon the PRC Reporting or PRC Compliance allegations.  Moreover, each of the four acts alleged in the Complaint lacks one or more essential elements required to state a claim under any of the Complaint's counts.

### A.      The Government's Claims Are Barred in Part by the Statute of Limitations

The 1997 Disclosures and a significant portion of the actions underlying the PRC Reporting and Compliance allegations occurred outside of the applicable limitations periods.  The statute of limitations ("SOL") for Counts 1 and 2, asserting violations of the FCA, is six years.  *See* 31 U.S.C. § 3731(b)(1) (2006) ("FCA SOL").  The SOL applicable to Counts 3 to 8 ("Common Law SOL"), asserting various common law fraud, contract or quasi-contract claims is either three years (for the fraud claims) or six years (for the contract and quasi-contract claims).  *See* 28 U.S.C. § 2415 (2006)**;** *United States v. Intrados Int'l Mgmt. Group*, 265 F.Supp.2d 1, 12 (D.D.C. 2002) (applying 28 U.S.C. § 2415 to common law claims).

### 1.      All counts based upon the 1997 Disclosures are untimely

Oracle made the 1997 Disclosures in September and November 1997; the alleged "confirmations" of these statements occurred between 1998 and 2001 (*See* Compl. ¶ 87) - between nine and thirteen years ago. Accordingly, the Government's 1997 Disclosure claims can only be timely if (a) the tolling provisions of both SOLs apply. Moreover, the Government may not further extend the SOL under relation back rules because the 1997 Disclosures do not relate back to the Relator's complaint.

### a.      The tolling provisions do not apply

The FCA and Common Law SOL contain nearly identical tolling provisions that apply when "facts material to the right of action" are unknown and reasonably could not be known by "the official of the United States charged with responsibility to act in the circumstances" ("Responsible Official"). *See* 31 U.S.C. § 3731(b)(2) (2006); 28 U.S.C. § 2416(c) (2006). The FCA provision permits extension of the six-year SOL to up to ten years if the Government files its Complaint within three years of the date upon which the material facts are known or should have been known by the Responsible Official. 31 U.S.C. § 3731(b)(2) (2006). The Common Law SOL simply excludes any period of time during which the Responsible Official did not know or reasonably should not have known the material facts. 28 U.S.C. § 2416(c) (2006).

After GSA's 1998 audit of Oracle's disclosures, the Responsible Official knew the material facts underlying any claim based upon the 1997 Disclosures. Accordingly, the applicable SOL began to run at that time and was not tolled.

### (i)      In 1998, the GSA OIG knew or reasonably should have known facts material to any claim based upon the 1997 Disclosures

As part of the 1998 Contract negotiations, the GSA OIG audited six months of Oracle transactional data to determine Oracle's actual discounting and pricing practices. The sole

reason for a pre-award audit is to probe the offeror's actual pricing and discounting practices when there is uncertainty surrounding the disclosures.  *See* 62 Fed. Reg. 44,518, 44,519 (Aug. 21, 1997) (explaining that pre-award audits are limited to instances in which the offeror deviates "from its policies or practices to such an extent that the policies or practices alone cannot be relied upon" in determining "that the prices offered are fair and reasonable").  GSA audited the very facts that Oracle allegedly misrepresented, and in 1998, it knew or should have known about the facts material to all counts arising out of the 1997 Disclosures.

The audit's scope further confirms that the GSA OIG knew or should have known about the facts material to any 1997 Disclosures claim.  GSA's policy statement directs that audits be limited in scope to the minimum disclosures needed to ensure a fair and reasonable price:  "In cases where information is requested, the request will be targeted to limit the submission of sales data to that needed by the contacting officer to establish whether the price is fair and reasonable."  *Id*.  Here, the GSA OIG received six months of data for all of Oracle's sales.  (Ex. 3 at 2.)  Thus, the audit's purpose was to determine whether the sales data confirmed Oracle's disclosures which would support the fairness and reasonableness of Oracle's proposed prices.

The 1998 audit had the broad mandate of comparing Oracle's pricing and discounting practices to its representation of those practices in its previous disclosures.  GSA's letter requesting the audit made clear that "the primary purpose of the audit office's examination will be to *verify that pricing information submitted in your offer is current, accurate, and complete*." (Ex. 2 (emphasis added).)  An objective of the report was to understand "Oracle's commercial sales policies and practices," and determine "[w]hich customers (or class of customers) received Oracle's best pricing (deepest discounts)."  (Ex. 3 at 2.)  GSA further explained that the data and

requested records were "needed to *verify [Oracle's] adherence to the pricing policy or practices described in the Oracle offer . . .*" (Ex. 2 (emphasis added).)

The audit report's findings establish that the GSA OIG knew or should have known about the facts material to any claim based upon the 1997 Disclosures.  With regard to software licensing, the report concluded that Oracle's offer to GSA did not propose a fair and reasonable price to the Government because some Oracle commercial customers with small average order sizes received 40% discounts, while Oracle only offered GSA a 20% discount for the same order size.  (Ex. 3 at 4.)  The report also noted that Oracle offered commercial software license discounts as high as 70%, but concluded that those transactions were not comparable to Government purchases.  (*Id.* at 5.)  Having taken the opportunity to assess the size, type, and frequency of Oracle's discounts to commercial customers, the GSA OIG knew or should have known the material facts underlying any claim based upon 1997 Disclosures.

### (ii)     The GSA OIG is the Responsible Official

The Fourth Circuit has broadly interpreted the phrase "Responsible Official" in the context of the Common Law SOL.  *United States v. Boeing Co., Inc.*, 845 F.2d 476, 481-82 (4th Cir. 1988) (*rev'd on other grounds sub nom*, *Crandon v. United States*, 494 U.S. 152 (1990)).  In that case, the Government alleged that Boeing violated a conflict of interest statute by making large severance payments to former Boeing employees.  Since Boeing made several of these payments more than three years before it entered into a tolling agreement with the Government, and thus claims based on them would be barred, the Government relied on the Common Law SOL tolling provision.  *Id.*

The Government argued that the Responsible Official was the Department of Defense contracting officer ("CO") who learned the relevant facts in a memo from the Defense Contract Audit Agency ("DCAA").  *Id.* at 482.  The Fourth Circuit, however, rejected this position,

finding that the DCAA auditors reasonably qualified as "official[s] of the United States charged with the responsibility to act in the circumstances":

> The government fails to explain, however, why DCAA employees charged with auditing responsibilities were not charged with the responsibility to act here. Conclusory statements that the contracting officer was the first official with the knowledge and ability to recognize a conflict do not justify tolling the statute under § 2416(c) and are refuted by the fact that DCAA employees and managers recognized that a problem existed. The decision to refer that problem to the contracting officer does not diminish their ability to act.

*Id.*

In this case, both the CO <u>and</u> GSA auditors knew or should have known of the material facts underlying the 1997 Disclosure claims by September 1998. Moreover, the role played by the GSA OIG was nearly identical to the role played by DCAA in *Boeing*. DCAA audited Boeing's overhead calculations, which included the allegedly improper severance payments. The fact that DCAA reported the payments to another government entity (in that case, the CO) did not exclude DCAA from being "charged with the responsibility to act in the circumstances." Similarly, GSA OIG audited six months of Oracle transactions to verify the sales and discounting practices that Oracle previously disclosed. Under the ruling set out in *Boeing*, the GSA OIG was clearly "charged with the responsibility to act in the circumstances."

The Responsible Official's identity under the FCA is an open question of law in the Fourth Circuit. The issue was raised but not decided in *United States ex rel. Sanders v. N. Am. Bus Indus., Inc.*, 546 F.3d 288, 296 n.2 (4th Cir. 2008). The analysis employed by the court in *Sanders*, as well as the holding in *Boeing*, however, strongly suggest that the Fourth Circuit will not limit Responsible Official to DOJ officials in FCA cases.

In *Sanders*, the Fourth Circuit found that Congress adopted the Responsible Official language used in the FCA SOL from the Common Law SOL tolling provision. 546 F.3d at 294.

This ruling is consistent with the legislative history of the 1986 FCA amendments, which added the tolling provision.  When debating the 1986 FCA amendments, the Senate stated:  "The committee has added a tolling provisions [ sic ] to the False Claims Act *which is adopted directly from 28 U.S.C. § 2416(c).*"  132 Cong. Rec. S11,238 (1986) (Senator Grassley's statement explaining amendments) (emphasis added).

Similarly, in Congressional testimony supporting proposed changes to the FCA, the Assistant Attorney General, Civil Division, stated that:

> The general statute of limitations for the Federal Government, 28 U.S.C. § 2416(c) does include a tolling provision.  The problem is the False Claims Act, as I understand it at least, has its own statute of limitations and is not subject to the general provision.  So what we are proposing to do is to conform the False Claims Act to the general rule under common law in most States, and for that matter, for the Federal Government, to provide this limited tolling period where the fraudulent conduct has been concealed, as it frequently is, from the Government, and we don't find out about it until later.

*False Claims Act Amendments: Hearings Before the H. Subcomm. on Admin. Law and Governmental Relations of the H. Comm. on the Judiciary*, 99th Cong. 118, 159 (1986).  If Congress intended Responsible Official to be limited to DOJ, it would have expressly stated so in the statute.

Cases from other jurisdictions have similarly concluded that the Responsible Official under 31 U.S.C. § 3731(b)(2) is not limited to DOJ attorneys.  *See e.g.*, *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 777 F. Supp. 195, 205 (N.D.N.Y. 1991) (dismissing FCA claims where "the facts material to the relator's cause of action were known in 1979 by the senior officials in charge of the Black Hawk project"), *aff'd on other grounds*, 985 F.2d 1148 (2d Cir. 1993); *United States v. Kensington Hosp.*, No. 90-5430, 1993 WL 21446, *14 (E.D. Pa. Jan. 14, 1993) (rejecting Government position that the Responsible Official was limited to DOJ officials, where FBI and IRS agents knew material facts underlying the fraud claim).

Consistent with these cases, and the Fourth Circuit's interpretation of nearly identical language in *Boeing*, this Court should find that the either the CO or the GSA OIG was the Responsible Official under the FCA and Common Law SOL tolling provisions.

> **(iii)  Even under a narrow reading of the FCA, the Responsible Official reasonably should have known facts material to claims based upon the 1997 Disclosures**

Even if Responsible Official is limited to DOJ attorneys, the FCA SOL still began to run no later than September 1, 1998 when the GSA OIG issued its audit report.  Courts that have narrowly construed the definition of Responsible Official have nonetheless recognized that knowledge by Government officials outside of DOJ may trigger the three-year clock under the tolling provision's "reasonably should have known" clause.  *See United States v. Tech Refrigeration*, 143 F. Supp. 2d 1006, 1010 (N.D. Ill. 2001); *United States v. Inc. Village of Island Park*, 791 F.Supp. 354, 374 (E.D.N.Y. 1992).  In *Tech Refrigeration*, after holding that Responsible Official, as used in § 3731(b)(2), means pertinent DOJ officials, the court continued:

> That does not mean that the statute of limitations begins to run only when a responsible Department of Justice official actually knows the material facts: the statute says the clock starts running when the material facts "are known or reasonably should have been known" to the DOJ.  It is possible to conceive of circumstances in which the statute might begin to run before the DOJ is actually advised of the pertinent facts.

143 F. Supp. 2d at 1009.

Similarly in *Island Park*, after construing Responsible Official to mean "an official within the Department of Justice with the authority to act in the circumstances," the court held:

> However, it does not necessarily follow, as the government argues, that the limitations period under Section 3731(b) was tolled until lawyers at DOJ read about the Island Park affair in a newspaper article.  Rather, the limitations period was tolled until "the facts material to the right of action [were] known or reasonably should have been known" by that DOJ official.  That is, under the "reasonably should have been known" standard, the limitation

period under Section 3731(b) may run even while officials at DOJ
are unaware of the "facts material to the right of action."

791 F. Supp. at 363.  The court found that DOJ should have known about the alleged fraud on

"the day on which HUD released an audit report that alleged extensive wrongdoing by Island

Park officials and residents." *Id.*  The Court reasoned that the report "was widely disseminated

throughout the United States government" and that "any one of the many offices to which it was

sent could have-and should have-referred the matter to the Department of Justice."  *Id.*

In this case, as in *Island Park*, DOJ *should have known* about the GSA audit report when

it was distributed in 1998, even if it actually learned of the report at some later point in time.

According to the report distribution list, at least seven copies of the report were distributed to

four different offices.  Moreover, one of the recipients was the GSA Assistant Regional Inspector

General for Investigations.  The Office for Investigations is the section of GSA charged with

investigating fraud.  *See* http://www.gsaig.gov/invest.htm.  The OIG is directed to refer possible

fraud matters to DOJ.  John W. Chierichella & Jonathan S. Aronie, *Multiple Award Schedule*

*Contracting* 72-73 (2002).

Thus, regardless which interpretation is adopted, the SOL began to run on September 1,

1998 because the Responsible Official knew or should have known about the material facts

underlying the theory.  The Government should have filed all FCA and common law contract or

quasi-contract claims based upon the 1997 Disclosures no later than September 1, 2004, and

should have filed all common law fraud claims based upon the 1997 Disclosures no later than

September 1, 2001.  Thus, the Court should dismiss all claims based on the 1997 Disclosures.

> **b.      Claims based upon the 1997 Disclosures do not relate back to
>          the Relator's Complaint under the FCA**

To the extent that the Government attempts to further extend the SOL by arguing that the

Complaint relates back to the Relator's complaint, this position is fatally flawed.  The Federal

Rules permit late-filed pleadings to relate back to timely-filed pleadings when "the law that provides the applicable statute of limitations allows relation back." Fed. R. Civ. P. 15(c)(1)(A).

Relation back under the FCA is substantially the same as that in FCRP 15(c)(1)(B), which allows relation back when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading." Despite this similarity, cases interpreting Rule 15 are of limited value in an FCA context because they look to whether the timely-filed complaint gave the defendant adequate notice of the amended claims within the limitations period. *See, e.g., Goodman v. Praxair, Inc.*, 494 F.3d 458, 468 (4th Cir. 2007); *Grattan v. Burnett*, 710 F.2d 160, 163 (4th Cir. 1983) (if there is a factual nexus between the original pleading and the amendments, they will relate back so long as the defendant had notice and is not prejudiced by their addition). However, "[t]his focus upon notice is in tension with the requirement that a [relator's] complaint alleging a violation of the FCA be filed under seal and not served 'on the defendant until the court so orders.'" *United States ex rel. Miller v. Bill Harbert Int'l Constr.*, 608 F.3d 871, 880 (D.C. Cir. 2010).

In deciding whether a Government complaint in intervention relates back, the *Harbert* court concluded "the inquiry cannot be whether the defendant had actual notice of the claim before the statute of limitations had run." *Id.* Instead, it stated there should be no relation back "when the new pleading 'asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.'" *Id.* at 881 (quoting *Mayle v. Felix*, 545 U.S. 644, 650 (2005)).

None of the 1997 Disclosure allegations relate back because such claims differ in both time and type from the claims set forth in the Relator's complaint. The Relator's allegations are

limited to claims that Oracle manipulated its sales under the 1998 Contract in a purported effort to avoid its obligations under the PRC:

- referring the customer to resellers who then sold the license (Relator's Compl. ¶ 22),

- selling a limited-use technology license along with a full-use applications license, while informing the commercial customer that the limit on the use of the technology would not be enforced (Relator's Compl. ¶ 23-24),

- selling term licenses without enforcing the term (Relator's Compl. ¶ 24),

- whiting out prices on documents to obscure the discount (Relator's Compl. ¶ 25), and

- using price holds.  (Relator's Compl. ¶ 34.)

The Relator's allegations all pertain to the performance of the 1998 Contract; in contrast, the facts underlying the 1997 Disclosures necessarily predate the performance.  None of the Relator's claims could have arisen until more than a year after the 1997 Disclosures occurred. Moreover, the type of facts supporting claims based upon the 1997 Disclosures are quite different from those alleged by the Relator, which have nothing to do with Oracle's representations regarding its "standard" and "non-standard" discounting practices as of mid to late 1997.  Instead, the Relator's Complaint focuses on contract *performance*, and alleges a scheme to avoid PRC compliance by restructuring a single type of commercial software license sales - those with a total value of $200,000 or less.  In short, the 1997 Disclosure claims relate to preaward negotiations and representations regarding overall commercial business practices, while the Relator's claims focus on post-award contract performance and the structure of specific and limited commercial transactions.  Because the 1997 Disclosures allegations do not relate back to the Relator's Complaint, they should be dismissed.

        **c.**      **The 1997 Disclosures do not relate back to the Relator's Complaint under Federal Rule of Civil Procedure 15**

Separate from an FCA relation-back analysis, the Complaint still fails to relate back under standard FRCP 15 caselaw.  The Fourth Circuit's test for relation back under FRCP 15 is two-pronged and emphasizes notice to prevent prejudice to the defendant.  *Grattan*, 710 F.2d at 163.  First, there must be a factual nexus between the amendment and the original complaint.  If there is a factual nexus, then, the "amended claim is liberally construed to relate back to the original complaint if the defendant had notice of the claim and will not be prejudiced by the amendment."  *Id.*  This liberal construction, however, is tempered by the need to ensure that "the policies of statutes of limitations have been effectively served."  *Goodman*, 494 F.3d at 468.

As set out above, claims based upon the 1997 Disclosures do not arise out of the same factual nexus as the Relator's claims.  Moreover, Oracle did not have notice of the claims.  Because the complaint was under seal while the government conducted its investigation, Oracle did not receive a complete copy of the Relator's Complaint until December 2009.

Finally, the policies underlying SOLs would be eviscerated if the Government were allowed to proceed with any claim based upon the 1997 Disclosures.  SOLs are intended to "protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise."  *United States v. Kubrick*, 444 U.S. 111, 117 (1979).  With regard to the 1997 Disclosures, all of the pitfalls that statutes of limitations seek to avoid are present.  First, James Bowdren, the primary GSA negotiator for the 1998 Contract, is deceased.  (*See* Ex. 7.)  Second, the Complaint does not rely upon the 1997/98 transactional data audited by GSA in 1998, which would have been the best evidence of whether the representations at issue in the 1997 Disclosures were false, and relies

instead on data from 1998 and 1999, which is more than a year after Oracle made the disclosures in question.  (*See* Compl. ¶¶ 57, 59, 62.)  Oracle infers that the Government has lost the audited transactional data.  Finally, by necessity, all claims based upon the 1997 Disclosures will require witnesses to recall what was said, intended, and understood during complex negotiations from more than 13 years ago.  Memories have no doubt faded.  These policy considerations not only confirm that the Complaint should not relate back to the Relator's Complaint, regardless of the standard applied, but also require the overall conclusion that all claims based upon the 1997 Disclosures should be dismissed as untimely.

### 2. A portion of the claims based upon the PRC Reporting and PRC Compliance allegations are untimely

The Government's PRC Reporting and Compliance allegations relate back to the Relator's May 29, 2007 Complaint, which alleged that Oracle breached the PRC.  In turn, as of May 29, 2007, the Responsible Official knew or should have known about the material facts underlying the PRC allegations.  Because the Government waited more than three years to file its Complaint, the maximum FCA SOL is six years.  31 U.S.C. §3731(b)(2) (2006).  Any PRC allegations regarding actions occurring before May 29, 2001 are thus outside of the FCA SOL, and the common law SOL for contracts and quasi-contract claims.  *Id.*; 28 U.S.C. §2415 (2006). Similarly, any PRC allegations regarding actions occurring before May 29, 2004 are outside of the common law SOL for fraud.

### B. The Complaint's Four Primary Allegations are "Naked Assertions of Wrongdoing" That Lack Fundamental Elements Required to State a Plausible Claim under any Theory of Liability

The Complaint's eight counts overlap to a great extent.  Five of the eight counts -- Counts 1, 2, 4, 5 and 6 -- assert some form of fraud.  Count 3 asserts a breach of contract and Counts 7 and 8 assert quasi-contract claims.  A key required element is missing from each of the

Complaint's four allegations -- 1997 Disclosures, PRC Reporting, PRC Compliance and E-Business Disclosures.  Accordingly, the Complaint should be dismissed in its entirety.

Material false statements are required to state a claim under the FCA.  *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784–85 (4th Cir. 1999) (setting out elements for claim under § 3729(a)(1) (pre-2009) and FCA fraud in the inducement claim); *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010) (setting out elements for claim under § 3729(a)(1)(b) (post-2009 amendment of § 3729(a)(2)).  Similarly, all of the Complaint's common law fraud counts require material false statements or omissions in order to state a claim.  *See Ware v. Scott*, 257 S.E.2d 855, 857 (Va. 1979) (setting out elements for common law fraud in the inducement); *White v. Potocska* 589 F.Supp.2d 631, 642 (E.D. Va. 2008) (setting out elements of common law fraud by omission, which under Virginia law is commonly referred to as "concealment").[4]  None of the Complaint's four allegations of wrongdoing allege that Oracle made material false statements or omissions and thus all four fail to state a claim.

The common law breach of contract count requires the breach of a legally enforceable obligation.  *See Pryor v. United States*, 85 Fed. Cl. 97, 104 (Fed. Cl. 2008).  Quasi-contractual claims are "inappropriate claims when there is an express contract."  *United States v. EER Sys. Corp.*, 950 F. Supp. 130, 133 (D. Md. 1996); *Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir. 1988).  Even if they were appropriate, the quasi-contract counts require impermissible retention of funds.  *Belcher v. Kirkwood*, 383 S.E.2d 729 (Va. 1989) (quoting *Robertson v.*

---

[4] This Court applies Virginia's choice of law rules by default, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941), and under those rules, Virginia law applies to the Government's common law fraud counts.  *See Insteel Indus. Inc. v. Costanza Contracting Co., Inc.*, 276 F. Supp. 2d 479, 486-87 (E.D. Va. 2003).

*Robertson*, 119 S.E. 140, 140-41 (Va. 1923) (describing an unjust enrichment claim: "This kind of equitable action, to recover back money, which ought not in justice to be kept, is very beneficial, and therefore much encouraged.  It lies only for money which, *ex aequo et bono,* the defendant ought to refund....")).  Neither the contract nor the quasi-contract counts allege that Oracle breached a legally enforceable obligation or accepted funds that it was not entitled to retain; the entire Complaint must be dismissed for failure to state a claim.

### 1.   The Government's claims may not rely upon the 1997 Disclosures

The 1997 Disclosures are built on the assertion that GSA relied on the CPC that Oracle submitted in response to the Solicitation.  (*See* Compl. ¶¶ 30-48.)  As a matter of law, the CPC disclosures cannot form the basis for any of the Government's claims.  The CPC materially deviated from the format required by regulations, and was not properly part of the Solicitation.  Under well-established caselaw, the Government may not enforce illegal Solicitation provisions.

The Federal Acquisition Regulation ("FAR"), together with approved agency supplemental regulations, is the unitary regulatory system for all federal procurements.  48 C.F.R. § 1.101.  If the FAR or supplemental regulations are to be modified, the modifications are subject to notice and comment rulemaking.  48 C.F.R. § 1-501.  Non-FAR solicitation provisions, or modified provisions, require prior approval.  48 C.F.R. §§ 1.401-405, 2.101.

At least as early as 1982, GSA began collecting information regarding contractor sales, discount, and marketing practices through a DSMD.  *See* 47 Fed. Reg. 50,242 (Nov. 5, 1982).  The DSMD was the subject of notice and comment rulemaking.  *Id.*  In 1991, after consultation with the contractor community, GSA published a proposed revised DSMD that it intended to use in five "test" solicitations and on which it would seek contractor feedback.  *See* 56 Fed. Reg. 56,956 (Nov. 7, 1991).  In 1993, GSA published a revised draft DSMD that incorporated vendor feedback and that GSA said was "more clear, concise and logical than the current format."  *See*

58 Fed. Reg. 32085 (June 8, 1993).  In 1996, GSA issued another proposed disclosure format, known as a Commercial Sales Practices Format ("CSP").  *See* 61 Fed. Reg. 6164, 6167-68 (Feb. 16, 1996).  In 1997, GSA adopted the CSP form, as modified, as an interim rule effective on an optional basis for solicitations issued after March 4, 1996 and mandatory on solicitations issued after December 19, 1997.  *See* 62 Fed. Reg. 44,518 (Aug. 21, 1997).

While previous versions contained a DSMD pricing disclosure chart, the Solicitation here included the CPC.[5]  The CPC requested different categories of information, utilized undefined terms, and grouped customer types differently; critically, in contrast to the DSMD and the CSP, the CPC did not include detailed instructions, nor was it the subject of notice and comment rulemaking.  It was an unvetted, unapproved form that GSA had no authority to use.

A CO, as agent of the executive department, has only that authority actually conferred upon him.  48 C.F.R. § 1.602.  The CO's incorporation of the CPC into the Solicitation was contrary to the FAR and in excess of her authority.  When a CO utilizes an unauthorized provision, the offending provision is read out of the contract.  *See* Charles Beseler Co., ASBCA No. 22669, 78-2 BCA ¶ 13483 (CO inserted an unauthorized clause into a contract, and thus clause was an "invalid and unenforceable provision");  Guard-All of America, ASBCA No. 22167, 80-2 BCA ¶ 14462 (CO's action in selecting the inappropriate clause was "arbitrary, capricious and an abuse of discretion," and clause was read out of contract); Carrier Corporation, GSBCA No. 8516, 90-1 BCA ¶ 22409.

As a matter of law, the CPC and the disclosures made through the CPC must be read out of the Solicitation and out of the resulting contract.  Having exceeded its authority, the

---

[5] The FAR mandates that if a solicitation contains a deviation, such a deviation must be clearly marked.  48 C.F.R. § 52.103.  The Solicitation contains no such marking.

Government may not now rely on the CPC. The Government may not enforce a regulation without having first provided notice of the proposed provision and opportunity for public comment. 5 U.S.C. § 553 (2006); *Alaska Prof'l Hunters Ass'n, Inc. v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999) (notice to aircraft operators that altered previous interpretation of FAA rules was invalid because it was published without required notice). *See also* Craft Machine Works, Inc., ASBCA No. 35167, 90-3 BCA 23095. In *Craft*, the Government sought to enforce a non-FAR based economic price adjustment clause; the Armed Services Board of Contract Appeals held that clause substitution was an abuse of discretion: "When a contract clause drafted by the Government is inconsistent with law, whether the appellant inquired, protested, accepted or otherwise assumed any risks regarding the same is not controlling; the impropriety will not be allowed to stand." *See also, MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed. Cl. 405, 416 (Fed. Cl. 1992) (*abrogated on other grounds*) (improper clause must be read out and Government may not rely upon its inclusion).

The CPC disclosures are a legally insufficient basis for all claims arising out of the 1997 Disclosures. Approved disclosure charts and accompanying instructions have long been part of GSA MAS solicitations, but the CPC materially deviated from the approved format. The GSA CO exceeded her authority in including the CPC in the Solicitation, and GSA may not now rely on the CPC disclosures to support its claims. Thus, the 1997 Disclosures cannot form the basis of a claim under Counts 1, 2, 4, 5 or 6. Nor can they support a claim in Count 3, since the only contract breach alleged with regard to the 1997 Disclosures was a failure to accurately fill out a chart that the Government was not permitted to use. To the extent that the quasi-contract counts remain viable, the Government has not alleged that Oracle impermissibly retained money to which it was not entitled. Thus, Counts 7 and 8 likewise must be dismissed.

2.     **The PRC Reporting allegations are contradictory and fail to identify an actual PRC violation**

The Government's PRC Reporting allegations are vague and amorphous.  Parts of the Complaint appear to assert that during contract performance, Oracle offered better discounts to "commercial customers" (Compl. ¶ 4) and "non-GSA customers" (Compl. ¶ 65), and should have passed those discounts along to GSA.  The Complaint, however, only addresses Oracle's discounts in a chart that allegedly compares (in an undefined "preliminary analysis") Oracle's disclosed discounts based upon sales volume to its actual transactions during contract performance.  (*See* Compl. ¶ 62.)  Neither this chart, nor any other portion of the Complaint, references the BOA customer or alleges that Oracle's discounts during contract performance altered the relationship between the BOA price and the GSA price.  Absent such an assertion, Oracle's alleged discounting practices would not violate the PRC.  *See* 48 C.F.R. § 552.238-75(a) (defining a "price reduction" as "[a]ny change in the Contractor's commercial pricing or discount arrangement" applicable to that BOA customer); 47 Fed. Reg. 50,242, 50,243 (Nov. 5, 1982) (". . . the [PRC] is activated when prices are changed so as to change the relationship between the Government and the customer or category of customer upon which the award was predicated."); 59 Fed. Reg. 52,450, 52,451 ("The Price Reductions clause is intended to ensure that the Government maintains its price/discount (and/or term and condition) advantage in relation to the contractor's commercial customer(s) upon which the MAS contract is predicated.")

Other portions of the Complaint cite to PRC provisions regarding changes to price lists, (*see* Compl. ¶¶ 27, 64), but once again, the Complaint does not allege that Oracle changed its price list.  More fundamentally, the Complaint's PRC Reporting allegations are contradicted by its PRC Compliance allegations, which assert that Oracle's strict pricing discipline prevented any

transaction that would have triggered the PRC.  It is unclear how Oracle could have breached the PRC through some unidentified discounts or pricing changes, and simultaneously breached some unidentified obligation by dogmatically preventing the PRC from being triggered.  The PRC Reporting allegations are thus precisely the type of "naked assertions of wrongdoing" that FRCP 12(b)(6) was intended to eliminate and fail to state a plausible claim for relief under any count or legal theory.  *See Francis*, 588 F.3d at 193.

### 3.    The PRC Compliance allegations do not allege any wrongdoing

Claims arising out of the PRC Compliance allegations are like a joke without a punch line.  Selectively quoting a handful of emails, the Government asserts that Oracle "manipulated" its commercial software license transactions to avoid triggering the PRC, but never explains why such behavior was improper.  (Compl. ¶¶ 67-78.)  Under the 1998 Contract and the PRC, Oracle's obligation to report and grant higher discounts to GSA customers was triggered only if Oracle gave a higher discount to a BOA customer on a license sale with net license fees of $200,000 or less.  48 C.F.R. § 552.238-75.  As described below, the alleged "manipulation" is more appropriately described as PRC *compliance* through strict pricing discipline.  (Compl. ¶¶ 67-78.)

Initially, the Government alleges that Oracle would not approve software license discounts greater than those offered to GSA for commercial transactions valued less than $200,000, but would approve such greater discounts if the commercial customers agreed to purchase more, increasing the transaction value above $200,000.  (Compl. ¶¶ 72-74.)  In other words, Oracle rejected transactions that would violate the PRC, but accepted transactions that would not.  Similarly, the "workarounds" described in the Complaint simply indicate that Oracle educated its sales force on the specifics of its PRC obligations, and made sure that they knew what transactions would trigger Oracle's PRC obligation.  (Compl. ¶ 75, 77-78.)

Finally, the Complaint cites passages from a series of emails which state both "we have been trained on [GSA restrictions] and have always enforced them," and "60% of the company have been ignoring contractual terms we have in place with [GSA]."  (Compl. ¶ 76.)  When the emails are read in their entirety, however, it is clear that the underlying commercial transaction being discussed, one of less than $50,000 with a discount of 66.6%, is merely *proposed*.  (*See* Ex. 8.)[6]  There is no indication in the email, nor Complaint allegation, that Oracle actually approved this transaction.  (*Id.*)

The Government would have apparently preferred Oracle to be *less* vigilant in its PRC compliance.  A compliance program, however, is not the basis for a false claim.  The Complaint, therefore, fails to state a claim under any of the eight counts.  The Government has not alleged that Oracle made any false claims, statements or omissions relating to PRC Compliance. Accordingly, Oracle's "failure" to report certain commercial discounts and offer them to GSA fails to state a claim for fraud under Counts 1, 2, 4, 5 or 6.  Similarly, because the PRC Compliance allegations do not allege a breach of the PRC or any other contractual duty, they fail to state a claim for breach of contract under Count 3.  To the extent that either quasi-contract count (7 and 8) is viable in light of an undisputed contract, the Government's only asserted basis for relief is a non-existent legal obligation.  On these bases, the Complaint should be dismissed.

### 4.   The Government has improperly recast Oracle's disclosures regarding the 2001 E-Business Modification to support its claims

The Government alleges that Oracle made two fraudulent representations when modifying the 1998 Contract to implement the E-Business pricing structure: (1) that Oracle's discounting policy was based upon order size as reflected in the charts (Compl. ¶¶ 81-84); and

---

[6] The Court may consider the quoted email when ruling on this Motion because it is integral to the Complaint and its authenticity is not at issue.  *See Trimble Navigation*, 484 F.3d at 705.

(2) that Oracle "did not amend its previously false disclosures, including its false statements that 'non-standard discounts are used in less than five percent (5%) of the total number of commercial transactions.'" (Compl. ¶ 86).

The Government alleges that Oracle made the order size representation in a May 2, 2001 letter, and then affirmed it in a series of documents.  The Government, however, inaccurately represents the May 2, 2001 letter through selective quotation.  The Complaint quotes the following language from page 3 of the letter:  "Order Size (list price of Software License and first year Software Maintenance) determines the discount offered.  The larger the order, the larger the discount."  (Compl. ¶ 81.)  It then connects this language to a chart that appears in the letter nine pages later, and argues that the combination of the quoted language and the chart results in a false disclosure "because Oracle engaged in numerous E-Business transactions with non-GSA customers in which Oracle granted discounts that were inconsistent with the 'Commercial Discounts' that are represented in the chart presented to GSA."  (Compl. ¶ 82.)

The Complaint, however, ignores the end of the order size paragraph, which states:

> Generally all products sold on a single order are discounted at the same rate.  Circumstances such as line item license credit from purchase of a successor product, prior contract IDIQ fixed price, product migration history, product quantity, required functionality, and license use restrictions can result in additional discount for specific line items within an overall order.

(Ex. 6.)

Oracle plainly disclosed several factors that might result in discounts beyond the mere volume discount.  The Complaint does not allege that this representation, when read in its entirety, was false.  As alleged in the Complaint, the disclosure sets forth Oracle's "Discounting Policy."  The May 2, 2001 letter includes a publicly available web page which confirms that the volume discounts disclosed were indeed the discounts offered to commercial customers.

- 29 -

The Fourth Circuit has held that such selective use of documents in an effort to plead fraud is one of the reasons it permits consideration of authentic documents attached to a motion to dismiss. "What the rule seeks to prevent is the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.,* 367 F.3d 212, 234 (4th Cir. 2004).

The second alleged misrepresentation -- failure to amend "previously false disclosures, including its false statements that 'non-standard discounts are used in less than five percent (5%) of the total number of commercial transactions'"-- is equally dubious. The May 2, 2001 letter clearly discloses that Oracle's E-Business pricing structure had replaced its prior pricing structure for commercial transactions, with certain limited exceptions. (*See* Ex. 6 at 3; *see also* Relator's Compl. ¶12.) All of the previous disclosures described practices and policies that were no longer in place. There was nothing for Oracle to amend.

The manufactured "misrepresentations" are the sole bases for all counts arising out of the E-Business Disclosure allegations. In their absence, the E-Business Disclosure allegations include no plausible allegation that Oracle made a material misrepresentation, or breached any enforceable obligation. The E-Business disclosure allegations thus fail to state a claim for relief.

### C.    The Complaint's Four Primary Allegations Are Not FCA Violations

Even if one ignores the fundamental pleading flaws described above, it is clear that the Complaint does not allege an FCA violation. Liability attaches under Count 1 of the Complaint only if Oracle "knowingly present[ed], or cause[d] to be presented [to the Government] a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729 (a)(1) (2006). Similarly, under Count 2, liability only attaches if Oracle "knowingly ma[d]e, use[d], or cause[d] to be made or

used a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2) (2006). Under both provisions of the FCA, the Government must show some lie or affirmative misrepresentation to establish liability. *United States ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1461 (4th Cir. 1997) ("There can only be liability under the False Claims Act where the defendant has an obligation to disclose omitted information."); *Laird v. Lockheed Martin Eng. & Sci. Servs. Co.,* 491 F.3d 254, 262 (5th Cir. 2007) ("There is no allegation before us that [the contractor] lied about whether it was in compliance with the contract, a lie that would have been material to the fee award or so it seems."); *United States ex rel. Joslin v. Comty. Home Health of Md.,* 984 F. Supp 374, 383 (D. Md. 1997) ("As Defendants note, mere non-compliance with a statute or regulation, in the absence of a false certification, is insufficient to constitute a false statement within the meaning of the FCA.") As set out below, the Government's four allegations of wrongdoing lack either affirmative falsehoods or claims for payment.

### 1.    The Complaint alleges no affirmative misrepresentations related to PRC Reporting and PRC Compliance

Neither the PRC Reporting nor the PRC Compliance allegations allege any affirmative misrepresentation or lie. The Complaint does not allege that Oracle was required to make or made any representation about its compliance with the PRC. In the absence of any such false statement, there can be no liability under the FCA.

In essence, the Government's PRC Reporting and Compliance allegations boil down to an argument that Oracle breached the 1998 Contract, not violated the FCA. The Fourth Circuit has repeatedly rejected efforts to "shoehorn what is, in essence, a breach of contract action into a claim that is cognizable under the False Claims Act." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 373 (4th Cir. 2008); *see also First Kuwaiti Gen.*, 612 F.3d at

728.  In *Wilson*, the Court upheld dismissal, under FRCP 12(b)(6), of FCA claims alleging that KBR agreed to certain contract maintenance conditions "even though it knew it would not, and later did not, abide by those terms."  The Court drew a distinction between "an objective falsehood, as required by the FCA," and a "subjective interpretation of KBR's contractual duties."  525 F.3d at 377.  Noting the "imprecise nature of the general maintenance provisions at issue," the Court concluded that the sufficiency of KBR's performance raised, at most, a breach of contract issue, but did not state an FCA claim.  *Id.*

Regarding the PRC Reporting and PRC Compliance claims, the Government is on the same wrong track as the relator in *Wilson*, and attempts to recast a contract interpretation dispute as an FCA violation.  The issue underlying these claims -- whether Oracle's PRC compliance program "turned [the] requirement upside down" -- is just as subjective as the interpretation of KBR's contractual duties in *Wilson*.  Even if the Government's "subjective interpretation" of the PRC is correct, it is unclear how Oracle violated any duty at all, much less committed fraud.

> **2.    The Complaint does not identify a single false claim for payment arising out of the PRC Reporting and Compliance allegations**

Even if the Government alleged an objective falsehood, the PRC Reporting and Compliance allegations would fail to state an FCA claim because the Complaint has not identified a single false claim for payment that Oracle submitted in connection with these allegations.  As set out above, the PRC:  (1) required Oracle to maintain a set relationship between the GSA and BOA customer price, (2) did not apply to transactions above $200,000, and (3) required reporting of price reductions within 15 days.

The only specific transactions that the Complaint identifies are "example[s]" of transactions where Oracle allegedly submitted "inflated" invoices.  (Compl. ¶ 96.)  These examples consist of charts comparing 16 "GSA" transactions to various "Commercial"

transactions.  (*Id.*)  The charts include order numbers, transaction dates, prices paid, and discounts.  (*Id.*)  The only other information alleged about the transactions is the generic statement that they "are illustrations of Government purchases that are similar to commercial transactions."  These charts are irrelevant to Oracle's PRC obligations.[7]

Most fundamentally, the charts do not allege that any of the "Commercial" transactions contained in the charts involved Oracle's BOA customer.  Even if they did, the Complaint never sets out the relationship between the GSA and BOA customer price, much less explains how the chart transactions disrupt that relationship.  Moreover, several of the chart transactions are above $200,000, or compare "GSA" purchases to "Commercial" purchases occurring later in time (which could not, under the 15-day reporting requirement, evidence a PRC violation).  Finally, there is no indication that the charts are making apples-to-apples comparisons.  The generic statement that the transactions show "Government purchases that are similar to commercial transactions," is not equivalent to an allegation that a "GSA" and "Commercial" customer bought identical products at different prices in such a way as to disturb the BOA/GSA price relationship.  Vague and undefined phrases like "similar to commercial transactions" are subjective and subject to varying interpretations.  They fail to satisfy the requirement of the FCA.  *Wilson*, 525 F.3d at 378 ("An FCA relator cannot base a fraud claim on nothing more than

---

[7] It appears that the charts are the product of an ill-conceived "cut and paste."  The Government Complaint in another case before this Court, *United States ex rel. Norman Rille v. EMC Corp.*, No. 1:09cv00628, included similar charts, and a nearly identical description.  In that case, however, in addition to the PRC, the defendant had contractually agreed to "compare the government's order to commercial orders for similar products and give GSA the better of the GSA list price or the price given to the commercial customer."  (*See* Ex. 9, EMC Complaint.)  Although the charts submitted might be relevant to that broad assertion, they are meaningless with regard to the PRC.

his own interpretation of an imprecise contractual provision.  To hold otherwise would render meaningless the fundamental distinction between actions for fraud and breach of contract.")

> **3.    The 1997 and E-Business Disclosures do not relate to a claim for payment**

DOJ's allegations regarding the 1997 Disclosures and E-Business Disclosures also fail to state a claim under the FCA because they do not relate to a claim for payment.  The FCA imposes liability when "a false or fraudulent claim for payment or approval" is submitted or a "false or fraudulent claim [is] paid or approved by the Government."  Under the FCA, the term "claim" is defined as "any request or demand, whether under a contract or otherwise, for money or property…."  31 U.S.C. § 3729(c) (2009).  Thus, courts have consistently found that the FCA does not attach to the underlying fraudulent activity, but rather only to the false claim for payment.  *Harrison,* 176 F.3d at 785 ("The [FCA] statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, *but to the 'claim for payment.'*") (emphasis added).

In this case, the Government does not allege that the 1997 or E-Business Disclosures were claims for payment.  Indeed, it is undisputed that the 1997 Disclosures occurred more than one year prior to the award of the 1998 Contract.  The E-Business Disclosures came in advance of the modification of the 1998 Contract authorizing orders to be placed for E-Business products. Because of the unique nature of the MAS program, the cases in which FCA liability is imposed for pre-contract statements are inapplicable.  Under the MAS program, GSA has no obligation to place orders under Schedule contracts.  *See* Ralph C. Nash & John Cibinic, *Multiple Award Schedules: What are They?*, 11 Nash & Cibinic Rep. ¶ 60 (November 1997) (Explaining that "[i]t is questionable, at best, whether the MAS awards are contracts" and classifying MAS program schedules as "a group of standing offers…which *can be accepted* by ordering

agencies…") (emphasis added).   The lack of mutual obligation is demonstrated by review of

Oracle's 1998 Contract.  (Relevant excerpts attached at Ex. 10.)  Section C.6(a) of the Contract

states that there would be no purchases under the Contract and thus no requests for payment

would be made pursuant to the Contract:

> This is an indefinite-quantity contract for the supplies or services
> specified and effective for the period stated.  The quantities of
> supplies and services specified in the contract are estimates only
> and are not purchased by this contract.

(Ex. 10.)   Section C.6(b) further clarified that the contractor's obligations only began when

subsequent delivery orders were issued: "Delivery or performance shall be made only as

authorized by orders issued in accordance with the Ordering clause." (*Id.*)  Thus, not only were

the 1997 Disclosures not a "claim for payment or approval," there was no basis within the 1998

Contract itself for Oracle to make a claim for payment.  *See also* Section C.2(A), Section C.3(a),

Section G.5.  The only purpose of the 1997 Disclosures was to allow the Government to

negotiate a "fair and reasonable price."   Further breaking the necessary nexus between any

alleged false statement and an eventual request for payment is that ordering agencies are

encouraged to negotiate prices lower than those specified in the MAS.  48 C.F.R. § 8.405-4; *see*

*also* General Services Administration, Multiple Award Schedules Desk Reference 11, 33-34

(Summer 2010), *available at* http://www.gsa.gov/portal/content/104447 (follow the "Multiple

Award Schedules Desk Reference" hyperlink).

The Tenth Circuit has recently held that submitting information to the Government to

allow it to conduct an evaluation of the reasonableness of prices paid by the Government is not a

request for payment.  In *United States ex rel. Lacy v. New Horizons, Inc.*,  348 F. App'x 421

(10th Cir. 2009), the court analyzed whether the submission of allegedly false annual cost reports

to obtain reimbursement for services under Medicare or Medicaid violated the FCA.  The court

held that they did not because they did not relate to a claim for payment:

> While the annual cost reports are mandatory,…they merely '[c]ollectively…establish a basis for evaluation of the reasonableness of the rate paid to the nursing homes and determination of what constitutes an economically and efficiently operated facility.'

*Lacy*, 348 F. App'x at 428.  As in *Lacy*, the 1997 and E- Business Disclosures' only purpose was

to allow the Government to evaluate the reasonableness of Oracle's proposed prices, and even

once awarded, the 1998 Contract did not purchase any supplies or services.  On this basis, the

Complaint fails to state a claim as to Counts 1 and 2.

## IV.   CONCLUSION

For the reasons set out above, and summarized in the chart below, even if all of its factual

allegations are accepted as true, the Complaint fails to state a facially plausible claim:

| Allegation | Basis for Dismissal |
|---|---|
| **1997 Disclosures** | Statute of Limitations - bars all claims in their entirety. |
| | Illegality of the CPC requiring allegedly false disclosures - eliminates materiality required for all fraud counts, the alleged act of breach underlying the contract count, and the sole alleged basis for impermissible retention of funds. |
| | No relationship to claim for false payment - bars FCA counts |
| **PRC Reporting** | Statute of limitations - bars FCA and common law contract claims arising before May 29, 2001; bars common law fraud claims arising before May 29, 2004. |
| | Contradictory allegations that fail to identify PRC violations - facially insufficient to state a plausible cause of action under any count or legal theory. |
| | No affirmative misrepresentations or claims for payment - bars FCA counts |
| **PRC Compliance** | Statute of limitations - bars FCA and common law contract claims arising before May 29, 2001; bars common law fraud claims arising before May 29, 2004. |
| | No statutory, regulatory or contractual breach alleged - eliminates false statements required for all fraud counts, the only contractual obligation allegedly breached, and the sole basis for impermissible retention of funds. |
| | No affirmative misrepresentations or claims for payment - bars FCA counts |

| E-Business | Disclosures, read in their entirety, are not false - eliminates alleged false statements required for all fraud counts, the only contractual obligation allegedly breached, and the sole alleged basis for impermissible retention of funds. |
|---|---|
| | No relationship to claim for false payment - bars FCA claims (Counts 1 & 2) |

This Court should thus dismiss the Complaint in its entirety and with prejudice.

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of September, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Richard Sponseller
Assistant United States Attorney
United States Attorney's Office
Justin W. Williams U.S. Attorney Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Richard.Sponseller@usdoj.gov

Christopher B. Meade
London & Mead
1225 19th Street, N.W.
Suite 320
Washington, D.C.  20036
cmead@londonandmead.com

                                                                   /s/
                                        Kristen E. Ittig (VSB #74362)
                                        ARNOLD & PORTER LLP
                                        1600 Tysons Boulevard, Suite 900
                                        McLean, VA  22102-4865
                                        Direct:  703.720.7035
                                        Facsimile:  703.720.7399
                                        Email:  Kristen.Ittig@aporter.com
                                        *Counsel for Defendants Oracle Corp.,*
                                        *Oracle America, Inc.*