**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel*. PAUL FRASCELLA,<br><br>      Plaintiff,<br><br>      v.<br><br>ORACLE CORP., ORACLE<br>AMERICA, *et al.*,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)    CASE NO.: 1:07cv529 (LMB/TRJ)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

The United States hereby opposes defendants Oracle Corp. and Oracle America, Inc.'s

(collectively "Oracle" or "defendants") motion to dismiss the United States' Complaint pursuant

to Fed. R. Civ. P. 12(b)(6), Dkt. No. 34. Defendants assert that 1) the Government's claims are

barred by the statute of limitations; 2) the Government has failed to plead a required element of

each of its claims; and 3) the Price Reduction Clause (PRC) allegations cannot give rise to False

Claims Act (FCA) violations. For the reasons set forth below, none of these arguments has

merit and defendants' motion should be denied.

Defendants' arguments suffer from numerous deficiencies. First, defendants assert that

the statute of limitations on the Government's FCA and common law claims began to run on

September 1, 1998. This is incorrect. The statutes of limitation for both FCA claims and

common law claims include tolling provisions which provide that the statutory period will not

begin to run until the "official of the United States charged with responsibility to act in the

circumstances" has knowledge of the material facts.  31 U.S.C. § 3731(b); 28 U.S.C. § 2416(c).

The legislative history of the FCA as well as relevant caselaw concerning both the FCA and

common law claims grounded in fraud, demonstrate clearly that the responsible official must be

an official within the Department of Justice (DOJ).  Here, it is undisputed that no DOJ official

had knowledge of the material facts underlying the FCA and common law claims at least until

relator Paul Frascella's <u>qui</u> <u>tam</u> Complaint was filed.

Second, defendants argue that the United States has failed to plead a required element of

each of its claims.  As set forth in detail at pp. 14 to 24 this argument is contradicted by the plain

language of the Complaint, in which the Government has carefully alleged each of the elements

of its FCA and common law claims as well as the facts that support those allegations.

Finally, defendants' contention that the PRC allegations cannot give rise to FCA

violations fails because the Government has clearly alleged that defendants' conduct during

performance of the Contract gave rise to false claims for payment and the viability of such

allegations are supported by existing case law.

## **FACTUAL BACKGROUND**

The General Services Administration of the United States (GSA) issued Solicitation

Number FCI-96-DL0001B in 1997.  United States Complaint in Intervention, Dkt. No. 31,

(Compl.) ¶ 30.  In response to the solicitation, Oracle provided written disclosures to the

Government regarding its commercial pricing practices on August 5, 1997, September 30, 1997

and November 4, 1997.  *Id.* ¶¶ 31-33.

Oracle sent its Best and Final Offer (BAFO) to the GSA Contracting Officer (CO) on

December 1, 1998.  *Id.* ¶ 40.  The BAFO certified that "Oracle Corporation acknowledges that all

data submitted in response to Solicitation Number FCI-96-DC0001B is accurate, complete, and current." *Id.* ¶ 41.  On December 15, 1998, Oracle was awarded GSA MAS contract number GS-35F-0108J (the Contract), effective December 1, 1998, through November 30, 2003.  *Id.* ¶ 45. (The Contract was subsequently temporarily extended through October 2006 to allow time for an audit and negotiation of a follow-on contract.  *Id.*)

On September 1, 1998, three months prior to the effective date of the Contract, GSA's Office of Inspector General (GSA-OIG) issued a report on a routine pre-award audit of Oracle's commercial pricing.[1]  The audit was based on sales data submitted by Oracle for the period September 1, 1997 through February 28, 1998.  1998 Audit Report at 2.  Oracle refused to certify to the accuracy or completeness of the sales data submitted to the GSA auditors.  The first page of the audit states:

> The audit results are qualified to the extent that Oracle could not certify that the sales data is reconcilable to the audited financial statements, and therefore we could not assure ourselves that the data is accurate, current and complete.

*Id.* at 1.

On page 3 of the 1998 Audit Report, there is a heading titled "Audit Qualification" under which the GSA auditors repeated the statement set forth above regarding the incompleteness of the data provided by Oracle and then added: "Additionally, the automated sales data provided by Oracle *did not contain sufficient information to allow us to effectively use it* in identifying sales and discounts for review.  *Id.* at 3 (emphasis added).  The last page of the audit notes that it was

---

[1]*See* PREAWARD AUDIT OF MULTIPLE AWARD SCHEDULE CONTRACT ORACLE CORPORATION SOLICITATION NUMBER FCI-96-DL0001B REPORT NUMBER A82136/F/7/X98145 SEPTEMBER 1, 1998, attached as Ex. 3 to Amended Mem. of Law in Support of Defendants' Motion to Dismiss for Failure to State a Claim, Dkt. No. 39.

distributed to only four offices, all of which are within GSA.  *Id.* at A-1.

During the performance of the Contract, Oracle repeatedly and falsely confirmed the accuracy of the commercial pricing and discount data that had been submitted to the GSA CO during the negotiation of the Contract.  Compl. ¶¶ 79-87.  On each of these occasions, Oracle falsely certified that "there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation."  *Id.*

On May 29, 2007, Relator Paul Frascella filed his Complaint, Dkt. No. 1, alleging violations of the FCA in connection with the formation and performance of the Contract.

## ARGUMENT

### I.     None Of The Government's Claims Are Barred By The Statute Of Limitations[2]

Defendants' statute of limitations argument is premised entirely on a pre-award audit report that was issued by GSA-OIG on September 1, 1998 (the 1998 Audit Report).  Defendants contend that this nine page report, which 1) specifically notes that the data submitted by Oracle on which the audit was based was unreliable; 2) does not conclude that defendants' 1997 disclosures were false; and 3) was not distributed outside of GSA, was sufficiently detailed to provide the Government with the material facts underlying most of the FCA and common law

---

[2]In order to prevail on their motion to dismiss defendants must establish that the Government's claims are not plausible on their face – that there are no factual allegations in the Complaint that could raise the reasonable inference that defendants are liable for violations of the FCA or the common law.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This plausibility requirement "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" unlawful conduct.  *Twombly*, 550 U.S. at 556.  Moreover, "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Boy Blue, Inc. v. Zomba Recording, LLC*, No. 09-483, 2009 U.S. Dist. LEXIS 84988, at *4-5 (E.D. Va. Sept. 16, 2009).

claims at issue in this case.

At a minimum, the question of what the Government knew or should have known as a result of the September 1, 1998 Audit Report is a factual question that is not appropriate for resolution on a motion to dismiss.  The Court, however, should deny defendants' statute of limitations arguments as a matter of law because the 1998 Audit Report 1) was not distributed to DOJ, which has exclusive jurisdiction to act on the FCA and common law claims that have been brought in this case, or 2) did not provide *any* Government official with sufficient information regarding defendants' actions to trigger the statutory period.

As noted above, the statutes of limitation for the Government's FCA and common law claims include tolling provisions which provide that the statutory period will not begin to run until the "official of the United States charged with responsibility to act in the circumstances" has knowledge of the material facts.  31 U.S.C. § 3731(b); 28 U.S.C. § 2416(c).  The only "official[s] of the United States charged with responsibility to act" on either FCA claims or common law claims grounded in fraud, are officials at DOJ.  Accordingly, because the 1998 Audit Report was not provided to DOJ officials in 1998 or at any other time prior to the filing of relator's Complaint, defendants' argument must fail.

### A.	The FCA Statute Of Limitations Does Not Begin To Run Until A DOJ Official Has Knowledge Of The Material Facts

The legislative history of the FCA, caselaw, and the structure of the FCA show that the "responsible official" must be an official at DOJ.  The legislative history of the FCA is unequivocal on this point.  The Senate report states:

> [T]he statute of limitations does not begin to run until the material facts are known by an official within the Department of Justice

with the authority to act in the circumstances.

S. Rep. No. 345, at 30 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5295.  Consistent with this unambiguous legislative intent, the vast majority of courts that have addressed this issue have concluded that the three-year period does not begin to run until a DOJ official has knowledge of the material facts.  *See, e.g.*, *United States v. Carell*, 681 F. Supp. 2d 874, 881 (M.D. Tenn. 2009) ("the Court agrees with the Government that the official charged with responsibility to act under the limitations period established by § 3731(b)(2) is an official within the Justice Department"); *Jana, Inc. v. United States*, 34 Fed. Cl. 447, 451 n.6 (1995) ("the discovery that triggers 31 U.S.C. § 3731(b)(2) is not knowledge of the fraud by *any* Government official, but knowledge of the fraud by an official having the authority to initiate litigation under the Act, generally considered to be an official at the Civil Division of the Department of Justice which has exclusive litigating authority under the False Claims Act") (emphasis in original); *see also United States v. Tech Refrigeration*, 143 F. Supp. 2d 1006, 1009 (N.D. Ill. 2001) (same); *United States v. Incorporated Village of Island Park*, 791 F. Supp. 354, 363 (E.D.N.Y. 1992) (same); *United States v. Macomb Contracting Corp.*, 763 F. Supp. 272, 274 (M.D. Tenn. 1990) (same).

The structure of the FCA confirms that the relevant "official" must be at DOJ.  The Attorney General has exclusive power to enforce the FCA.  28 C.F.R. § 0.45(d); *see also Martin J. Simko Constr., Inc. v. United States*, 852 F.2d 540, 547 (Fed. Cir. 1988) ("[T]he Attorney General is *specifically* authorized to administer [FCA] claims for the Government.  No other agency is empowered to act under the statute.") (emphasis in original).  FCA actions may be filed only by the Attorney General or a private person in the name of the United States.  31 U.S.C. §

3730.  In actions brought by private persons, the Attorney General has the power to intervene and proceed with the action.  *Id.*  If the Attorney General declines to intervene, the action may be dismissed only with his consent.  *Id.*

The cases cited by defendants do not support the argument that the Fourth Circuit will reach a conclusion directly contradictory to the legislative history of the FCA, its statutory structure, or the great weight of judicial authority.  *See* Am. Mem. of Law in Supp. of Defs.' Mot. to Dismiss for Failure to State a Claim (Mem.) at 14.  Defendants cite *United States v. Boeing Co.*, 845 F.2d 476, 481-482 (4th Cir. 1998) (*rev'd sub nom Crandon v. United States*, 494 U.S. 152 (1990)) for the proposition that the "Fourth Circuit has broadly interpreted the phrase "Responsible Official" in the context of the Common Law SOL[.]"  Mem. at 13.  The *Boeing* decision is inapposite, however, because it did not involve interpretation of "Responsible Official" in the context of either the FCA or common law claims grounded in fraud.

Defendants then cite *United States ex rel. Sanders v. North Am. Bus Indus., Inc.*, 546 F.3d 288, 296 n.2 (4th Cir. 2008) for the proposition that "Congress adopted the Responsible Official language used in the FCA SOL from the Common Law SOL tolling provision."  Mem. at 14.  Defendants then yoke *Boeing* and *Sanders* together and assert that they "strongly suggest that the Fourth Circuit will not limit Responsible Official to DOJ officials in FCA cases."  Mem. at 14.  It simply does not follow, however, that if Congress adopted the FCA tolling provision from 28 U.S.C. § 2416, it necessarily intended for these two provisions to be interpreted in exactly the same manner in all circumstances.  This is particularly true where, as demonstrated above, the legislative history of the FCA tolling provision directly contradicts defendants' proposed

interpretation.[3]

### B. The Statute of Limitations For Common Law Claims Grounded In Fraud Does Not Begin To Run Until A DOJ Official Has Knowledge Of The Material Facts.

Defendant likewise contends that the Government's common law claims based on the false 1997 disclosures should be barred on the basis of the 1998 Audit Report. This argument should also be rejected because, in fraud cases, as under the FCA, the "official of the United States charged with the responsibility to act" is an official within DOJ. *See, e.g., Jankowitz v. United States*, 533 F.2d 538, 548 (Ct. Cl. 1976) (for purposes of 28 U.S.C. § 2416, the Government did not have "actual knowledge of facts tending to indicate the presence of alleged fraud" until the "allegations [were] received by the United States Attorney.").

As is the case under the FCA, the Attorney General has exclusive authority over fraud matters. *See, e.g.,* 31 U.S.C. § 3711(b)(1) (agencies are permitted to settle and compromise certain claims, but not fraud claims); 41 U.S.C. §§ 604, 605(a) (under Contract Disputes Act, agencies cannot compromise a claim involving fraud); 28 C.F.R. § 0.45(d) (common law fraud claims are assigned to the Assistant Attorney General, Civil Division). This authority extends

---

[3]Oracle's attempted reliance on two district court cases from other circuits, Mem. at 15, is also misplaced. In *United States v. Kensington Hosp.,* No. 90-5430, 1993 WL 21446 (E.D. Pa. Jan. 14, 1993), the court found that the Government's FCA claims fell within the six year statute of limitations provision and thus never reached the question of who is the responsible official for FCA statute of limitations purposes. *Id.* at *14. Similarly, *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.* 777 F. Supp. 195, 205 (N.D.N.Y. 1991) is "of limited precedential value" because "the Second Circuit stated that the district court should not have reached the limitations issue." *Tech Refrigeration*, 143 F. Supp. 2d at 1010 n.3 (citing *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155 (2d Cir. 1993)). Indeed, when the district court's decision in *Kreindler* was appealed, the Second Circuit noted its disagreement with much of the lower court's statute of limitations analysis, stating that it had incorrectly applied a discussion of Government knowledge in a liability context to the statute of limitations question. 985 F.2d at 1156-57.

not only to the common law fraud claims, but to the other common law claims asserted in this case as well, because they arise from the same fraudulent conduct. *See* 28 C.F.R. § 0.45(d) (assigning to the Assistant Attorney General, Civil Division "civil claims arising from fraud on the Government"); c*f. United States ex rel. O'Keefe v. McDonnell Douglas Corp.*, 918 F.Supp. 1338, 1343-44 (E.D. Mo. 1996) (finding subject matter jurisdiction for non-fraud common law claims because "fraud is an integral part of [them]: each claim represents another theory of recovery for [defendant's] alleged fraud."). Because agency officials have no jurisdiction over fraud matters, *see* 31 U.S.C. § 3711(b)(1), they are not "charged with the responsibility to act" in situations involving fraud. Since only DOJ has authority to resolve the common law claims at issue here, the relevant official must be one from DOJ.[4]

Congress intended that the statutory tolling provision set forth at 28 U.S.C. § 2416(c) would apply to exactly this sort of case "because of the difficulties of Government operations due to the size and complexity of the Government." S. Rep. No. 1328, 89th Cong., 2nd Sess., *as reprinted* in 1966 U.S.C.C.A.N. 2502, 2507 (1966). It follows that Congress did not want Government legal action to be foreclosed when knowledge in one part of the Government had not been transmitted to an official with responsibility for taking action. This tolling provision is especially warranted in fraud cases. "The Committee understands that the principal application

---

[4]Conversely, in actions not involving fraud, the "official of the United States charged with the responsibility to act in the circumstances," 28 U.S.C. § 2416(c), need not necessarily be a DOJ official. It is for this reason, as discussed above, that defendants' reliance on the Fourth Circuit's *Boeing* decision has no bearing on the running of the common law SOL either. That case involved Boeing's alleged violation of a conflict of interest statute by making large severance payments to former Boeing employees; the employees disclosed the payments and no fraud was alleged. In this case, where the other common law claims are entangled with the fraud, they come under the purview of DOJ and a DOJ official must have notice of the material facts before the statute of limitations begins to run.

of this exclusion will probably be in connection with fraud situations." *Id.*  Accordingly, the limited  distribution of the 1998 Audit Report within GSA also did not trigger the running of the statutory period for the United States' common law claims.

### C.     The 1998 Audit Did Not Provide Notice Of "Facts Material To The Right of Action" To Any Government Officials

If, as the Government contends, the 1998 Audit Report has no bearing on the statute of limitations analysis in this case because it was never provided to DOJ, the Court need not reach the question of whether the 1998 Audit Report provided *any* Government official with the material facts underlying the Government's claims in this case.  Even if the Court decides to consider this issue, however, defendants' motion to dismiss should still be denied because the 1998 Audit Report did not provide even GSA-OIG with "facts material to the right of action" as required by the FCA and common law tolling provisions.  *See* 31 U.S.C. § 3731(b)(2); 28 U.S.C. § 2416(c).

Congress defined "material facts" as ones that "go to the very essence of the right of action."  S. Rep. No. 1328, *as reprinted* in 1966 U.S.C.C.A.N. 2502, 2507-08 (1966); *see also Sanders*, 546 F.3d at 293-94.  The 1998 Audit Report was issued on September 1, 1998.  Since the Contract at issue in this case was not effective until December 1, 1998, three months *after* the report was issued, and no false invoices were submitted by defendants prior to that date, it is not even theoretically possible that any of the claims at issue accrued on September 1, 1998.[5]  Even if defendants' motion is construed as arguing that the 1998 Audit Report somehow provided GSA with notice that the subsequently filed claims would be false, however, it still must fail.

---

[5] *See, e.g., United States v. Rivera*, 55 F.3d 703, 707 (1st Cir. 1995) (the date of violation is the date on which the false claim is presented to the Government).

The 1998 Audit Report found that Oracle had granted some commercial customers discounts of up to 40% on the purchase of software licenses.  1998 Audit Report at 1.  This finding, however, did not shed any light on the veracity of Oracle's 1997 disclosures in which they had informed the Government that their standard discounts were 15-20%,  Compl. ¶ 33, but that they granted "non-standard discounts" in 5% of their sales.  *Id.* ¶ 35.  Indeed the GSA auditors' finding of both 40% discounts and individual examples that were even higher, was entirely consistent with Oracle's disclosures regarding the existence of non-standard discounts.

In addition, although the 1998 Audit Report concluded that GSA was not being offered "fair and reasonable prices," *id*. at 1, the GSA auditors heavily qualified their conclusion:

> The audit results are qualified to the extent that Oracle could not certify that the sales data is reconcilable to the audited financial statements, and therefore *we cannot assure ourselves that the sales data is current, accurate and complete.*  Additionally, the automated sales data provided by Oracle *did not contain sufficient information to allow us to effectively use it* in identifying sales and discounts for review.

*Id*. at 3 (emphasis added).  Having failed to provide GSA auditors with sufficient information to fully and accurately assess Oracle's commercial practices, and having been unwilling to certify that the data provided was reconcilable to its audited financial statements, Oracle cannot now claim to have given GSA all it needed to determine that Oracle's 1997 disclosures were false.

Moreover, defendants never explain how this brief report provided GSA with sufficient facts regarding other essential elements of the claims at issue in this case.  To take but one example, knowledge of falsity, as defined in the FCA, is a critical element of the Government's FCA claims.  *See* 31 U.S.C. § 3729(a)(1)(A), (B).  Nothing in the 1998 Audit Report gave notice that Oracle had *knowingly* made false statements or submitted false claims.

-11-

In sum, the qualified and limited conclusions in the 1998 Audit Report did not put even GSA officials on notice that the 1997 disclosures were false, let alone provide them with the "material facts" underlying all of the causes of action that the Government has asserted in this case.

**D.     DOJ Officials Could Not Have Known The Material Facts Based On The 1998 Audit Report**

Defendants cite to *United States v. Incorporated Village of Island Park,* 791 F. Supp. 354 (E.D.N.Y. 1992) for the proposition that the 1998 Audit Report provided notice to DOJ of the falsity of the 1997 disclosures under the "should have known" prong of the FCA and common law tolling provisions. Mem. at 15-17. This is incorrect. As demonstrated above, the 1998 Audit Report did not provide the GSA officials who received it with such notice, so that there was no reason for them to refer it to DOJ, and even if it had been referred to DOJ, it would not have triggered the statutory period.

The 1998 Audit Report, moreover, is completely distinguishable from the report at issue in *Island Park*. In that case the Government agency at issue, HUD, had "concluded . . . that the Government had legally actionable claims," *id.* at 358, and the court found that the report was "widely disseminated throughout the United States Government." *Id*. at 363. The 1998 Audit Report, in stark contrast, did not even conclude that Oracle's disclosures were false, let alone that Oracle had violated any laws, and was sent by GSA-OIG to four other offices, all within GSA. Thus the *Island Park* court's conclusion, referenced by defendants, that "any one of the many offices to which [the report] was sent could have – and should have – referred the matter to the Department of Justice" *id.,* must be seen in the context of a report which was widely

disseminated and expressly concluded that the subject had engaged in illegal conduct.

In this case, because the 1998 Audit Report did not find any wrongdoing by Oracle, there was no reason that GSA should have referred it to DOJ.  As one court has noted "'courts should be leery of finding that the Government had knowledge of the existence of a possible cause of action based merely upon the discovery of irregularities that fall short of a concrete suspicion that fraud has occurred.'" *United States ex rel. Condie v. Bd. Of Regents*, No. C89-3550, 1993 WL 740185, at *2 (N.D. Cal. Sept. 7, 1993) (quoting 132 Cong. Rec. S11,244-45 (daily ed. Aug. 11, 1986)).  Accordingly, defendants' argument that DOJ officials "should have known" of the material facts underlying any of their causes of action based on the 1998 Audit Report must fail.

### E.    The Statutory Period Extends Back to May 29, 1997

The FCA expressly provides that the filing of relator's Complaint tolls the statute of limitations for claims subsequently brought by the Government that arise out of the same conduct that is set forth in the relator's Complaint.  31 U.S.C. § 3731(c).  In this case, the Government's Complaint and relator's Complaint both arise out of defendants' actions in connection with the formation and performance of the Contract.  Indeed, defendants have not challenged the fact that all of the Government's claims arise out of the same "conduct, transactions, or occurrences" as those set forth in relator's Complaint.  Accordingly, it is undisputed that the Government's FCA and common law claims relate back to relator's Complaint for statute of limitations purposes. *See, e.g., United States ex rel. Serrano v. Oaks Diagnostics*, 586 F. Supp. 2d 1136, 1141 (C.D. Cal. 2008) (finding that "each of the Government's FCA claims, as well as the related common law claims" relate back to the filing date of relator's Complaint because "they arise from the same conduct alleged in the Relator's Complaint"); *U.S. ex rel. Miller v. Bill Harbert Int'l*

*Constr. Inc.*, 2007 WL 842082 *1, (D.D.C. March 19, 2007) ("*all* of the Government's claims relate back under Rule 15(c) to the date the relator's original Complaint was filed because . . . [they] arise out of the same 'conduct, transaction, or occurrence' set forth in the relator's original Complaint") (emphasis in original).

In addition, the FCA provides that an action may be brought a maximum of ten years after the date of the violation, as long as it is brought within three years of the date on which material facts are known to the responsible official.  31 U.S.C. § 3731(b)(2).  This action was "brought" when relator filed his Complaint on May 29, 2007.  *See, e.g., Miller,* 2007 WL 842082 *2, n.6 (noting that for purposes of applying the SOL, an FCA action is "brought" by the filing of relator's Complaint).  As a result, the statutory period in this case extends back to May 29, 1997, well before the December 1, 1998 effective date of the Contract at issue and the first submission of false claims to the United States by defendants.

## II.     The Complaint Adequately Alleges Claims Under The FCA And Common Law

Oracle asserts that the Complaint fails to allege claims "under any theory of liability" because "key required element(s)" are missing from "each of the Complaint's four allegations." Mem. at 18.  Oracle's arguments for dismissal are unavailing.  Oracle has mischaracterized the Government's allegations by improperly attempting to shoehorn them into four separate and narrow claims involving the "1997 Disclosures," "PRC Reporting," "PRC Compliance" and "E-Business Disclosures."  Mem. at 18.  To the contrary, the Complaint alleges an ongoing, interrelated fraud involving multiple false statements and omissions during negotiation and performance of the Contract.  When properly construed, the Complaint alleges the elements of each of its claims.

### A.     The Complaint Adequately Pleads Fraud In The Formation Of The Contract

The Complaint contains detailed facts showing that defendants induced GSA to enter into the Contract by falsely representing their discounting policies and practices during negotiations. Compl. ¶¶ 30-48.  In response, defendants assert that the Government's claims must be dismissed in their entirety because one of the forms GSA used to solicit information on Oracle's discounting practices had not been authorized for use at the time.  Mem. at 19-22.  Defendants' argument is without merit for a number of reasons.

### 1.     The Government's Use Of A Purportedly Non-Authorized Form Is Not A Defense To Fraud

Even if the CPC were "unauthorized," its use by GSA does not insulate defendants from liability for fraud.  In essence, Oracle asserts that their disclosures are not fraudulent because the Government was not permitted to inquire into their discounting policies by asking the particular questions set forth on the CPC form.  Mem. at 19-22.  This argument is baseless.  There is no element of any of the Government's causes of action that provides that misrepresentations are only actionable when stated in response to questions a defendant was legally obligated to answer.  The Complaint alleges facts showing that defendants (1) made false statements, (2) with scienter, (3) that were material, and (4) that caused the Government to pay out money.  That is all that is required to state a fraud claim.  *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 788 (4th Cir. 1999).  Even if the Government were not explicitly authorized to ask questions in the manner in which it did, that would be irrelevant.[6]

---

[6]Defendants have cited no authority holding that the Government's use of an unapproved form in contract negotiations is a defense to fraud.  Most of the cases they cite merely stand for the proposition that the Government cannot enforce a particular *contract provision* in a *contract action* if it is contrary to the FAR, which has the full force and effect of law.  *See Charles Beseler*

2.    **Whether The CPC Was An "Illegal" Form Is A Question Of Fact That Cannot Be Resolved On A Motion To Dismiss**

In any event, even if the use of a purportedly "unauthorized" form were a defense to fraud

(which it is not), defendants' argument still lacks merit.  Defendants assert that the Complaint

should be dismissed because the CPC was "illegal."  Mem. at 19.  But defendants do not cite a

single case or ruling by any administrative body supporting that assertion.  The determination of

whether the Government was permitted to use the CPC during contract negotiations is a highly

factual inquiry.  As such, the determination of this issue on a motion to dismiss is improper.  *See,*

*e.g., Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (a "motion to dismiss tests

the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the

merit of a claim, or the applicability of defenses").

3.    **Defendants Made Multiple Misrepresentations During Contract Negotiations In Addition To Those Contained On The CPC**

Oracle argues that, but for the CPC, the Government could not maintain an action for

fraud or an action upon any of the common law counts against it.  Mem. at 19-23.  Defendants'

assumption that *all* of Oracle's fraudulent disclosures were contained in the CPC is misguided.

Oracle was not restricted to use of the CPC alone in providing pricing and discount

information to the GSA.  The CPC form itself explicitly states that its use is "to *facilitate* the

---

*Co.,* ASBCA No. 22669, 78-2 BCA ¶ 13,483; *Guard-All of America,* ASBCA No. 22167, 80-2 BCA ¶ 14,462; *Craft Machine Works, Inc.* ASBCA No. 35167, 90-3 BCA ¶ 23,095; *MAPCO Alaska Petroleum Inc. v. United States,* 27 Fed. Cl. 405, 416 (Fed. Cl. 1992).  The last case they cite, *Alaska Prof'l Hunters Ass'n, Inc., v. FAA,* 177 F.3d 1030 (D.C. Cir. 1999), holds that a regulation is not enforceable if published without "notice and comment."  Here, the Government is not trying to "enforce" any illegal contract provision or law.  Rather, it is simply attempting to recover the damages suffered as a result of defendants' fraudulent misrepresentations.

offeror's response to Clause M.1, Paragraph 3, <u>Fair and Reasonable Prices</u>."  Mem. Ex. 1 (emphasis added).  Indeed, the Complaint alleges multiple false representations *in addition to* those in the CPC form.  First, the "Summary of Business Practices and Non-standard Discounts" document Oracle provided to GSA contains multiple false statements related to Oracle's discounting policies and practices as detailed in the Complaint.  Compl. ¶¶ 35-37.  Second, the Complaint alleges that defendants' BAFO submitted to GSA on December 1, 1998 contained the following false statement: "Oracle Corporation acknowledges that all data submitted in response to Solicitation Number FCI-96-DC00001B is accurate, complete, and current."  Compl. ¶ 41. The BAFO also falsely stated that "***[c]onsistent with commercial practices,*** [this offer] establishes multi-tiered discount for software licenses by providing a ramped discount for orders up to the Maximum Threshold."  Compl. ¶ 42 (emphasis added).[7]  Finally, Oracle certified repeatedly beginning in September 1999 that its commercial discount/pricing policies and practices remained unchanged from those originally provided "in response to Section M.1 of the Solicitation of the Contract."  Compl. ¶¶ 79, 87.  These statements are all false irrespective of any information provided on the CPC.

In sum, the CPC form was but one item amongst a number of sources of false information that Oracle provided to the GSA during and after negotiations for the Contract.  It was certainly not the sole item containing Oracle's false and misleading disclosures and it is not the *sine qua non* in support of all eight counts of the Complaint.  Thus, defendants' argument that the

---

[7] This statement was false because Oracle's discounts are not based on the dollar value of the order.  Compl. ¶ 47.

Complaint should be dismissed in its entirety is without merit.[8]

**B.      The Complaint Adequately States Claims Related To Oracle's Concealment Of Its High Discounts To Commercial Customers**

Oracle asserts that the Government's "PRC Reporting allegations" are "vague and amorphous" and fail to state claims because they do not "reference[] the BOA customer or allege[] that Oracle's discounts during contract performance altered the relationship between the BOA price and the GSA price." Mem. at 22. For these reasons, it claims the United States has not properly alleged any fraud in the performance of the Contract. These arguments lack merit.

First, the Complaint alleges fraud in the performance well beyond a breach of the PRC. The Government alleges that Oracle made multiple *affirmative*, fraudulent statements related to its discounting policies and practices throughout performance of the Contract. After the Contract was executed, Oracle gave commercial customers discounts significantly higher than the "standard discounts" disclosed during negotiations. Compl. ¶ 62. It also used "non-standard" discounts much more frequently than it disclosed to GSA. *Id.* ¶¶ 35, 62. Further, not only were Oracle's actual discounts much higher than the company disclosed, they were also significantly higher than GSA discounts. The Complaint alleges multiple examples of transactions where Oracle's actual discounts exceeded the level disclosed to GSA and the discounts given to Government customers. Compl. ¶ 96. Despite these facts, Oracle never disclosed the differences

---

[8]Defendants erroneously assert that the "CPC materially deviated from the format required by regulations." Mem. at 19. To the contrary, the information requested in all three publications cited by defendant is essentially the same as that requested in the CPC. *Compare* Mem. at 19-20 *with* Mem. Ex. 1 (CPC Form). Oracle would therefore still have been required to disclose its discounting practices and policies regardless of what form GSA had chosen to use in its solicitation, belying any assertion by defendants that they were somehow detrimentally affected by their use of the CPC.

between their pre-contract disclosures and actual discounts to GSA.  To the contrary, Oracle

affirmatively stated on multiple occasions during performance of the Contract that "[t]here have

been no changes in commercial discount/pricing policies and practices from that originally

provided in response to Section M.I of the solicitation."  Compl. ¶¶ 79, 87.  These statements

were false and made with the intent to induce GSA to enter into contract modifications and

continue to accept the discounts originally disclosed (which it did).  Compl. ¶¶ 79, 87.  These

affirmative misrepresentations – which are separate and distinct from any violation of the PRC –

state garden variety claims under the FCA and common law.  *See, e.g., Harrison,* 176 F.3d at 791

(allegations that defendant made false representations to induce Government to approve

subcontract "are sufficient grounds for a False Claim Act to survive a Rule 12 (b)(6) motion");

*United States ex rel. Ubl v. IIF Data Solutions,* 2007 U.S. Dist. LEXIS 56207, at **8-11 (E.D.

Va. Aug. 1, 2007) (denying motion to dismiss in case where defendant was alleged to have made

false statements to GSA to induce it to enter into contracts with defendants at inflated prices).

Second, the Complaint adequately alleges claims related to Oracle's breach of the PRC.

The Complaint alleges that "Oracle routinely provided discounts to all classes of customer that

were outside the ranges set forth in its disclosures."  Compl. ¶ 57; *see id.* ¶ 65.  This included

BOA customers:[9]  "the KPMG data reveals that Oracle routinely sold software licenses to . . .

***Commercial End Users*** at discounts greater than 20 percent."  Compl ¶ 59 (emphasis added).

As the Complaint alleges, Oracle was required under the PRC to affirmatively disclose "any

change in [its] commercial pricing or discount arrangement applicable to the [BOA customer]"

(and provide GSA with similarly reduced discounts).  Compl. ¶ 25.  The PRC also separately

---

[9]The BOA customers were Oracle's "Commercial End Users."  Compl. ¶ 43.

required Oracle to report any changes in the commercial pricing practices or policies that were

disclosed to GSA during negotiations.  Compl. ¶ 27.  Nevertheless, Oracle at no point informed

GSA of these high discounts being provided to commercial customers, including BOA

customers.  Compl. ¶ 65.  Instead, it submitted invoices to the Government that were inflated

because they did not contain discounts similar to what BOA customers were receiving.  The

Complaint, therefore, adequately alleges claims related to Oracle's fraudulent breach of the PRC.

*See, e.g., United States ex rel. Carter v. Haliburton Co.,* 2009 U.S. Dist. LEXIS 63649, at **18-

21 (E.D. Va. July 23, 2009) (allegations that defendants submitted inflated invoices under

Government contract were sufficient to withstand motion to dismiss FCA claims); *United States*

*ex rel. Vosika v. Starkey Labs., Inc.,* 2004 U.S. Dist. LEXIS 18349, at *14 (D. Minn. Sept. 8,

2004) (allegations were sufficient to survive motion to dismiss FCA claims based on violation of

price reduction clause in Government contract because "[p]laintiffs have alleged that certain

purchasers were sold items at prices less than those offered to [the Government]").[10]

---

[10]Contrary to Oracle's assertions, Mem. at 23, the allegations that Oracle committed fraud by manipulating its transactions, *see infra* at 21-23, do not contradict the Government's allegations that Oracle's actual discounts to commercial customers were higher than its disclosures.  First, as discussed below, while Oracle ***attempted*** to bring certain transactions outside of the scope of the PRC, these "reworked" transactions were still required to be disclosed to GSA under the PRC because they represented a change in Oracle's discounting practices. (*See infra,* at 22-23.)  Second, the allegations related to Oracle's fraudulent manipulation of transactions are merely one part of a broad, interrelated fraud, the overarching purpose of which was to conceal the company's true discounting practices from GSA.  This scheme included fraudulently concealing its true discounting policies during contract negotiations, concealing during performance of the Contract the fact that it was giving certain commercial customers discounts higher than it had disclosed, ***and*** manipulating ***other*** transactions to evade PRC liability entirely.  Thus, the Government's claims are overlapping and complementary, not contradictory.  In any event, even if the two claims were contradictory the "right to plead in the alternative" is expressly authorized by Fed. R. Civ. P. 8(a).  *See, e.g., R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel,* 435 F.3d 521, 534 (4th Cir. 2006).

**C.    The Complaint Adequately States Claims Based On Oracle's Fraudulent Manipulation Of Its Commercial Transactions**

Defendants assert that the "PRC Compliance" allegations fail to state claims because there was nothing improper about Oracle fraudulently manipulating commercial transactions to evade the requirements of the PRC.  Mem. at 23-24.  As the Complaint alleges, Oracle identified transactions with BOA customers that violated the PRC and then "reworked" them so that they fell outside the PRC, thus permitting Oracle to give these customers discounts significantly higher than GSA was receiving in essentially identical transactions.  Compl. ¶¶ 67-78.  Oracle would convert "standard transactions" into "non-standard transactions" (not subject to the PRC) through a number of fraudulent schemes:  inflating the value of transactions to push them just over $200,000; converting them to "non-perpetual" licenses; amending contracts to improperly extend "price holds;" and reworking sales so they went through a reseller.  Compl. ¶¶ 68-78.  Defendants contend this conduct was perfectly legitimate.  Mem. at 23-24.  In fact, they audaciously argue that these allegations show that they were vigorously *complying* with the PRC, not *evading* it.  Mem. at 23-24.  Defendants' arguments are unavailing and their attempts to fraudulently circumvent the law and their contractual obligations should not be condoned.

The allegations related to Oracle's manipulation of its commercial transactions are sufficient to withstand defendants' motion to dismiss.  All of the elements of an FCA claim have been adequately pled here: (1) Oracle engaged in a fraudulent course of conduct (manipulating its transactions in an attempt to evade the PRC and avoid giving reduced discounts to GSA), Compl. ¶¶ 67-78; (2) which was carried out with scienter (Oracle

management not only knew that employees were manipulating transactions, but were actually encouraging such practices), Compl. ¶¶ 69-71, 77-78; (3) their actions were material (GSA would not have agreed to the discount levels in the Contract if it knew Oracle was evading its obligations under the PRC), Compl. ¶¶ 88; and (4) they caused the Government to pay out money ("Oracle's manipulation of its commercial sales to avoid the contractual requirement to reduce the prices offered to the Government dramatically increased the cost to the Government of purchases that were made under the Contract"), Compl. ¶ 68. *See Harrison*, 176 F.3d at 788 (setting forth the elements of an FCA claim).

In addition, as stated above, Oracle affirmatively stated on multiple occasions during performance of the Contract that there had been no changes in its commercial discounting practices. Compl. ¶¶ 66, 79, 87. But Oracle never informed GSA during contract negotiations that it would give a significant number of BOA customers substantially high discounts by "reworking" their contracts. This practice of manipulating BOA transactions to evade reporting requirements under the PRC thus clearly represents a change in discounting practices from what was disclosed to GSA. Compl. ¶ 60, 65, 67-78. Oracle's fraudulent statements during contract modifications that there had been no changes to its discounting policies are thus actionable. *See Ubl,* 2007 U.S. Dist. LEXIS 56207, at **8-11 (denying motion to dismiss and holding that allegations that defendant made false statements about commercial pricing to induce GSA to pay higher prices were sufficient to state an FCA claim).

Finally, the PRC *affirmatively* required Oracle to disclose changes in discount practices for BOA customers. Compl. ¶¶ 25, 27, 64. Thus, in addition to its affirmative false statements that its discount policies had not changed, Oracle also violated the PRC by not disclosing its

practice of manipulating commercial transactions to avoid paying higher discounts to GSA.

GSA relied upon Oracle's misrepresentations and non-disclosures in continuing to accept the

discounts in the Contract.  Compl. ¶¶ 3, 88.  Had Oracle disclosed its true discounting

practices, GSA never would have accepted those discounts.  Compl. ¶ 88.  Thus, the Complaint

adequately states claims based on Oracle's fraudulent manipulation of its commercial

transactions.

### D.     The Complaint Adequately States Claims Related To Oracle's E-Business Disclosures

Defendants contend that the Complaint fails to adequately plead claims relating to the

E-Business disclosures because, when read in their entirety, the disclosures are not false.  Mem.

at 25-27.  Defendants then assert that their disclosures were truthful because they stated:

"Generally all products sold on a single order are discounted at the same rate.  Circumstances .

. . can result in additional discount for specific line items within an overall order."  Mem. at 26;

Mem. Ex. 6.  The addition of that purported disclaimer does not render the disclosures truthful.

Put simply, that statement does not say what Oracle says it does.  All it says is that while

Oracle "generally" discounts all products *within an order* at the same rate, there may be

circumstances *within a single order* where certain products *in that order* are discounted at a

different rate from other products *in that order*.  Mem. Ex. 6.  It says nothing at all about

Oracle discounting certain transactions at levels higher than were disclosed to GSA.[11]

In any event, even under Oracle's interpretation, the disclosures are still false.  For the

---

[11] Even if there were a dispute as to the meaning of that clause, the allegations in the Complaint must be construed in the light most favorable to the Government.  *See Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir. 1998).

12-month period preceding Oracle's disclosures, over *68 percent* of E-Business discounts were greater than what Oracle disclosed.  Compl. ¶ 84.  While Oracle may have stated that additional circumstances *can* result in higher discounts, at no point did it disclose that these additional circumstances were the rule rather than the exception.  Oracle never disclosed, and GSA had no reason to believe, that the discounting tiers Oracle represented as being their "standard" discount levels only applied to a minority of transactions.  Compl. ¶ 86.

Oracle asserts that it was not obligated to update its prior disclosure about the percentage of non-standard transactions because "[t]here was nothing for Oracle to amend" as "[a]ll of the previous disclosures described practices and policies that were no longer in place."  Mem. at 27.  To the contrary, Oracle stated on multiple occasions that its original discounting disclosures remained in effect unless specifically modified as part of the E-Business disclosures: "[e]xcept as previously discussed and identified in previous modification submissions, *there have been no changes in commercial discount/pricing policies and practices from that originally provided [during negotiations]*."  Compl. ¶ 87 (emphasis added).  Oracle's statements that non-standard transactions were "unique" and "used in less than five percent (5%) of the total number of commercial transactions," Compl ¶ 35, were never "discussed and identified" in Oracle's E-Business disclosures or at any other time.  Compl. ¶ 86; Mem. Ex. 6.  Thus, Oracle's affirmative misrepresentations that there had been no changes to its discounting practices are actionable.

## III.   Oracle's Fraud In Performance Of The Contract Is Actionable Under The FCA

Oracle asserts that the "PRC Reporting and Compliance allegations" fail to state FCA claims because they "lack either affirmative falsehoods or claims for payment."  Mem. at 28.

Again, Oracle's interpretation of the post-contract formation allegations as alleging only narrow and distinct "PRC Reporting" and "PRC Compliance" claims is misguided.  The Complaint adequately alleges affirmative misstatements and omissions in the performance of the Contract and identifies the "claims for payment."

### A.    The Complaint Adequately Alleges False Statements

Oracle erroneously asserts that the Complaint fails to allege any "affirmative misrepresentation or lie" by Oracle during performance of the Contract.  Mem. at 28.  In fact, the Complaint enumerates numerous specific and detailed fraudulent statements.  As stated above, the Complaint alleges facts showing 1) that Oracle provided commercial customers with discounts that exceeded the discount levels disclosed to GSA; 2) that Oracle's "non-standard" discounts exceeded the five percent of transactions disclosed to GSA; and 3) that it was Oracle's practice to manipulate transactions with BOA customers in an attempt to evade its reporting requirements under the PRC.  *See supra* at § II.B.  Oracle never informed GSA of the marked discrepancy between its real world discount practices and its prior disclosures.  Compl. ¶¶ 4, 60, 65, 68-78.   Instead, it stated time and time again during performance of the Contract that there had been no changes in its discounting policies and practices.  Compl. ¶¶ 79, 87.

Thus, the Complaint adequately alleges the following false statements and omissions by Oracle during performance of the Contract:

- Oracle stated on multiple occasions that there had been no changes in its discounting policies and practices when it knew those statements were not true because (1) Oracle's commercial customers were receiving discounts at levels significantly higher than prior disclosures; and (2) it was Oracle's practice to employ schemes to make sales seeking a high discount somehow "non-standard," for the sole purpose of evading its requirements under the PRC.   Compl. ¶¶ 57-59, 62-63, 64-78, 79, 83-84, 87.

- Oracle fraudulently concealed that it was giving discounts to BOA customers that exceeded the levels previously disclosed to GSA, even though it was expressly obligated under the PRC to inform the GSA of changes in its discount practices. Compl. ¶¶ 25-27, 57-59, 62-63, 83-84.

- Oracle fraudulently concealed its practice of manipulating transactions to avoid the PRC's reporting requirements, even though the PRC expressly required Oracle to report any changes in its discounts or discounting practices.[12]  Compl. ¶¶ 25-27, 64-78.

As a result of these false representations, GSA was induced to continue to maintain contract terms and conditions to which it would not have agreed had Oracle accurately and truthfully disclosed its commercial sales practices.  Compl. ¶¶ 88-89.  Thus, the Government has adequately alleged false statements sufficient to withstand defendants' motion to dismiss. *See, e.g., Harrison,* 176 F.3d at 791; *Ubl,* 2007 U.S. Dist. LEXIS 56207, at **8-11; *Carter,* 2009 U.S. Dist. LEXIS 63649, at **18-21; *Vosika,* 2004 U.S. Dist. LEXIS 18349, at *14.

Defendants' reliance on *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370 (4th Cir. 2008), is misplaced.  The relators in *Wilson* alleged that defendant falsely represented that it would adhere to certain maintenance requirements in its government contract, including the requirement to maintain vehicles in a "safe operating condition and good appearance."  525 F.3d at 374.  The Fourth Circuit held that these maintenance requirements were "vague," "imprecise," and "subjective," and, thus, "it [was] not exactly clear what would qualify as adequate (or inadequate) maintenance" under the contract.  *Id.* at 377. Such "vague maintenance provisions . . . do not qualify as objective falsehoods and thus do not constitute false statements under the FCA."  *Id.*  The false statements at issue here, by contrast, are objectively false.  Oracle unequivocally stated that there had been no changes to its

---

[12] This conduct also constitutes a "fraudulent course of conduct" under the FCA. *Harrison,* 176 F.3d at 788.

discounting practices and policies when in fact there had been.  In contrast to *Wilson,* Oracle's

misrepresentations were expressions of fact capable "of being adjudged true or false," and the

question of whether Oracle's actual discounting practices were different from its disclosures

does not require "subjective interpretation" of an "imprecise contractual provision."  *Id.* at 377-

78.  Indeed, the statements at issue here are similar to those that the Fourth Circuit found

actionable in *Harrison*.  *See* 176 F.3d at 781, 791 (defendant's statement that a project would

take only 1.5 years to complete and his underestimation of overhead costs in a bid submission

were, if true, objectively false statements and thus actionable under the FCA).

### B.      The Complaint Adequately Alleges False Claims For Payment

Defendants assert that the "PRC Reporting and Compliance allegations" fail to state

FCA claims because "the Complaint has not identified a single false claim for payment that

Oracle submitted in connection with these allegations." Mem. at 29.  Again, contrary to

defendants' attempts to shoehorn this case into a simple breach of the PRC, the Complaint

alleges a broad, interrelated fraud during performance of the Contract involving multiple

affirmative misrepresentations and fraudulent claims.  Oracle affirmatively stated on over a

dozen occasions beginning in September 1999 that there had been no changes to its discounting

policies and practices from what had previously been disclosed to the Government.  Compl. ¶¶

79, 87.  As shown above, these statements were false for multiple reasons.  (*See supra,* at 18-

24.)  Oracle made these misrepresentations to induce GSA to continue to accept a discount

structure it would not have agreed to had Oracle accurately disclosed its discounting practices.

(Compl. ¶¶ 3, 79, 87.)

The Fourth Circuit has recognized that where a defendant obtains a Government

contract by fraud, all claims subsequently submitted pursuant to that contract constitute false claims within the meaning of the FCA. *See Harrison,* 176 F.3d at 790-91; *see also United States ex rel. Marcus v. Hess,* 317 U.S. 537 (1943) (finding contractor liable under the FCA for claims submitted under a contract obtained via collusive bidding). Here, GSA was fraudulently induced by Oracle's misrepresentations to enter into contract modifications and continue to accept the discount levels originally proposed by Oracle. Compl. ¶ 3. Thus, every subsequent claim for payment constitutes a false claim. *See Harrison,* 176 F.3d at 790-91 (allegations that misrepresentations induced Government to enter into subcontract and, thus, that "all demands for payment under the subcontract were false claims" adequately stated FCA claim); *Ubl,* 2007 U.S. Dist. LEXIS 56207, at **8-11 ("false claim" element was adequately pled because where Government has been induced to enter into contract through fraud, "all claims subsequently submitted pursuant to the contract are sufficient to constitute 'false claims' within the meaning of the False Claims Act").

Even assuming the Government's FCA claims were based on an alleged discrete breach of the PRC (which it is not), the allegations of the Complaint would still be sufficient to plead an FCA claim. An analysis of the limited data provided by Oracle for the time period immediately after the contract was executed shows that "Oracle routinely sold software licenses to . . . Commercial End Users [the BOA customers], at discounts greater than 20 percent," the highest discount level disclosed to GSA. Compl. ¶ 59. Those facts constitute a violation of the PRC. Compl. ¶ 27 (PRC violated where company "[g]rants more favorable discounts or terms and conditions than those contained in the . . . documents upon which contract award was predicated."). The Complaint alleges that "Oracle's false and fraudulent conduct led to the

-28-

submission of false claims for payment to the United States." Compl. ¶ 88.  The Complaint

further identifies executive agencies that purchased under the contract and describes the false

claims as "invoices for payment of Oracle products sold under the Contract."   Compl. ¶¶ 92,

98, 100.  These allegations are sufficient to plead the "false claim" element of an FCA claim.

*Carter,* 2009 U.S. Dist. LEXIS 63649, at **26-27 (in denying motion to dismiss, court stated

that "Relator need not include the number, date and time of every invoice or time card

submitted over the course of two years in order to survive a motion to dismiss . . . .  Such a

requirement would be irrelevant to both the general purposes of the federal system of notice

pleading and the more specific goals of Rule 9(b) in FCA cases;").[13]

## CONCLUSION

For all of the foregoing reasons, defendants' motion to dismiss the Government's

Complaint for failure to state a claim upon which relief could be granted should be denied.

Respectfully submitted,

TONY WEST
Assistant Attorney General

NEIL H.  MACBRIDE
United States Attorney

---

[13]Oracle's assertion that the Government must identify every transaction by Oracle that violated the PRC is unavailing.  Oracle has made thousands of sales to BOA customers, the overwhelming majority of which were at discounts higher than Oracle's disclosures and the discounts GSA was receiving.  Compl ¶ 59, 62, 83.  Requiring the Government to list each and every one of these transaction in its Complaint is simply not feasible, nor is it required.  *Carter,* 2009 U.S. Dist. LEXIS 63649, at **24-25 ("'particularly in the context of federal FCA cases,' it is impractical to require a 'plaintiff to plead the facts of each individual claim, particularly where the claims are numerous and extend over the course of several years'") (citation omitted). Nevertheless, the Government has provided multiple examples in the Complaint of transactions where commercial customers received discounts greater than the amount disclosed to the Government.  Compl. ¶ 96.

_____/s/_____
By:     Richard W. Sponseller
        Assistant United States Attorney
        VSB # 39402
        United States Attorney's Office
        Justin W. Williams U. S. Attorney's Building
        2100 Jamieson Avenue
        Alexandria, VA 22314
        Telephone: 703.299.3700
        Facsimile: 703.299.3898
        E-mail: Richard.Sponseller@USDOJ.GOV

        JOYCE R. BRANDA
        SARA MCLEAN
        DAVID WISEMAN
        CHRISTELLE KLOVERS
        MELISSA HANDRIGAN
        Civil Division
        U.S. Department of Justice
        601 D Street
        P.O. Box 261
        Ben Franklin Station
        Washington, DC  20044
        (202) 514-0132
        FAX No. (202) 307-3852
        Attorneys for the
        United States of America

Dated: 10/12/2010