IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

NOV - 2 2010

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA, <u>ex rel.</u> )
      PAUL FRASCELLA            )
                               )
            Plaintiff,          )
                               )     1:07cv529 (LMB/TRJ)
      v.                        )
                               )
ORACLE CORP., ORACLE USA, INC.  )
                               )
            Defendants.         )

## MEMORANDUM OPINION

### I. Background

This action is a False Claims Act ("FCA") case in which the government alleges that defendants Oracle Corporation and Oracle USA, Inc. (collectively "Oracle") made false and fraudulent statements to the General Services Administration in connection with a contract to provide software products to various federal agencies. The core of the government's claim is that Oracle failed to disclose to the government the deep discounts that it offered to many of its commercial customers, thereby resulting in substantial overcharges to the government.

#### A. General GSA Contract Terms

The General Services Administration of the United States ("GSA") negotiates, awards, and manages Multiple Award Schedule ("MAS") contracts, which provide federal agencies with a simplified process for obtaining commercial supplies and services at fair and reasonable prices. 48 C.F.R. § 8.402. To evaluate whether offered prices are reasonable, GSA requires an offeror to

disclose its commercial pricing policies and sales practices.
GSA also conducts various analyses of those disclosures, such as
comparing "the terms and conditions of the MAS solicitation with
the terms and conditions of agreements with the offeror's
commercial customers." 48 C.F.R. § 538.270(c). GSA also
reserves the right to request and audit transactional data
reflecting a prospective contractor's actual commercial sales.

Moreover, GSA contracts typically include a Price Reductions
Clause ("PRC"), which requires GSA contractors to maintain a
static relationship between GSA's negotiated discounts or prices
and those for a designated customer or category of customers, as
identified and agreed upon during contract negotiations. Such
designated customers are known as Basis of Award ("BOA")
customers. See United States's Compl. in Intervention ¶¶ 25-26.
If the relationship between the prices charged to the government
and those charged to the BOA customer changes during the life of
a MAS contract, the contractor must disclose the change to GSA
and offer discounts or prices that restore the static
relationship. Id.

B. Oracle's GSA Contract

In 1997, GSA issued MAS Solicitation Number FCI-96-DL0001B.
Id. ¶ 40. In response to that solicitation, Oracle provided
written disclosures to the government regarding its commercial
pricing for its software products. Id. ¶ 31-33. Those initial

2

disclosures were made on August 5, 1997, September 30, 1997, and November 4, 1997. Id. As part of its initial disclosures, GSA also required Oracle to complete a Commercial Practices Chart ("CPC"), and Oracle complied with that requirement. Id. Thereafter, the government and Oracle engaged in approximately sixteen months of negotiations, during which representatives of Oracle and GSA met in person on multiple occasions. Id. ¶ 39. On December 1, 1998, Oracle sent its Best and Final Offer ("BAFO") to the GSA Contracting Officer, certifying that "Oracle Corporation acknowledges that all data submitted in response to Solicitation Number FCI-96-DC0001B [sic] is accurate, complete, and current." Id. ¶¶ 40-41.[1] The BAFO also stated that relevant details regarding Oracle's commercial practices "have been provided during negotiations and have also been reviewed by GSA officers." Id.

On December 15, 1998, Oracle was awarded GSA MAS contract number GS-35F-018J (hereinafter "the Contract" or "the 1998 Contract"), effective December 1, 1998 through November 30, 2003. See United States's Compl. in Intervention ¶ 45.[2] As part of

---

[1] Oracle's certification erroneously refers to "Solicitation Number FCI-96-DC0001B." It appears that the correct solicitation number for the contact was FCI-96-DL0001B, as cited in paragraph 40 of the Complaint in Intervention.

[2] The contract was later temporarily extended through October 2006 to allow time for an audit and negotiation of a follow-on contract.

3

that 1998 Contract, GSA and Oracle agreed that the relevant BOA customer for the Contract would be "sales of Oracle's perpetual software licenses to Oracle's U.S. commercial end-user customers."  Id. ¶ 43.  The parties further agreed that the PRC would not apply to software license transactions "in excess of $200,000 per order."  Id.

## C.  1998 Audit

Meanwhile, on September 1, 1998, three months before the effective date of the Contract, GSA's Office of Inspector General ("OIG") issued a report on a routine pre-award audit of Oracle's commercial pricing.  The audit was based on sales data submitted by Oracle for the six-month period between September 1, 1997 and February 28, 1998, and was designed "to verify that the commercial practices information submitted in [Oracle's] offer [was] current, accurate, and complete."  Amend. Mem. of Law in Supp. of Defs.'s Mot. to Dismiss at Ex. 2.  The OIG's report included an analysis of the type, nature, and extent of discounts that Oracle provided to commercial customers in software licensing transactions.  See id. at Ex. 3.  The report concluded that in light of discounts being offered to Oracle's commercial customers, "GSA is not being offered fair and reasonable prices." Id.  Moreover, at multiple points throughout the 1998 audit report, OIG states that Oracle's disclosures and certifications were inadequate to allow it to evaluate the accuracy or

4

completeness of the sales data submitted to the GSA auditors.
For example, the first page of the OIG audit report states:

> The audit results are qualified to the extent that
> Oracle could not certify that the sales data is
> reconcilable to the audited financial statements, and
> therefore we could not assure ourselves that the data
> is accurate, current, and complete.

Id. On the third page, the GSA OIG auditors repeat the same
statement quoted above, and then add: "Additionally, the
automated sales data provided by Oracle did not contain
sufficient information to allow us to effectively use it in
identifying sales and discounts for review." Id.

### D. 2001 E-Business Amendments

In May 2001, Oracle informed GSA that it wished to modify
the 1998 Contract to include upgraded versions of many of the
software licenses on the MAS schedule, which Oracle was now
marketing as part of its "E-Business" category of products. Id.
¶ 80. In a letter dated May 2, 2001, Oracle provided GSA with
disclosures regarding its commercial sales practices and pricing
with respect to such E-Business products. Id. In that letter
and its related attachments, Oracle specifically described its E-
business discounts, indicating that they are determined primarily
by order size, with "[t]he larger the order, the larger the
discount." Id. ¶ 81. The letter also included an attachment
with a chart displaying a comparison of discounts offered to

Oracle's commercial customers, versus those offered to the government. Id.

## E. Plaintiff's Complaint

On May 29, 2007, Relator Paul Frascella filed a qui tam Complaint alleging violations of the False Claims Act by Oracle in connection with the formation and performance of its 1998 Contract. The United States filed a Notice of Election to Intervene on April 2, 2010, and then filed its Complaint in Intervention on July 29, 2010. The government's Complaint contains four distinct categories of claims of wrongdoing, arising out of numerous allegedly false or fraudulent statements made by Oracle, along with Oracle's alleged failures to comply with various PRC and other reporting and disclosure requirements. The government's four categories of factual allegations break down as follows:

### 1. 1997 Disclosures

First, the government alleges that Oracle fraudulently induced GSA to enter into the 1998 Contract by making false representations regarding pricing and discounting for Oracle's commercial software licenses. Specifically, the United States alleges that Oracle falsely represented that: (a) discounts were based upon customer category; (b) discounts fell within certain disclosed ranges; (c) "non-standard" discounts were used in less than five percent of the total number of transactions; and (d)

6

single license order discounts were based upon the value of the
individual transaction.  United States's Compl. in Intervention
¶¶ 51-63.  These allegedly fraudulent disclosures were all
contained in the CPCs that Oracle submitted on September 30, 1997
and November 4, 1997, during the initial stages of the Contract
negotiations.  Id. ¶¶ 33-37.

### 2.  PRC Reporting

The government further alleges that Oracle breached the PRC
in its Contract by failing to report or offer to GSA certain
software license discounts that Oracle purportedly gave to its
commercial customers.  Id. ¶¶ 65-66.  In fact, the government
alleges that "Oracle routinely granted discounts to all
categories of customers that exceeded the discounts that were
disclosed to GSA, and were inconsistent with the discounting
methodology that Oracle had represented to GSA."  Id. ¶ 65.
Moreover, the government alleges that Oracle repeatedly certified
that "there have been no changes in commercial discount/pricing
policies and practices from that originally provided in response
to Section M.1 of the solicitation," despite knowing that that
statement was inaccurate.  Id. ¶ 66.

### 3.  PRC Compliance

In a related allegation, the government alleges that Oracle
"consistently manipulated its sales of software licenses to
Commercial End Users" in order to evade its PRC reporting

obligations. Id. ¶ 67. Specifically, the government contends
that Oracle established a mechanism to monitor its commercial
software license sales and to ensure that any proposed deal that
would have triggered PRC obligations under the Contract would be
"reworked so that it no longer met the criteria and GSA would not
have to be informed of, or provided with, the higher discount."
Id. ¶ 68. The government alleges that this manipulation
dramatically increased the cost to the government of purchases
made under the Contract. Id.

### 4. E-Business Disclosures

Finally, the government's Complaint in Intervention alleges
that Oracle fraudulently induced GSA to modify the 1998 Contract
in May 2001 by (a) falsely representing that the E-Business
pricing structure set discounts based entirely upon transaction
size and pursuant to a discount chart, and (b) failing to correct
previous false disclosures made during the negotiation process.
Id. ¶¶ 80-86. The government argues that those representations
were false because "Oracle engaged in numerous E-Business
transactions with non-GSA customers in which Oracle granted
discounts that were inconsistent with the 'Commercial Discounts'
that are represented on the chart presented to GSA." Id. ¶ 82.
Accordingly, the government claims that to the extent that Oracle
failed to grant GSA the same discounts that it granted its

8

commercial customers, Oracle overcharged the government for its
E-Business software licenses. Id. ¶ 85.

The government alleges that all of Oracle's false statements
and fraudulent conduct led to the submission of false claims for
payment to the United States. Id. ¶ 88. Specifically, the
government alleges that it relied upon false statements made by
Oracle in deciding to award the 1998 Contract to Oracle, that
Oracle knew that these statements were false at the time that it
made them, and that the United States was damaged by each false
claim submitted under the Contract. Id. ¶¶ 88-90. The
government's Complaint in Intervention thus asserts two counts
for violation of the False Claims Act, with Count 1 alleging
violation of 31 U.S.C. § 3729(a) (2006) (dealing with false
claims), and Count 2 alleging violation of 31 U.S.C. §
3729(a)(1)(B) (dealing with false statements). Id. ¶¶ 97-100.
The United States also asserts claims for Breach of Contract
(Count 3), Fraud in the Inducement (Count 4), Constructive Fraud
(Count 5), Fraud by Omission (Count 6), Payment by Mistake (Count
7), and Unjust Enrichment (Count 8).

The United States seeks judgment on Counts 1 and 2 against
Oracle for statutory penalties and damages as provided in the
False Claims Act, along with such other relief as the Court deems
just and proper. On Counts 3 through 8, plaintiff seeks judgment
against defendants in an amount to be determined at trial.

## F. Defendants' Motion to Dismiss

In its Motion to Dismiss for Failure to State a Claim, Oracle argues that all of the allegations in the United States's Complaint in Intervention should be dismissed because they are either untimely or fail to state a plausible claim to relief. Specifically, Oracle contends that all counts based upon the 1997 disclosures are barred by the applicable statutes of limitations, and that some of the claims based on PRC reporting and compliance obligations are also time-barred. Moreover, Oracle argues that all of plaintiff's allegations lack fundamental elements required to state a plausible claim to relief, and that the PRC reporting and compliance allegations in particular do not support counts for False Claims Act violations.

## II. Standard of Review

Under Fed. R. Civ. P. 12(b)(6), a complaint should not be dismissed "unless it appears certain that [plaintiff] can prove no set of facts that would support his claim and would entitle him to relief." Smith v. Sydnor, 184 F.3d 356, 361 (4th Cir. 1999). The Court must accept all of the complaint's well-pleaded allegations as true and view them in a light most favorable to the plaintiff. Smith, 1184 F.3d at 361. However, that requirement applies only to facts, not to legal conclusions. Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009).

10

In addition, "if the well-pled facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged- but it has not 'show[n]'- that the pleader is entitled to relief." Id. at 1950. "Factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Accordingly, a party must "nudge[] their claims across the line from conceivable to plausible" in order to survive a Rule 12(b)(6) motion to dismiss. Id. at 570.

## III. Discussion

### A. Statute of Limitations

In their Motion to Dismiss, defendants argue that many of the government's claims are barred by the applicable statutes of limitations. Specifically, defendants contend that the United States's claims based upon the 1997 disclosures, as well as any counts based on breach of the contractual PRC provisions or PRC-related false claims submitted before May 29, 2001, are barred by the False Claims Act, common law contract, and common law quasi-contract statutes of limitations. Similarly, defendants argue that any allegations of common law fraud based on conduct before May 29, 2004 are untimely and should be dismissed.

11

### 1. Applicable statutes of limitations

The statute of limitations for Counts 1 and 2 of the United States's Complaint in Intervention, which assert violations of the False Claims Act, is six years. See 31 U.S.C. § 3731(b)(1) (2006). Meanwhile, Counts 3 through 8 of the Complaint in Intervention assert various claims for common law fraud, breach of contract, and quasi-contract. The relevant statute of limitations for the fraud claims is three years, while the statute of limitations for the contract and quasi-contract claims is six years. See 28 U.S.C. § 2415 (2006); see also United States v. Intrados Int'l Mgmt. Group, 265 F. Supp. 2d 1, 12 (D.D.C. 2002) (applying 28 U.S.C. § 2415 to such common law claims). The relator's Complaint in this case was filed on May 29, 2007, and the United States filed its Complaint in Intervention on July 29, 2010.

The statutes of limitations for the False Claims Act and the common law counts provide for tolling during any period in which the responsible official did not know and could not reasonably have known the material facts. See 31 U.S.C. § 3731 (2006); see also 28 U.S.C. § 2415 (2006). The False Claims Act statute specifically provides for tolling when "facts material to the right of action" are unknown and could not reasonably have been discovered by the "official of the United States charged with responsibility to act in the circumstances." 31 U.S.C.

§ 3731(b)(1) (2006). Additionally, the False Claims Act's
statute of limitations provision permits extension of the six-
year statute of limitations to up to ten years if the government
files its complaint within three years of the date on which the
relevant material facts are known or should have been known by
the responsible official. See 31 U.S.C. § 3731(b)(1) (2006).[3]

### 2. Application to 1997 disclosures

The United States invokes the tolling provisions cited above
to argue that its False Claims Act counts and other claims based
upon allegedly false statements made during contract negotiations
that occurred *thirteen years ago* are somehow timely.
Specifically, the government argues that the United States
officials charged with responsibility to act in the circumstances
did not know and could not have reasonably known of Oracle's
false statements or fraudulent claims until relator Paul
Frascella filed his qui tam Complaint, or possibly until the
government completed its own investigation into Oracle and filed
its own Complaint in Intervention in July 2010, and that the
statute of limitations was therefore tolled in the interim.

As an initial matter, the parties disagree about which
government officials qualify as "official[s] . . . charged with

_____

[3] This extended ten-year statute of limitations is not
available to the government in this case because the government
did not file its Complaint in Intervention within three years of
the date on which it concedes that it should have known of any
potential claims against Oracle (May 29, 2007, when relator Paul
Frascella filed his Complaint).

responsibility to act in the circumstances" for tolling purposes under 31 U.S.C. § 3731(b)(1) (2006) and 28 U.S.C. § 2415 (2006). Defendants contend that government officers within the GSA OIG qualify as responsible officials, and that the 1998 GSA audit provided those officers with all relevant material facts necessary to start the clock on the statute of limitations. <u>See</u> Am. Mem. of Law in Supp. of Defs.'s Mot. to Dismiss at 11-15. The United States responds that only officials within the Department of Justice ("DOJ") constitute responsible officials, and that none of them could reasonably have known about Oracle's alleged misconduct until at least 2007. <u>See</u> United States's Opp. to Defs.'s Mot. to Dismiss at 8-13.

There is no clear authority in the Fourth Circuit resolving the question of who qualifies as an "official . . . charged with responsibility to act" under the False Claims Act or the common law statutes of limitations. Rather, the identity of the responsible official remains an open question of law, which was raised but not decided in <u>United States ex rel. Sanders v. N. Am. Bus. Indus., Inc.</u> 546 F.3d 288, 196 n.2 (4th Cir. 2008). Courts in other circuits are split on the issue, with many holding that the statute of limitations does not begin to run until a DOJ official has knowledge of the material facts. <u>See, e.g.</u>, <u>United States v. Carell</u>, 681 F. Supp. 2d 874, 881 (M.D. Tenn. 2009); <u>United States v. Tech Refrigeration</u>, 143 F. Supp. 2d 1006, 1009

14

(N.D. Ill. 2001); <u>Jana, Inc. v. United States</u>, 34 Fed. Cl. 447, 451 n.6 (1995); <u>United States v. Incorporated Vill. of Island Park</u>, 791 F. Supp. 354, 363 (E.D.N.Y. 1992). However, a handful of courts have also concluded that the responsible official may be defined more broadly to include other government officials outside of DOJ. <u>See, e.g.</u>, <u>United States ex rel. Kreindler & Kreindler v. United Techs. Corp.</u>, 777 F. Supp. 195, 205 (N.D.N.Y. 1991) (dismissing False Claims Act claims where "the facts material to the relator's cause of action were known . . . by the senior officials in charge of the Black Hawk project"); <u>see also United States v. Kensington Hosp.</u>, No. 90-5430, 1993 WL 21446, at *14 (E.D. Pa. Jan. 14, 1993) (rejecting, albeit in *dicta*, the government's position that the responsible official was limited to DOJ officials, where FBI and IRS agents knew material facts underlying the fraud claim).

The structure and legislative history of the False Claims Act provide similarly mixed signals. Congress added the tolling provision to the False Claims Act's statute of limitations during the 1986 amendments to the False Claims Act, adopting the "official . . . charged with responsibility" language from the common law statute of limitations tolling provision in 28 U.S.C. § 2416(c). <u>See</u> 132 Cong. Rec. S11,238 (1986) (Sen. Grassley). The intention was to "conform the False Claims Act to the general rule under common law in most States" by providing a "limited

15

tolling period [for when] the fraudulent conduct has been concealed, as it frequently is, from the Government." <u>False Claims Act Amendments: Hearings Before the H. Subcomm. on Admin. Law and Gov't Relations of the H. Comm. on the Judiciary</u>, 99th Cong. 118, 159 (1986).

The language chosen during the amendments process, "official of the United States charged with responsibility to act in the circumstances," appears at first blush to refer most logically to an official within DOJ, given that the Attorney General and his agents have the exclusive authority to enforce the False Claims Act and to prosecute claims for fraud on the government. <u>See</u> 31 U.S.C. § 3730 (stating that False Claims Act claims can only be brought by the Attorney General or a private person suing in the name of the United States); <u>see also</u> 31 U.S.C. § 3711(b)(1) (providing that agencies are permitted to settle and compromise certain claims, but not fraud claims); 28 C.F.R. § 0.45(d) (assigning common law fraud claims to the Assistant Attorney General, Civil Division). However, it bears noting that the False Claims Act makes several specific references and grants of authority to the Attorney General or the Deputy Attorney General, indicating that Congress knew how to identify those executive officials when it so chose. <u>See</u> 31 U.S.C. §§ 3730(a), 3730(b), 3730(e)(4)(a), 3733(a). Despite those specific references, however, the tolling provision in the False Claims Act does not

refer explicitly to either the Attorney General or to DOJ, instead using the broader and more general phrase "official of the United States."

Moreover, in its Memorandum in Opposition to the Motion to Dismiss, the United States identifies a quotation from the Senate Committee Report prepared during the adoption of the 1986 False Claims Act amendments, which states that "the statute of limitations does not begin to run until the material facts are known by an official *within the Department of Justice* with the authority to act in the circumstances." S. Rep. No. 345, at 30 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5295 (emphasis added). However, as defendants note, the draft tolling provision in place at the time that the Senate Committee Report was prepared referenced "the official within the Department of Justice with authority to act." S. Rep. No. 99-345, at 44. After the Report was issued, the full Senate struck the "Department of Justice" phrase and replaced it with the current "official . . . charged with responsibility to act" language. See 132 Cong. Rec. 20530, 20537-42 (1986). Thus, the legislative history on this issue is equivocal at best.

The only indirect guidance from the Fourth Circuit comes from United States v. Boeing Co., Inc., 845 F.2d 476, 481-82 (4th Cir. 1988), rev'd on other grounds sub nom, Crandon v. United States, 494 U.S. 152 (1990)). Boeing is admittedly not quite on

17

all fours with this case because it did not deal directly with a
False Claims Act or even a common law fraud claim, instead
involving an allegation that the defendant, Boeing, had violated
a conflict of interest statute by making large severance payments
to former Boeing employees. The Fourth Circuit in Boeing,
however, confronted the issue of whether the government's claims
were timely in light of the tolling provision in the relevant
common law statute of limitations, which contained language
substantially similar to the statutes at issue here. Id. at 482.
Specifically, the Boeing court addressed whether employees of a
Defense Contract Audit Agency ("DCAA"), which had prepared a
report identifying the allegedly improper severance payments,
could be considered to be officials "charged with the
responsibility to act in the circumstances." Id. Similar to
this case, the government in Boeing argued that the responsible
official was the Department of Defense contracting officer, not
any of the DCAA auditors, but the Fourth Circuit rejected that
position, holding that:

> The government fails to explain, however, why DCAA
> employees charged with auditing responsibilities were
> not charged with the responsibility to act here.
> Conclusory statements that the contracting officer was
> the first official with the knowledge and ability to
> recognize a conflict do not justify tolling the statute
> under § 2416(c) and are refuted by the fact that DCAA
> employees recognized that a problem existed. The
> decision to refer that problem to the contracting
> officer does not diminish their ability to act.

18

Id. The Boeing holding thus suggests that the Fourth Circuit may ultimately take a similarly broad view of the definition of "official . . . charged with responsibility to act" under the False Claims Act.[4]

In this case, however, it is not necessary to reach a final conclusion as to the identity of the relevant responsible officials because the government's claims relating to the 1997 disclosures are time-barred under *either* interpretation of the statute of limitations. If the GSA officials are included within the definition of an "official . . . charged with responsibility to act," then the statute of limitations quite obviously began to run at the time of the 1998 audit, when the GSA OIG audited Oracle's commercial discounts and prices and concluded both that Oracle had not made all required disclosures and that GSA was not being offered fair and reasonable prices. See Am. Mem. of Law in Supp. of Defs.'s Mot. to Dismiss at Ex. 2.

The government has argued in its opposition that the 1998 audit report did not contain sufficient "facts material to the right of action," as required by the FCA and common law tolling

---

[4] The government has argued in its opposition that Boeing is distinguishable because it did not involve allegations of fraud or False Claims Act violations, which are often especially difficult to detect. See United States's Opp. to Defs.'s Mot. to Dismiss at 9-10. However, it is not immediately clear why the tolling provisions for False Claims Act and fraud cases should work differently from those for other types of claims, particularly given that the statutory language is similar or nearly identical in each circumstance.

19

provisions. See United States's Opp. to Defs.'s Mot. to Dismiss
at 10 (citing 31 U.S.C. § 3731(b)(2) and 28 U.S.C. § 2416(c)).
However, the report clearly indicated that Oracle had been less
than forthcoming during the disclosure process, and that Oracle's
commercial customers were being given larger discounts than the
GSA. Under the circumstances, therefore, the GSA had all
necessary material facts at its fingertips to conclude that it
had been the victim of false or fraudulent statements during the
contract negotiation process, and that any claims submitted for
payment under the final contract were therefore likely to give
rise to False Claims Act liability.

At the very least, the audit report put the government on
inquiry notice and provided "sufficient critical facts to cause a
reasonable person to investigate." Kensington Hosp., 1993 WL
21446 at *6; see also United States ex rel. Bauchwitz v.
Holloman, 671 F. Supp. 2d 674, 695-96 (E.D. Pa. 2009) (finding
that "the start date is when the plaintiff possesses enough
knowledge that would lead a reasonable person to investigate
whether a false claim was made") (citing Zeleznik v. United
States, 770 F.2d 20, 24 (3d Cir. 1985)).[5] Thus, if GSA OIG

---

[5] The United States has repeatedly argued, both in its
briefing and at oral argument on the Motion to Dismiss, that the
1998 audit report did not put the government on notice of
potential fraud because it included language qualifying its
conclusions in light of the fact that Oracle may not have
provided accurate or complete financial information during the
audit process. However, far from strengthening the government's
argument, that fact only undermines it. If the GSA OIG auditors                          •

officers qualify as responsible officials, then the statute of limitations began to run on September 1, 1998, when the GSA OIG issued its audit report. The government's allegations relating to the 1997 disclosures therefore fall outside the six-year statutes of limitations for False Claims Act and common law contract claims, as well as the three-year statute of limitations for common law fraud claims.[6]

Moreover, even if the United States is correct that the definition of "official . . . charged with responsibility to act" for tolling purposes is limited to the Attorney General and attorneys within DOJ, the statute of limitations in this case still began to run no later than September 1, 1998, when the GSA OIG report was distributed. After all, even those courts that narrowly construe the responsible official language have nearly uniformly recognized that knowledge by government officials outside of DOJ may nonetheless trigger the statute of limitations under the tolling provision's "reasonably should have known" clause. See United States v. Tech Refrigeration, 143 F. Supp. 2d 1006, 1010 (N.D. Ill. 2001); see also United States v. Inc. Vill.

---

were dissatisfied with the financial information provided by Oracle, they were empowered to require more complete disclosures. More to the point, if the auditors believed that the information provided was inaccurate or untruthful in some material respect, that should have served as yet another red flag prompting GSA to investigate further before awarding Oracle the contract.

[6] This is true regardless of whether the United States's July 29, 2010 Complaint in Intervention is deemed to relate back to the relator's May 29, 2007 Complaint.

of Island Park, 791 F. Supp. 354, 374 (E.D.N.Y. 1992) (holding that DOJ officials reasonably should have known about an alleged fraud claim in light of a HUD audit report that was widely disseminated throughout the government).

In this case, while the 1998 GSA OIG audit report was not as widely distributed as the report in Island Park, the report distribution list indicates that at least seven copies of the report were sent to four different offices within GSA. One of the recipients of the report was the GSA Assistant Regional Inspector General for Investigations, an officer within the GSA Office for Investigations. The Office for Investigations is the section of GSA charged with investigating fraud, and it is required by law to refer possible fraud matters to DOJ. See 5 § U.S.C. app. 3, § 4(a)(1), 4(d) (2006); 28 C.F.R. pt. 0, subpt. Y, app. Directive 14-95 (Apr. 6, 1995). The GSA Assistant Regional Inspector General was thus clearly "an official in a position both to recognize the existence of a possible violation of [the FCA] and to take steps to address it." 132 Cong. Rec. 20536 (1986).

Accordingly, once GSA's pre-award audit had identified potential issues with Oracle's disclosures and its commercial discounting practices, the government either should have refused to award Oracle the MAS contract, or the GSA Office for Investigations should have alerted the relevant DOJ officials

about a potential fraud and False Claims Act lawsuit. The
government should then have filed any False Claims Act and common
law contract or quasi-contract claims based upon the 1997
disclosures no later than September 1, 2004, and should have
brought all common law fraud claims based upon the 1997
disclosures no later than September 1, 2001. Having failed to do
so, the government may not now press its thirteen-year-old
claims.

Finally, the policies underlying statutes of limitations
fully support dismissing the portions of the United States's
Complaint in Intervention dealing with the 1997 disclosures.
Statutes of limitations are intended to "protect defendants and
the courts from having to deal with cases in which the search for
truth may be seriously impaired by the loss of evidence, whether
by death or disappearance of witnesses, fading memories,
disappearance of documents, or otherwise." United States v.
Kubrick, 444 U.S. 11, 117 (1979). With regard to the 1997
disclosures, all of the pitfalls that statutes of limitations are
designed to avoid would almost certainly be present, including
the immense difficulties presented by requiring whatever
witnesses who are still available to recall what was said,
intended, and understood during complex contract negotiations
from over a decade ago. For all these reasons, defendants'

Motion to Dismiss the allegations based on the 1997 disclosures
on grounds of untimeliness will be granted.

### 3. Application to other allegations

Similarly, a portion of the government's claims based upon
the PRC reporting and compliance obligations will be dismissed as
untimely. Specifically, any False Claims Act, common law breach
of contract, or common law quasi-contract claims premised upon
conduct pre-dating May 29, 2001 will be dismissed under the
applicable statutes of limitations, and any common law fraud
claims arising out of conduct before May 29, 2004 will also be
dismissed as time-barred.

This Court arrives at those dates by counting backwards
from the date on which relator Paul Frascella filed his qui tam
Complaint, thereby tolling the statute of limitations. The False
Claims Act expressly provides that the filing of a relator's
complaint tolls the statute of limitations for claims
subsequently brought by the government that "arise out of the
[same] conduct, transaction, or occurrences set forth, or
attempted to be set forth, in the prior complaint  . . . ." 31
U.S.C. § 3731(c); see also United States ex rel. Miller v. Bill
Harbert Int'l Constr. Inc., 2007 WL 842082, at *1 (D.D.C. March
19, 2007) (holding that all of the government's allegations in
its complaint relate back to the date of a relator's complaint
because they arose out of the same conduct, transaction, or

occurrence). That relation-back provision mirrors Fed. R. Civ.
P. 15, which allows for relation back of other civil claims
whenever the law that provides the applicable statute of
limitations allows relation back, as well as when an "amendment
asserts a claim or defense that arose out of the conduct,
transaction, or occurrence set out - or attempted to be set out -
in the original pleading." Fed. R. Civ. P. 15(c)(1)(a)-(b).

In this case, Frascella's Complaint and the United States's
subsequent Complaint in Intervention arise out of the same
conduct, transaction, or occurrence. In fact, the two complaints
relate to the exact same allegedly fraudulent course of behavior
by Oracle, and contend that Oracle's violations led to precisely
the same ultimate wrong. Namely, both the relator's Complaint
and the government's Complaint in Intervention allege that Oracle
failed to accurately disclose its commercial discounting
practices in an effort to avoid its PRC compliance obligations,
thereby resulting in substantial overcharges to the federal
government on its software licensing contract. For that reason,
defendants' contention that the government's allegations "differ
in time and type" from the allegations set forth in relator's
Complaint must be rejected. See, e.g., United States ex rel.
Wyke & Brown v. Am. Int'l, Inc., No. 01-60109, 2005 WL 1529669,
at *3 (E.D. Mich. June 20, 2005) (holding that a government's
complaint in intervention "arises out of the same conduct,

transaction and occurrences as those identified in the [relator's] complaint," where "[b]oth complaints are predicated on the [same] multi-million dollar, federally-funded contract.").

Counting backwards six years from May 29, 2007 for the False Claims Act and common law contract and quasi-contract claims yields a date of May 29, 2001, while counting back three years for the common law fraud claims yields a date of May 29, 2004. Accordingly, to the extent that any of the government's non-disclosure, false statements, or non-compliance claims rest on factual allegations dealing with conduct before those dates, the allegations will be dismissed as time-barred under the relevant statutes of limitations.[7]

## B. Fed. R. Civ. P. 12(b)(6)

In the remainder of defendants' Motion to Dismiss, they argue that all of the United States's allegations fail to state a plausible claim to relief because "key required element[s]" are missing from "each of the Complaint's . . . allegations." Am. Mem. of Law in Supp. of Defs.'s Mot. to Dismiss at 18. Defendants advance a variety of arguments in favor of dismissing the remaining counts in the government's Complaint in

---

[7] Given that many of the allegations in the United States's Complaint in Intervention do not provide specific dates, instead merely alleging a general pattern of fraud, the government will be required to file an Amended Complaint in Intervention stating only common law fraud claims based upon conduct occurring on or after May 29, 2004, along with any False Claims Act and breach of contract or quasi-contract claims based upon conduct occurring on or after May 29, 2001.

Intervention, including those counts that were timely filed. First, defendants argue that the Complaint in Intervention does not sufficiently allege common law fraud or a violation of the False Claims Act because such claims require proof of a material false statement, while the government fails to plausibly allege any affirmative misrepresentations or false claims for payment by Oracle. Id. at 18-19; 25-29. Defendants also assert that the breach of contract and quasi-contract claims fail because Oracle did not breach any legally enforceable obligations. Id. at 22-24. Specifically, defendants contend that the Complaint in Intervention does not identify an actual PRC violation because it never directly references the BOA customers who were to serve as the relevant point of comparison for PRC purposes. Id. Finally, defendants somewhat boldly proclaim that rather than serving as a means for Oracle to manipulate its commercial software license transactions to avoid triggering the PRC, Oracle's strict pricing discipline actually functioned as a means of PRC compliance, preventing Oracle from engaging in any transaction that would have violated the PRC. Id. at 22-23; 27-28.

However, none of defendants' arguments is persuasive. Rather, when read as a whole, the United States's Complaint in Intervention alleges an ongoing, interrelated fraud involving multiple false statements and omissions during the performance of the Oracle contract, leading to the submission and payment of a

27

number of false claims.  When properly construed, the Complaint
in Intervention thus plausibly alleges all required elements of
each of its claims to relief.

First, the United States does allege that Oracle made
multiple affirmative false or fraudulent statements related to
its discounting policies and practices throughout performance of
the contract.  The government contends that throughout the life
of the contract, Oracle gave its commercial customers discounts
significantly higher than the "standard" discounts disclosed
during the initial contract negotiations, and that it also used
"non-standard" discounts much more frequently than it initially
admitted.   See United States's Compl. in Intervention ¶¶ 35, 62.
Despite those facts, Oracle never informed GSA of the difference
between its pre-contract disclosures and its actual commercial
discounts.  To the contrary, Oracle affirmatively stated on
multiple occasions during performance of the contract, including
during the 2001 renegotiation of the contract terms relating to
E-business discounts, that "[t]here have been no changes in
commercial discount/pricing policies and practices from that
originally provided in response to Section M.1 of the
solicitation."   Id. ¶¶ 79, 87.

According to the allegations in the Complaint in
Intervention, which this Court accepts as true for the purposes
of defendants' Motion to Dismiss, those statements were false and

28

were made with the intent to induce GSA to enter into contract

modifications and to continue to accept the discounts as

originally disclosed.  Id.  Such allegations are sufficiently

detailed and plausible to state a claim to relief under both the

False Claims Act and common law.  See, e.g. Harrison v.

Westinghouse Savannah River Co., 176 F.3d 776, 791 (4th Cir.

1999) (holding that allegations that a defendant made false

representations to induce the government to approve a subcontract

"are sufficient grounds for a False Claims Act to survive a Rule

12(b)(6) motion"); United States ex rel. Ubl v. IIF Data

Solutions, 2007 U.S. Dist. LEXIS 56207, at *8-11 (E.D. Va. Aug.

1, 2007) (denying a motion to dismiss in a case where the

defendant was alleged to have made false statements to GSA to

induce it to enter into contracts at inflated prices).[8]  The False

Claims Act and fraud claims in this case therefore survive

defendants' Motion to Dismiss.

     The United States's Complaint in Intervention also

adequately alleges claims related to Oracle's breach of the PRC.

_____

     [8] Defendants' reliance on United States ex rel. Wilson v.
Kellogg Brown & Root, Inc., 525 F.3d 370 (4th Cir. 2008), to
argue the contrary is misplaced.  The Fourth Circuit in Wilson
held only that allegations of violations of "vague," "imprecise,"
and "subjective" contractual terms could not "qualify as
objective falsehoods and thus do not constitute false statements
under the FCA [False Claims Act.]"  Id. at 377.  The false
statements alleged here, by contrast, are objectively false, and
the contract terms regarding PRC disclosure and compliance are in
no way vague, subjective, or imprecise.

The United States alleges that "Oracle routinely provided
discounts to all classes of customer that were outside the ranges
set forth in its disclosures," and that "the KPMG data reveals
that Oracle routinely sold software licenses to . . . Commercial
End Users [the relevant BOA for the contract] at discounts
greater than 20 percent." United States's Compl. in Intervention
¶¶ 57, 59. Oracle then failed to disclose those discounts to the
government, in direct violation of the explicit terms of the PRC
clause in the contract. See id. ¶¶ 25-27, 65. Instead, it
submitted invoices to the government that were inflated because
they did not contain discounts comparable to what commercial BOA
customers were receiving. The Complaint in Intervention
therefore plausibly alleges claims related to Oracle's fraudulent
breach of the PRC provisions of the contract. See, e.g., United
States ex rel. Carter v. Haliburton Co., 2009 U.S. Dist. LEXIS
63649, at *18-21 (E.D. Va. July 23, 2009) (concluding that
allegations that defendants submitted inflated invoices under a
government contract were sufficient to withstand a motion to
dismiss False Claims Act claims).

Similarly, the government's Complaint in Intervention
plausibly alleges that Oracle fraudulently manipulated its
commercial transactions in order to evade the requirements of the
PRC. The United States contends that Oracle identified
transactions with its commercial BOA customers that would have

30

violated the PRC and then instructed its agents to "rework" those contracts so that they fell outside the PRC, thereby permitting Oracle to give those customers discounts significantly higher than those that GSA was receiving in essentially identical transactions.  See United States's Compl. in Intervention ¶¶ 67-78.  According to the Complaint in Intervention, Oracle would manipulate its discounts through a number of fraudulent schemes, including inflating the value of transactions to just over $200,000, converting them to "non-perpetual" licenses, amending contracts to improperly extend "price holds," and reworking sales so they went through a reseller.  Id.  This practice of manipulating BOA transactions, if true, clearly represents a significant and purposeful deviation from the sort of discounting practices that Oracle actually disclosed to GSA.  Moreover, accepting the government's factual allegations as true, the alleged fraud was both knowing and material and led to significant financial losses on the part of the government.  The alleged use of such techniques to evade PRC reporting requirements thus also states a plausible claim to relief on both the False Claims Act and common law counts.

## IV.  Conclusion

For the reasons stated above, the defendants' Motion to Dismiss will be granted in part as to: (1) any claims based upon the 1997 disclosures; (2) any claims alleging common law fraud occurring before May 29, 2004; and (3) any claims alleging False

31

Claims Act violations, breach of contract, or quasi-contract violations occurring before May 29, 2001. The Motion to Dismiss will be denied in all other respects, and the United States will be ordered to file an Amended Complaint in Intervention consistent with this decision.

Entered this 2nd day of November, 2010.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge