**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel*. PAUL FRASCELLA, | ) | |
| | ) | |
| Relator, | ) | |
| | ) | CASE NO.: 1:07cv529 (LMB/TRJ) |
| v. | ) | |
| | ) | False Claims Act Violations |
| ORACLE CORP., ORACLE | ) | Breach of Contract |
| AMERICA, *et al*., | ) | Constructive Fraud |
| | ) | Fraud By Omission |
| | ) | Payment by Mistake |
| Defendants. | ) | Unjust Enrichment |
| | ) | |
| | ) | |
| | ) | JURY TRIAL DEMANDED |

<u>**UNITED STATES' FIRST AMENDED COMPLAINT IN INTERVENTION**</u>

Plaintiff, the United States of America, by its undersigned counsel, represents as follows:

**INTRODUCTION**

1.      This is an action brought by Plaintiff, the United States of America ("United

States" or "Government"), to recover treble damages and civil penalties under the False Claims

Act, 31 U.S.C. §§ 3729-33 (FCA), and to recover damages under common law theories of breach

of contract, constructive fraud, fraud by omission, payment by mistake, and unjust enrichment.

2.      Relator, Paul Frascella, originally filed this action, on behalf of the United States,

pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b)(1).  The United

States files this First Amended Complaint in Intervention pursuant to 31 U.S.C. § 3730(b)(4)(A).

3.      This action arises out of Defendants' false or fraudulent conduct in providing false

information to the General Services Administration of the United States (GSA) about their

commercial pricing practices.  As a result of Defendants' false representations and the

Government's reliance upon those false representations, GSA was induced to enter into contract modifications and maintain contract terms and conditions to which it would not have agreed had Defendants accurately and truthfully disclosed their commercial sales practices to the Government.

4.      As discussed in detail herein, Defendants' false and fraudulent statements and conduct and material omissions took several interconnected forms.  First, Defendants submitted requests to modify GSA Multiple Award Schedule (MAS) Contract GS-35F-0108J (the Contract) which stated that their commercial pricing and discounting practices were consistent with the practices that had previously been disclosed to the United States.  These statements were false because, at the time they were made, Defendants were offering far higher discounts to commercial customers than had been disclosed to the Government during the negotiation of the Contract or at any subsequent time.  Second, Defendants breached their contractual obligations to 1) report to GSA that they had offered higher discounts to commercial customers than had been disclosed to GSA, and 2) provide proportionally higher discounts to Government purchasers.

5.      In addition, Defendants manipulated their commercial sales in an attempt to avoid a contractual obligation to reduce the prices offered to Government agencies consistent with reduced prices given to commercial customers, a practice never previously disclosed to GSA. From at least May 29, 2001 through December 31, 2006, Defendants used a small group of high level managers to systematically provide discounts to commercial customers that they should have, but did not, disclose to the Government.  Defendants' purported purpose for operating this group was to monitor their commercial sales practices in order to comply with the requirements of the Contract.  In practice, however, this group circumvented and violated the Contract

requirements by manipulating commercial sales so that those sales appeared to fall outside the Contract's reporting requirements.

6.      As a result of Defendants' false and fraudulent statements and conduct and material omissions, Defendants knowingly submitted and caused to be submitted false or fraudulent claims for payment to the United States for products that they sold to the United States.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action under 31 U.S.C. §§ 3730 and 3732.

8.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact business and are found in this District.

9.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a).

## PARTIES

10.     Plaintiff in this action is the United States of America.

11.     Relator Paul Frascella is a former Oracle employee.  Mr. Frascella began working at Oracle in the fall of 1997.  When Mr. Frascella left Oracle in late 2008 he was Senior Director of Contract Services.

12.     Defendants are Oracle Corp. and Oracle America, Inc., and any and all of their predecessors in interest, successors in interest or assigns.

13.     Defendant Oracle Corp. is a Delaware corporation with its headquarters in Redwood City, California.

14.     Defendant Oracle America, Inc. is a Delaware Corporation with its headquarters in Redwood City, California.

15.     On information and belief, Oracle USA, Inc. was a wholly owned subsidiary of Oracle Corp.  On February 15, 2010, Oracle USA, Inc. merged with Sun Microsystems, Inc.  The surviving corporation, Sun Microsystems, Inc., was then renamed Oracle America, Inc.  Oracle America, Inc. is the legal successor in interest to Oracle USA, Inc.

16.     Defendants are referred to collectively herein as "Oracle."

17.     During all relevant time periods, Oracle has been doing business in the Commonwealth of Virginia, throughout the United States, and within the geographical limits of the United States District Court for the Eastern District of Virginia.  Oracle manufactures and sells information technology products – hardware, software, maintenance, and services.  During the relevant time period, Oracle sold its products to the United States pursuant to the Contract.

## STATEMENT OF FACTS

**A.     The GSA Multiple Award Schedule Program**

18.     Executive agencies of the United States may procure products and services only through full and open competition, unless they meet certain exceptions.  41 U.S.C. § 253(a)(1).

19.     The competitive bidding process, and the negotiation of contractual terms, is a lengthy and costly process.  In order to expedite the procurement process for executive agencies and contractors wishing to sell products to executive agencies, the GSA, through the Federal Acquisition Service, solicits, negotiates, awards, and administers MAS contracts to procure products and services for federal agencies.  41 U.S.C. § 251, *et seq*.; 40 U.S.C. § 501(b).

20.     Under the MAS program, GSA negotiates prices and contract terms that will

-4-

apply to subsequent orders placed for all of the items that are covered by the MAS contract.  The

list of products or services that are available for purchase under a particular MAS contract is

referred to as the contract "schedule."  The pre-negotiation of the terms of sale for a large number

of products and services under the MAS program saves a significant amount of administrative

time for Government agencies ordering off of MAS contract schedules and for contractors

wishing to sell products to the Government.

21.     The MAS program allows the Government to obtain commercial supplies and

services at prices associated with volume buying.  41 U.S.C. § 259(b)(3).  Additionally, agencies

placing orders under MAS contracts are considered to meet the requirements of full and open

competition.  48 C.F.R. § 8.404(a).  Contractors also benefit from the MAS program, because

they do not have to compete in sealed bidding or negotiated acquisitions, and their products are

more widely available to federal agencies, thus making it easier for the agencies to place orders.

22.     The Administrator of GSA establishes the procedures that govern the MAS

program, including the requirements that contractors must follow in order to participate in the

program.  40 U.S.C. §§ 121(c), 501(b)(2).  These rules and regulations are set forth in the Federal

Acquisition Regulations (FAR) and the General Services Administration Acquisition Manual

(GSAM).

23.     GSA initiates the MAS process by publishing a contract solicitation.  Interested

contractors then submit responses to the solicitation to GSA.  Any contractor that enters into an

MAS contract with the United States Government must abide by 1) the obligations that are

outlined in the Government's solicitation; 2) the FAR and GSAM clauses that are incorporated

into the contract; 3) any additional requirements negotiated between the parties; and 4) any other

general federal contracting requirements set forth in the applicable regulations.

24.     The MAS contract solicitation requires prospective contractors to provide GSA with extensive information about their commercial sales and practices, including price and discount information.  GSA contracting officers use this information to negotiate MAS contract prices.  Pursuant to 48 C.F.R. § 538.270(a), GSA contracting officers are required to "seek to obtain the offeror's best price (the best price given to the most favored customer)."  In negotiating the terms of an MAS contract, the contracting officer must determine whether the price offered to GSA is reasonable by "compar[ing] the terms and conditions of the [offeror's response to the] MAS solicitation with the terms and conditions of agreements with the offeror's commercial customers."  48 C.F.R. § 538.270(c).  GSA contracting officers therefore rely heavily on the accuracy and truthfulness of the information provided by the offeror regarding its commercial sales in negotiating the terms of an MAS contract.  *Id*.

25.     The MAS contract provides that if GSA discovers that the prices in a contract or modification were inflated due to the contractor's failure to provide current, accurate, and complete information, or to update that information, the Government is entitled to a reduction in the price of each order issued pursuant to the MAS contract.  48 C.F.R. § 552.215-72 states as follows:

> Price Adjustment – Failure to Provide Accurate Information
>
> (a) The Government, at its election, may reduce the price of this contract or contract modification if the Contracting Officer determines after award of this contract or contract modification that the price negotiated was increased by a significant amount because the Contractor failed to:
> (1) Provide information required by this solicitation/contract or otherwise

requested by the Government; or

(2) Submit information that was current, accurate, and complete; or

(3) Disclose changes in the Contractor's commercial pricelist(s), discounts or discounting policies which occurred after the original submission and prior to the completion of negotiations.

(b) The Government will consider information submitted to be current, accurate and complete if the data is current, accurate and complete as of 14 calendar days prior to the date it is submitted.

The amount of the reduction is the amount by which the Government orders were inflated as a result of the inaccurate or undisclosed information. *Id.*; GSAM 552.238-75(c).

26. The regulations governing MAS contracts include a mechanism that is known as the "Price Reductions clause" (PRC). GSAM 552.238-75 states as follows:

Price Reductions
(a) Before award of a contract, the Contracting Officer and the Offeror will agree upon (1) the customer (or category of customers) which will be the basis of award, and (2) the Government's price or discount relationship to the identified customer (or category of customers). This relationship shall be maintained throughout the contract period. Any change in the Contractor's commercial pricing or discount arrangement applicable to the identified customer (or category of customers) which disturbs this relationship shall constitute a price reduction.

(b) During the contract period, the Contractor shall report to the Contracting Officer all price reductions to the customer (or category of customers) that was the basis of award. The Contractor's report shall include an explanation of the conditions under which the reductions were made.

27. As set forth above, the regulations require the contracting officer and the offeror to agree upon 1) the customer or category of customers which will be known as the "Basis of Award" (BOA) customer, and 2) a fixed relationship between the prices that the offeror gives to the BOA customer and those that it gives to the Government. If, during the period that the contract is in effect, the Contractor offers the BOA customer prices, discounts, or other terms that

are better than those previously offered to the BOA customer, the prices that are offered to the Government must be adjusted accordingly.  Any such change offered by the Contractor to the BOA customer must be reported to the Government no later than 15 days after its effective date, and the resulting change in prices on products sold to the Government is effective retroactive to the date on which the change in price was offered to the BOA customer.  GSAM 552.238-75(f)

28.     In addition to the requirement that the Contractor inform the Government of any changes in prices offered to the BOA customer, the PRC also requires the Contractor to report any changes in the commercial pricing practices or policies that were disclosed to GSA during pricing negotiations:

(1)     A price reduction shall apply to purchases under this contract if, after the date negotiations conclude, the Contractor--

(i)     Revises the commercial catalog, pricelist, schedule or other document upon which the award was predicated to reduce prices;

(ii)    Grants more favorable discounts or terms and conditions than those contained in the commercial catalog, pricelist, schedule or other documents upon which contract award was predicated;

*                         *                         *

(2)     The Contractor shall offer the price reduction to the Government with the same effective date, and for the same time period, as extended to the commercial customer (or category of customers).

GSAM 552.238-75(c).

29.     Orders under MAS contracts are submitted by executive agencies directly to contractors such as Oracle.  48 C.F.R. § 8.406-1.

30.     Oracle participated in the GSA MAS program beginning in the early 1990s.  At that time, the Oracle MAS contracts were awarded for a one-year period of time and eligible for

renewal annually.  In early 1994, for example, Oracle was participating through MAS Contract

number GS00K 94 AGS 5694.

**B.     Oracle's Responses To Section M.1 Of The Solicitation**

31.     In 1997, GSA issued Solicitation Number FCI-96-DL0001B (the Solicitation).

Section M.1.A.3 of the Solicitation is titled "Fair and Reasonable Prices" and states as follows:

> In order to assist the Government in making a fair and reasonable price
> determination, the following information is requested of all offerors:
>
> (a)     Commercial pricelist(s)
>
> (b)     Commercial contract forms, including terms, conditions, and warranty
>         information.
>
> (c)     Discount and pricing policies, to include but not limited to end users, end
>         user volume customers, original equipment manufacturers (OEM),
>         dealers/resellers, distributors, and state and local governments.
>
> (d)     A summary of business practices.  This summary would consist of a
>         discussion of the nonstandard discounting practices, including the
>         circumstances involving these practices, and their frequency of occurrence.
>         Included with the business practices could be a summary of the
>         pricing/discounts granted to the offeror's five (5) largest commercial
>         customers.

32.     On August 5, 1997, Oracle provided its initial proposal to GSA in response to

Section M.1 of the Solicitation.  As required by the Solicitation and the regulations, these

disclosures provided GSA with information regarding the pricing policies and practices that

Oracle followed with its commercial customers.  Oracle provided additional information to GSA

regarding its commercial practices on September 30, 1997.  Following its review of these

disclosures, GSA requested additional information regarding Oracle's commercial practices.  By

letter dated November 4, 1997, Oracle's Contract Negotiator, Patrick Burch, provided GSA

Contracting Officer (CO) Yvonne Jones with additional information regarding Oracle's

commercial sales practices.[1]

33.     Oracle made numerous representations to GSA regarding its commercial pricing

and discounting practices in its original disclosures.

34.     Oracle represented that its discounts were based on the class of customer to whom

the products were sold.  Oracle's September 30, 1997, and November 4, 1997, submissions both

include a chart in which the first column is titled "Type of Customer," the second column is titled

"Standard Discounts and Pricing Policies," and the third column is titled "Non-Standard

Discounts, incl[uding] deg[ree] of freq[uency]."  This chart includes the following entries:

| Type of Customer | Standard Discounts and Pricing Policies | Non-Standard Discounts, incl. deg. of freq. |
|---|---|---|
| State and Local Governments | 20% [to] 30% | see Exhibits (1) & (4) |
| National and Corporate Accounts | 20% to 70% | see Exhibits (1) & (3) |
| Commercial End Users | 15% to 20% | see Exhibit (1) |

Oracle defined "National and Corporate Accounts" as "major accounts" such as "AT&T Corp. &

Boeing Company," and defined "Commercial End Users" as "'general business accounts' where

companies are less than $250 million in size."

35.     Oracle represented that it offered "Standard Discounts" to non-GSA customers

and that these discounts fell within certain specified ranges.  The chart set forth above indicates

---

[1]Oracle's August 5, September 30, and November 4, 1997 disclosures are referred to
hereafter as the "original disclosures."

that it was Oracle's standard practice to provide State and Local Governments with 20 to 30

percent discounts, National and Corporate Accounts with 20 to 70 percent discounts and

Commercial End Users with 15 to 20 percent discounts.

36.     Oracle represented that it only departed from its standard discounts in 5 percent of

commercial transactions.  Exhibit 1 of Oracle's November 4, 1997 disclosures is titled "Oracle

Corporation Summary of Business Practices" and, under the subheading "Frequency of Non-

Standard Discounts," states:

> Oracle uses non-standard discounts in unique situations where an individual
> transaction/contract size warrants additional considerations, generally in the form
> of additional concessions to the end user customer.  Oracle estimates that non-
> standard discounts are used in less than five percent (5%) of the total number of
> commercial transactions.

37.     Oracle represented that the discounts offered to GSA were better than the

discounts offered to commercial customers or state/local customers.  Oracle's September 30,

1997, and November 4, 1997, disclosures both state at Exhibit 1 that the "total effective discount

of 26.7% to 40% for single orders" offered to GSA is "significantly above those single order

discounts offered to commercial or state/local customers."  Similarly, Exhibit 1 of the September

30, 1997 disclosures and Exhibit 2 of the November 4, 1997, disclosures both represent that

"[b]ased on materially different terms and conditions and firm commitments, Oracle offers

additional non-standard discounts to its commercial customers. The importance of the GSA IT

Schedule to Oracle results in the *offering of single order initial discounts that are superior to*

*those generally extended to commercial customers* and are fair and reasonable to the Federal

Government customer based on net order size."  (Emphasis added).

38.     In its original disclosures in response to Section M.1 of the Solicitation, therefore,

Oracle expressly represented that:

    1) discounts were based on distinctions between classes of customers;

    2) Oracle offered "standard discounts" that fell within specified ranges to its non-GSA customers, and the "standard discount" for commercial end users was 15 to 20 percent off of list prices;

    3) "non-standard discounts are used in less than five percent (5%) of the total number of commercial transactions" and that "Oracle uses non-standard discounts [only] in unique situations where an individual transaction/contract size warrants additional considerations;"

    4) the "total effective discount of 26.7% to 40% for single orders" offered to the Government was "significantly above those single order discounts offered to commercial or state/local customers," and that Oracle had offered the Government "single order initial discounts that are . . . fair and reasonable to the Federal Government customer based on net order size"; and

    39.    Oracle sent its Best and Final Offer (BAFO) to the GSA CO on December 1, 1998.

    40.    The BAFO certified that "Oracle Corporation acknowledges that all data submitted in response to Solicitation Number FCI-96-DL0001B is accurate, complete, and current."

    41.    Oracle's BAFO proposed "Oracle's U.S. commercial end-user customers" as the BOA customer for the Contract.  Thus, Oracle proposed to align the Government with the category of customers designated "Commercial End Users," for the purposes of monitoring Oracle's compliance with the Contract's Price Reductions clause.  Oracle proposed to "monitor and administer all requirements of the Price Reduction Clause of the contract," but specified that the PRC, "will not apply to Oracle's commercial end-user customers under firm-fixed price definite quantity contracts for software licenses with specified delivery in excess of $200,000 per

order."

42.     Under this proposal, any sale at or under the amount of $200,000 net price made to "commercial end-user customers" that was discounted at a greater percentage than had been disclosed to the Government was required to be reported to the Government, and would have the effect of automatically increasing the discount provided to the Government.  In addition, Oracle would be obligated to refund to the Government the difference between 1) the amounts the Government had paid, and 2) the increased discount to which the Government was entitled in light of the increased discount provided to the BOA customer.

43.     Oracle was awarded GSA MAS contract number GS-35F-0108J on December 15, 1998, effective December 1, 1998, through November 30, 2003.  The Contract was subsequently temporarily extended through October 2006 to allow time for an audit and negotiation of a follow-on contract.  Oracle's last report to GSA of sales made under the Contract covered the period ending December 31, 2006.

## C.     Oracle's 2001 E-Business Modifications

44.     In May 2001 Oracle informed GSA that it wished to modify the Contract to include upgraded versions of many of the software licenses on the MAS schedule which Oracle was now marketing as part of its "E-Business" suite of products.  In a letter dated May 2, 2001 Oracle provided the GSA CO with disclosures regarding the pricing of its E-Business products.

45.     In its May 2, 2001, letter, Oracle makes several statements regarding its commercial discounting practices for its E-Business products.  Attachment 2 to this letter is titled "Oracle Commercial Business Practices" and, consistent with statements that Oracle had made in its original disclosures, states that E-Business discounts are determined by the dollar value of the

Order:

> Discounting Policy
> Order Size (list price of Software License and first year Software
> Maintenance) determines the discount offered.  The larger the
> order, the larger the discount.

This representation is confirmed in Attachment 4 to the May 2, 2001 letter, which is titled

"Comparison of Commercial and Federal Discounts" and includes the following chart:

Comparison of Standard Discounts

| List Transaction Size | Commercial Discount | GSA Offer |
|---|---|---|
| $0-$5,000 | 0% | 25% |
| $5,001-$10,000 | 5% | 25% |
| $10,001-$25,000 | 10% | 25% |
| $25,001-$50,000 | 15% | 25% |
| $50,001-$100,000 | 20% | 25% |
| $100,001-$250,000 | 25% | 30% |
| $250,001-$375,000 | 30% | 35% |
| $375,001-$1,000,000 | 30% | 40% |

46.    In a letter to GSA dated July 27, 2001, submitted with several of Oracle's requests

for modification, Kevin J. Fitzgerald, Oracle's Senior Vice President Public Sector, disclosed

further changes in the commercial discounts that were set forth in Oracle's May 2, 2001 E-

business modification.  The letter states expressly that it is an "Update to CPC Table

Information" and includes the following chart, which is intended to revise the May 2, 2001 chart

to reflect Oracle pricing that went into effect on June 15, 2001:

-14-

| Transaction Band List License + List Support | Old Commercial Discount | New Commercial Discount | GSA Offer |
|---|---|---|---|
| $0-$5,000 | 0% | 0% | 25% |
| $5,001-$10,000 | 5% | 0% | 25% |
| $10,001-$25,000 | 10% | 0% | 25% |
| $25,001-$50,000 | 15% | 5% | 25% |
| $50,001-$100,000 | 20% | 10% | 25% |
| $100,001-$250,000 | 25% | 15% | 30% |
| $250,001-$1,000,000 | 30% | 20% | 35% |
| $1,000,001+ | call for pricing | 25% | 40% |

47.    The representations in Oracle's May 2, 2001 and July 27, 2001 disclosures were false because Oracle engaged in numerous E-Business transactions with non-GSA customers in which Oracle granted discounts that were inconsistent with the "Commercial Discounts" that are represented on the charts presented to GSA.  These charts were particularly misleading in that they suggested that GSA would be receiving better discounts than commercial customers for each of the price tiers set forth in the charts, when, in fact, Oracle repeatedly granted discounts to commercial customers that were greater than those represented on these charts and greater than the discounts that were offered to GSA.

48.    For E-Business products on the MAS schedule, Oracle charged the Government a standard amount of 22 percent of the license fee for maintenance.  Accordingly, to the extent that Oracle failed to grant discounts to the Government for E-Business product license fees that were consistent with its commercial discounts for these products, Oracle also overcharged the Government for maintenance on E-Business licenses.

-15-

**D.    Oracle's False Statements In Requests For Modification**

49.    In a series of requests for modification of the Contract beginning in July 2001, Oracle expressly represented to the Government that its commercial discounting and pricing policies were the same as had been described in Oracle's original disclosures, except to the extent that Oracle had identified changes in its practices in previous requests for modification:

a.    On July 27, 2001, Oracle certified over the signature of Kevin J. Fitzgerald, Senior Vice President, Public Sector, that "[e]xcept as previously discussed and identified in previous modification submissions, there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PO0023, effective June 29, 2001.)

b.    On July 27, 2001, Oracle certified over the signature of Kevin J. Fitzgerald, Senior Vice President, Public Sector, that "[e]xcept as previously discussed and identified in previous modification submissions, there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PO0024, effective August 2, 2001.)

c.    On July 27, 2001, Oracle certified over the signature of Kevin J. Fitzgerald, Senior Vice President, Public Sector, that "[e]xcept as previously discussed and identified in previous modification submissions, there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PO0025, effective August 2, 2001.)

d.    On July 27, 2001, Oracle certified, over the signature of Kevin J. Fitzgerald, Senior Vice President, Public Sector, that "[e]xcept as previously discussed and identified in previous modification submissions, there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PA0027, effective August 2, 2001.)

e.    On September 25, 2001, Oracle certified over the signature of Terrence P. Ford, Vice President, OSI Operations, that "[e]xcept as previously discussed, there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PO0029, effective September 1, 2001.)

f.  On October 10, 2001, Terrence P. Ford, Vice President, OSI Operations certified on Oracle's behalf that "Except as previously discussed, there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PA0030, effective October 18, 2001.)

g.  On May 22, 2002, Oracle certified, over the signature of Kevin J. Fitzgerald, Senior Vice President, Public Sector, that "[e]xcept as previously discussed and identified in previous modification submissions, there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PO0034.)

h.  On August 5, 2002, Oracle certified, over the signature of Kevin J. Fitzgerald, Senior Vice President, Public Sector, that"[e]xcept as previously discussed and identified in previous modification submissions, there have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation." (Modification PO0039,  effective August 5, 2002.)

50.  Oracle's requests for modification repeatedly assert that "there have been no changes" in the information regarding its "commercial discount/pricing policies and practices . . . originally provided in response to Section M.1 of the solicitation," except to the extent that the Government has been notified of such changes.  Thus Oracle's requests for modification reaffirmed its original statements to the effect that:

1) Oracle's discounts were based on distinctions between classes of customers;

2) Oracle offered "standard discounts" that fell within specified ranges to its non-GSA customers, and the "standard discount" for commercial end users was 15 to 20 percent off of list prices; and

3) "non-standard discounts are used in less than five percent (5%) of the total number of commercial transactions" and that "Oracle uses non-standard discounts [only] in unique situations where an individual transaction/contract size warrants additional considerations."

51.  Similarly, Oracle's requests for modification expressly reaffirmed the representations in Oracle's May 2, 2001 E-business disclosures to the effect that: 1) the discount

-17-

percentage for single license orders was based on the dollar value of the order, and 2) Oracle's standard discounts to commercial customers for each transaction tier were consistent with the charts accompanying those disclosures.

52.     In connection with modifications PO0023, PO0024, PO0025 and PA0027, Oracle submitted a letter dated July 27, 2001, over the signature of Michelle Howell, GSA Contract Manager, affirming that "all provided information is current, accurate and complete."

53.     Similarly, a letter dated August 5, 2002, from Kevin J. Fitzgerald, Oracle Senior Vice President Public Sector, to GSA CO Regina Moore, includes the following language:

> Oracle certifies the following for SINs 132-33 and 132-34:
>
> . . . .
>
> c.      All data submitted is accurate, complete and current as of the modification's effective date.

54.     A letter dated June 22, 2005, from Patricia Neiss, Oracle Director of North America Operations to GSA CO Regina Moore regarding a proposed modification, states that "[a]ll other discounts, terms and conditions remain the same."

55.     Oracle's certifications that the data it had submitted to GSA was "accurate, complete and current" and its representation that "all other discounts . . . remain the same" were false, because, as discussed in Section E below, Oracle's actual commercial sales and discounting practices for the items on the GSA schedule were not consistent with its representations to GSA regarding those practices.

56.     In describing the terms of requested modification No. FX-03, dated October 31, 2003, Oracle certified, over the signature of Kevin J. Fitzgerald, that:

-18-

> For purposes of paragraph (a) of clause 552.238-75, Price Reductions, the price/discount relationship established between the negotiated prices, without consideration of the IFF, and those of the designated customer or class of customer, will remain unchanged.

This certification was false because Oracle had not accurately disclosed to the Government the prices it was offering to "the designated customer or class of customer" i.e. Commercial End Users, and therefore the actual "price/discount relationship" between GSA prices and Commercial End User prices was not the same as the price/discount relationship that had been disclosed to GSA.

**E.    Oracle's True Undisclosed Commercial Sales Practices**

57.    Despite Oracle's express certifications to the contrary, the information that Oracle provided GSA regarding its commercial sales practices was not accurate, complete, or current, and its actual commercial discounting and pricing policies were not consistent with Oracle's disclosures to the Government.

**1.    Oracle's Repeated Certifications That Its Commercial Practices Were Consistent With Its Original Disclosures Were False**

58.    Internal Oracle documents and data demonstrate that when Oracle requested modifications of the Contract it withheld significant information from GSA that was material to GSA's willingness to maintain the pricing structure in the Contract.

**a.    Oracle's Discounts Were Not Based On Customer Classifications**.

59.    In its original disclosures to the Government, Oracle expressly represented that its discounts varied depending on whether the customer was classified as 1) National and Corporate Accounts ("major accounts"); 2) State and Local Government; or 3) Commercial End Users

("'general business accounts' where the companies are less than $250 million in size").

60.     Oracle never amended this representation and repeatedly certified to GSA, including from July 2001 forward, that its commercial practices remained consistent with its original disclosures.  These certifications were false.

61.     Oracle's internal guidelines for monitoring compliance with the PRC demonstrate that Oracle's actual discounting practices were not based on the customer classifications presented to GSA and reaffirmed during subsequent modifications.  As discussed above, during the negotiations for the Contract, Oracle informed GSA that its standard discounts to Commercial End Users were 15 to 20 percent, and proposed to align the Government with these purchasers for purposes of the PRC.   An internal Oracle document titled "GSA Schedule Discount Restrictions & Guidelines" dated April 23, 2003 states, however, that the GSA Discount Restrictions employed by Oracle because of the PRC apply to "Commercial End Users" (General Business Accounts) *and* may apply to National and Corporate Accounts (Major and Vertical Accounts).  If, as Oracle told GSA, it made a distinction in its non-GSA sales between discounts given to "Commercial End Users" and those given to  "National and Corporate Accounts," there would be no need to apply these restrictions to those deals that fell into the "National and Corporate Accounts" category.

62.     Similarly, Oracle's "GSA Schedule Discount Restrictions & Guidelines" dated May 4, 2006, notes with regard to both "State and Local Government" and "National and Corporate Accounts" that "For Purposes of Managing the GSA we apply the discount restrictions to these categories of customer."  This document also defines Commercial End Users as companies with annual revenues under $1 billion, not companies "less than $250 million in

size." *See* ¶ 34.  Oracle's internal documents demonstrate that its discounting policies were not based on the customer classifications it presented to GSA, despite its express representation that this was the case during contract negotiations.  Thus, Oracle's repeated statements from at least July 2001 forward that its actual discounting policies were consistent with its earlier disclosures were false.

**b. Oracle Did Not Offer Standard Discounts In The Ranges Disclosed To GSA.**

63.     Oracle's original disclosures expressly represented that its standard policy was to provide certain classes of customers with discounts within specified ranges.  Oracle never amended this representation and repeatedly certified to GSA that its commercial practices remained consistent with its original disclosures.  *See* ¶ 49.  These disclosures, which were material to GSA's agreement to modify the Contract, were false.

64.     For example, Oracle's original disclosures state expressly that Oracle's standard practice was to provide its Commercial End User customers with discounts between 15 and 20 percent.  On May 2, 2001 and July 27, 2001 Oracle submitted additional information indicating standard discounts of up to 30 percent.  However, an April 30, 2004 document titled "FY 2004 Approval and Options Matrix" specifically contemplates discounts to Commercial End Users ranging from 40 to 70 percent and greater with approvals.  Earlier internal handbooks contained similar language.  The existence of this formalized policy for discounts of 40 percent and above contradicts Oracle's assertion that 30 percent was the highest "standard discount" for commercial end users.

65.     In addition, as discussed *infra,* the Government's preliminary analysis of data

-21-

provided by Oracle to its outside consulting firm, KPMG, for the period June 1, 2000, through May 31, 2004 ("the KPMG data") shows that throughout that time period Oracle routinely provided discounts to all classes of customer that were outside the ranges set forth in its disclosures.

### c. Oracle Used "Non-Standard" Discounts More Frequently Than It Disclosed To GSA.

66.     In requests for modification made after May 29, 2001, Oracle never amended the express assertion in its November 4, 1997 disclosures that "non-standard discounts are used in less than 5 percent of the total number of commercial transactions."  Once again, however, Oracle's own documents show that Oracle provided non-standard discounts in significantly more than 5 percent of transactions.  Thus, Oracle's certifications from at least July 2001 forward were false.

67.     Consistent with the information set forth in the "FY 2004 Approval and Options Matrix" of discounts to commercial end users well in excess of Oracle's purported 30 percent ceiling, the KPMG data reveals that Oracle routinely sold software licenses to "General Business Account" customers, i.e. Commercial End Users, at discounts greater than 30 percent.  Indeed, the KPMG data shows that the vast majority of E-Business software license sales were provided at discounts greater than the range that was disclosed to GSA.  These discounts flatly contradict Oracle's express representation that "non-standard discounts are used in less than five percent (5%) of the total number of commercial transactions."

68.     Moreover, Oracle did not use non-standard discounts only in "unique situations." In fact, Oracle routinely offered "Price Holds" to its commercial customers as part of an initial

order.  Under a price hold, a customer could purchase additional products at a reduced price or

discount percentage on future orders for a specified period of time.  This effectively allowed a

customer to "lock-in" a price or discount for future orders regardless of order size.  Oracle

manipulated its price holds such that Oracle's Commercial End User customers received

discounts that were 1) larger than the discounts Oracle had disclosed to GSA and 2) larger than

the discounts that Government customers received under the Contract.  Oracle did not reveal to

GSA the ways it used price holds in sales to its Commercial End User customers.  Moreover, as

discussed *infra,* Oracle had a practice of manipulating transactions in an attempt to evade the

disclosure requirements of the PRC.  The effect of this manipulation was to convert a substantial

number of standard transactions into non-standard transactions.  Nevertheless, Oracle never

corrected its prior disclosure that only 5 percent of its transactions were non-standard.  Instead, it

repeatedly certified that there had been no changes in its discounting policies.

### d.      Single License Discounts Were Not Based On Dollar Value.

69.     In its original disclosures to GSA and its May 2, 2001 and July 27, 2001 E-

business modification submissions, Oracle expressly represented that its single license order

discounts for commercial customers were based on certain dollar value tiers.  Oracle's requests

for modification submitted after May 29, 2001, affirmed the continuing validity of this policy.

70.     Based on the KPMG data provided by Oracle, the Government has done a

preliminary analysis of Oracle's sales of software licenses on the GSA schedule to non-GSA

customers from June 1, 2000 to May 31, 2004.  The first two columns of the chart below show

the tiered discounting structure that Oracle disclosed to GSA in its May 2, 2001 E-business

modification submissions.  The last four columns show the percentage of actual transactions

within that tier that exceeded the disclosed discounts:

| Sales of Schedule E-Business Products to All Non-GSA Customers Where the Order Discount Exceeds the Disclosed Discounts, June 1, 2000 – May 31, 2004 | | | | | |
|---|---|---|---|---|---|
| Disclosed Tier | Disclosed Commercial Discount | Percentage of Transactions Within Tier That Exceeded The Disclosed Discount | | | |
| | | 6/1/00 to 5/31/01 | 6/1/01 to 5/31/02 | 6/1/02 to 5/31/03 | 6/1/03 to 5/31/04 |
| $0-$5,000 | 0% | 41.1% | 42.3% | 51.6% | 60.2% |
| $5,001-$10,000 | 5% | 61.6% | 61.2% | 74.3% | 80.8% |
| $10,001-$25,000 | 10% | 59.9% | 72.9% | 80.9% | 86.2% |
| $25,001-$50,000 | 15% | 66.2% | 78.0% | 86.3% | 88.9% |
| $50,001-$100,000 | 20% | 70.4% | 77.3% | 87.0% | 91.9% |
| $100,001-$250,000 | 25% | 78.5% | 80.1% | 88.5% | 91.9% |
| $250,001-$375,000 | 30% | 82.0% | 84.7% | 89.7% | 93.5% |
| $375,001-$1,000,000 | 30% | 89.1% | 94.1% | 96.3% | 97.5% |
| Total | N/A | 56.5% | 67.0% | 76.8% | 81.7% |

71.     This chart shows that in the year prior to Oracle's E-Business modification and in the three years following that modification, the majority of Oracle's sales of E-Business licenses on the GSA schedule to customers other than GSA included discounts that exceeded the discounts that Oracle had disclosed to GSA.

72.     The disparity between Oracle's disclosures and its actual practices is even greater if the first two columns of this chart are based on the purportedly reduced commercial discounts that were disclosed to GSA by Oracle on July 27, 2001:

-24-

| Sales of Schedule E-Business Products to All Non-GSA Customers Where the Order Discount Exceeds the Disclosed Discounts, June 1, 2001 – May 31, 2004 | | | | |
|---|---|---|---|---|
| Disclosed Tier | Disclosed Commercial Discount | Percentage of Transactions Within Tier That Exceeded The Disclosed Discount | | |
| | | 6/1/01 to 5/31/02 | 6/1/02 to 5/31/03 | 6/1/03 to 5/31/04 |
| $0-$5,000 | 0% | 42.3% | 51.6% | 60.2% |
| $5,001-$10,000 | 0% | 65.8% | 77.5% | 82.8% |
| $10,001-$25,000 | 0% | 78.0% | 87.3% | 90.5% |
| $25,001-$50,000 | 5% | 82.7% | 90.5% | 93.3% |
| $50,001-$100,000 | 10% | 86.0% | 92.8% | 95.3% |
| $100,001-$250,000 | 15% | 89.9% | 94.7% | 97.3% |
| $250,001- $375,000 | 20% | 92.7% | 95.5% | 97.4% |
| $375,001- $1,000,000 | 20% | 97.5% | 98.4% | 99.1% |
| $1,000,001+ | 25% | 99.4% | 97.5% | 97.7% |
| Grand Total | N/A | 75.5% | 81.6% | 85.3% |

73.      When Oracle repeatedly certified after May 29, 2001 that its original disclosures and requests for modification accurately described its current commercial practices, these certifications were false, and Oracle knew, as that term is defined in the FCA, that its statements were false.  Moreover. each of these false statements was material to the Government's decision to maintain the Contract's price structure, and each of these representations was made for the purpose of inducing the Government to pay the resulting claims.  Moreover, the natural and foreseeable result of Oracle's false statements regarding its commercial sales practices was that the United States would overpay for Oracle products under the Contract.

74.     On January 24, 2005, Oracle disclosed the following commercial discount

schedule to GSA.  This chart largely restated the discount schedule disclosed on July 27, 2001,

*see* ¶ 46*,* with slightly different price tiers:

| Transaction Band<br>List License +<br>List Support | Standard Discount | GSA Discount |
| --- | --- | --- |
| $1-$25,000 | 0% | 25% |
| $25,001-$50,000 | 5% | 25% |
| $50,001-$100,000 | 10% | 25% |
| $100,001-$250,000 | 15% | 35% |
| $250,001-$375,000 | 20% | 35% |
| $375,001-$1,000,000 | 20% | 40% |

75.     Upon information and belief, this January 24, 2005 disclosure, like Oracle's

previous disclosures regarding its "standard discounts," was false at the time it was made.

### 2.     Oracle Failed To Accurately Report Its Commercial Discounting During Performance Of The Contract And Manipulated Transactions To Avoid Its PRC Obligations.

76.     The Price Reductions clause states that "[a] price reduction shall apply to

purchases under this contract if, after the date negotiations conclude, the Contractor . . . [r]evises

the commercial catalog, pricelist, schedule or other document upon which contract award was

predicated to reduce prices" or "[g]rants more favorable discounts . . . than those contained in the

commercial catalog, pricelist, schedule or other documents upon which the contract award was

predicated," and requires the Contractor to offer the same price reductions to the Government.

GSAM 552.238-75(c).

77.     As discussed above, from May 29, 2001 forward, Oracle routinely granted

discounts to all categories of customers that exceeded the discounts that were disclosed to GSA, and were inconsistent with the discounting methodology that Oracle had represented to GSA. Yet Oracle failed to inform GSA of the discrepancy between 1) the actual discounts it was providing to non-GSA customers and its description of those discounts in its disclosures; or 2) the actual discounting methodologies it was using for non-GSA customers and the discounting methodology it had disclosed to GSA, as it was expressly required to do under the PRC.

78.     Oracle repeatedly certified during performance of the contract that "[t]here have been no changes in commercial discount/pricing policies and practices from that originally provided in response to Section M.1 of the solicitation," *see* ¶ 49 *supra*, even though Oracle knew that this statement was not true because its actual practices were not consistent with its disclosures.

79.     Moreover, during the performance of the Contract, Oracle consistently manipulated its sales of software licenses to Commercial End Users so that it would not have to report these sales to GSA and would not have to provide Government purchasers with proportionally higher discounts.  This practice was never disclosed to GSA.

80.     Under the terms of the Contract, Oracle agreed to monitor all sales of software licenses to Commercial End Users worth $200,000 or less to ensure that the negotiated relationship between discounts provided to the BOA customer and those provided to GSA stayed the same throughout the performance of the Contract.  In practice, Oracle turned this requirement upside down.  Instead of informing GSA whenever a Commercial End User received a discount greater than the disclosed standard discount on a sale under $200,000, and increasing the discount to the Government proportionately, Oracle established a mechanism to ensure that any

proposed deal that fit these criteria was reworked so that it no longer met the criteria and GSA would not have to be informed of, or provided with, a higher discount.  Oracle's manipulation of its commercial sales to avoid the contractual requirement to reduce the prices offered to the Government dramatically increased the cost to the Government of purchases that were made under the Contract.

81.     The small group of Oracle managers authorized to grant non-standard discounts routinely suggested to Oracle sales personnel how to manipulate discounts for sales of software licenses to evade the assurances of equity of discounts between the BOA customer and the Government.  If a BOA customer sought to purchase a software license and requested a discount beyond that permitted by the Contract's PRC, Oracle's "America's Approvals" group (AMAPP, later known as the HQAPPS group), would suggest ways to manipulate the sale so that it could be distinguished from the sales to the Government.

82.     Examples of this manipulation included the following: 1) increasing the order size to just over $200,000; 2) if there was a proposed deal for a perpetual software license that was similar to an item on the MAS schedule, Oracle would change the terms to represent that the software license was not perpetual, but limited in terms or access; 3) if a BOA customer had a prior sale that was subject to a future discount price hold, Oracle would amend and extend the discount price hold to grant the customer a greater discount than the Government purchaser would get for the same product; and 4) Oracle would sell the same license through a reseller.

83.      Internal Oracle emails show that this type of manipulation of the terms of a sale by Oracle management became a commonplace method of avoiding Oracle's obligation to offer higher discounts to Government purchasers.

84.     In a February 2004 internal Oracle email seeking permission to offer a discount to a customer, the response from Oracle's approval chain suggested that the sales representative, "grow this deal and make it GSA compliant… Let's just make this clean and get them over the required deal size."

85.     A May 2004 Oracle email chain requested approval for a 60 percent discount for a net license fee (NLF) of $170,280.  The Oracle HQAPPS responded that "This is not approved unless the current deal is raised above 200K to make this GSA compliant."  The deal was subsequently raised to $200,040 "to meet GSA guidelines" and approved.

86.     A September 2006 Oracle email chain which approved a transaction for $201,465 in Net License Fees at a 67 percent discount states, "Assuming the $201K NLF reflects final NLF . . . this does not violate the Price Reductions clause."

87.     A September 2003 email from an Oracle salesperson requesting approval discussed, "a possible workaround" to provide a discount above the discount being provided to Government purchasers under the Contract.  The response from the approval chain rejected the proposed solution while instead suggesting, "going through a reseller, restricting the licenses, using exclusivity commitment language."

88.     In a July 31, 2002 email to Oracle employee Michelle Howell from Oracle employee Wendy Smith, the two discussed a deal that involved a 66.6 percent discount on a commercial transaction of less than $50,000.  Ms. Smith states that:

> I feel very uncomfortable being told to ignore issues regarding
> GSA when we have been trained on them and have always
> enforced them.  I would like a note from Ellen stating that we are
> supposed to ignore what we know and allow these deals to go
> through in order to cover myself if this becomes an issue between

GSA and Oracle.

Ms. Smith then quotes an earlier email in which she wrote to another Oracle employee:

> I feel very uncomfortable blatantly ignoring rules that in place [sic] that I have been previously trained on, especially knowing the ramifications to Oracle when GSA finds out that *60% of the company has been ignoring the contractual terms we have in place with them*.  (Emphasis added).

89.     Email guidance provided by Oracle's Daniel McMurrer in October 2002, discussed the Contract's PRC liability and outlined specific methods for transforming a standard transaction into a non-standard transaction.  Mr. McMurrer advised the salesperson to consider alternative methods of discounting to circumvent the Contract's PRC, such as:

- "Stick to the discounts listed above for deals less than $200k in NLF."

- "Go through resellers (you could seek higher discounts for partners as well)."

- "Sell term licenses."

- "Make the licenses limited use (i.e. application specific)."

90.     A number of other internal Oracle communications demonstrate that Oracle sales personnel and those above them in the chain of command who were responsible for approving sales were well aware of the various schemes available to them to provide deeper discounts to commercial customers while evading their obligations to GSA under the Price Reductions clause. In a July 1998 email Hilarie Koplow-McAdams, VP DMD Western Region/Verticals, discussed changes to discounts offered under a prior Oracle GSA schedule contract.  The email includes discussions of "workarounds" used by the sales department such as 1) the use of Network Licenses as a licensing vehicle because Network Licenses are not on the schedule; 2) sending

business through partners to provide greater discounts; 3) providing application specific licenses instead of perpetual licenses to prevent the licenses from being too broad; and 4) excluding internal journal entries in calculations of the total net fees to increase the $200,000 net price and evade the Contract's PRC.  These workarounds are substantially similar to the alternatives advised by Daniel McMurrer in his October 2002 email, which demonstrates that Oracle's practice of circumventing PRC obligations to GSA was in place from at least May 29, 2001 forward.

**F.     Specific Transactions By Oracle In Violation Of The False Claims Act**

91.     As set forth above, Oracle's false statements and fraudulent conduct in the performance of the Contract from May 29, 2001 forward led to the submission of false, i.e. inflated, claims for payment to the United States.

92.     As set forth in detail above, the Government relied on the false statements made by Oracle in its requests for modification of the Contract, and Oracle knew that these statements were false at the time that it made them.  Because Oracle's false statements and manipulation of the PRC were material to the United States' willingness to maintain the pricing structure under the Contract, and deprived the United States of price reductions to which it was entitled, Oracle caused the United States to pay more than it should have for Oracle's products, and any claim for payment made by Oracle subsequent to these false statements and manipulations was a false claim.

93.     The United States was damaged on each claim on which the ordering agency received a discount that was less than it would have received had Oracle made accurate, complete, and current disclosures regarding its non-GSA pricing during the performance of the Contract.

94.     Oracle reported total sales under the Contract of approximately $775,000,000 for software licenses and maintenance from May 29, 2001 through the end of the Contract.

95.     The executive agencies of the United States Government that made purchases from Oracle under the Contract during that time period included, but were not limited to the following:

1.      The Bureau of Indian Affairs

2.      The Central Intelligence Agency

3.      The Department of Agriculture

4.      The Department of the Air Force

5.      The Department of the Army

6.      The Department of Commerce

7.      The Department of Defense

8.      The Department of Education

9.      The Department of Energy

10.     The Department of Environmental Protection

11.     The Department of Health & Human Services

12.     The Department of Homeland Security

13.     The Department of Interior

14.     The Department of Justice

15.     The Department of Navy

16.     The Department of State

17.     The Department of Transportation

18.     The Department of Veterans Affairs

19.     The Federal Aviation Administration

20.     The Federal Highway Administration

21.     The Minerals Management Service

22.     The Office of Federal Housing Enterprise Oversight

23.     The Social Security Administration

24.     The United States Customs Service

25.     The United States Geological Survey

26.     The United States Immigration & Naturalization Service

27.     The United States Postal Service

96.     As discussed above, GSA negotiated the prices to be applied to orders placed by Government customers under the Contract, in an effort to obtain the best price for the Government.  GSA, however, is not involved in the ordering process by Government customers. As a result, GSA is generally not aware of particular purchases by Government customers, and GSA does not receive any of the transaction documents related to particular purchases.

97.     Oracle maintains all such data and was required under the Contract to provide full cooperation with GSA auditors to verify that Oracle was pricing its sales to the Government as required by the Contract.

98.     GSA also does not routinely receive details of Oracle's commercial transactions. That data is maintained by Oracle and not generally disclosed to the Government.

99.     In response to inquiries related to this *qui tam*, Oracle provided certain limited data to GSA auditors.  Based upon that data, the following, provided by way of example only, are illustrations of Government purchases that are similar to commercial transactions, and where,

based on the information made available to it, the Government was overcharged.  Oracle submitted to the Government invoices for payment on the following transactions, all of which, based upon the information provided by Oracle, were inflated.

(1)

| | Tier: $0 – $5,000 | | | |
| --- | --- | --- | --- | --- |
| | GSA | Commercial A | Commercial B | Commercial C |
| Order Number | 6523559 | 6603278 | 6609295 | 6520805 |
| Order Date | 6/14/2001 | 10/31/2001 | 11/13/2001 | 6/8/2001 |
| Order Total (Net) | $ 3,655.18 | $ 2,928.00 | $ 2,054.95 | $ 480.00 |
| Order Total (List) | $ 4,913.85 | $ 4,880.00 | $ 3,699.95 | $ 1,836.00 |
| Order Discount | 25.6% | 40.0% | 44.5% | 73.9% |
| Disclosed Discount | 25.0% | 0.0% | 0.0% | 0.0% |

(2)

| | Tier: $0 – $5,000 | | | |
| --- | --- | --- | --- | --- |
| | GSA | Commercial A | Commercial B | Commercial C |
| Order Number | 6777328 | 6808391 | 6766995 | 6758960 |
| Order Date | 12/10/2002 | 3/13/2003 | 11/13/2002 | 10/24/2002 |
| Order Total (Net) | $ 430.87 | $ 1,098.00 | $ 2,256.66 | $ 2,196.00 |
| Order Total (List) | $ 608.75 | $ 1,830.00 | $ 4,757.17 | $ 3,660.00 |
| Order Discount | 29.2% | 40.0% | 52.6% | 40.0% |
| Disclosed Discount | 25.0% | 0.0% | 0.0% | 0.0% |

(3)

| | Tier: $5,001 – $10,000 | | | |
| --- | --- | --- | --- | --- |
| | GSA | Commercial A | Commercial B | Commercial C |
| Order Number | 6642260 | 6675087 | 6641214 | 6686219 |
| Order Date | 1/31/2002 | 4/10/2002 | 1/29/2002 | 5/6/2002 |
| Order Total (Net) | $ 7,300.79 | $ 986.95 | $ 2,450.25 | $ 4,367.50 |
| Order Total (List) | $ 9,677.95 | $ 6,139.95 | $ 5,490.00 | $ 7,320.00 |
| Order Discount | 24.6% | 83.9% | 55.4% | 40.3% |
| Disclosed Discount | 25.0% | 0.0% | 0.0% | 0.0% |

(4)

| | Tier: $5,001 – $10,000 | | | |
| --- | --- | --- | --- | --- |
| | GSA | Commercial A | Commercial B | Commercial C |
| Order Number | 6519865 | 6634231 | 6583159 | 6581609 |
| Order Date | 6/7/2001 | 1/16/2002 | 9/26/2001 | 9/24/2001 |
| Order Total (Net) | $ 6,863.40 | $ 1,502.45 | $ 5,557.50 | $ 6,832.00 |
| Order Total (List) | $ 9,787.75 | $ 6,139.95 | $ 8,550.00 | $ 9,760.00 |
| Order Discount | 29.9% | 75.5% | 35.0% | 30.0% |
| Disclosed Discount | 25.0% | 0.0% | 0.0% | 0.0% |

(5)

| | Tier: $10,001 – $25,000 | | | |
|---|---|---|---|---|
| | **GSA** | **Commercial A** | **Commercial B** | **Commercial C** |
| Order Number | 6901386 | 6937825 | 6917530 | 6916422 |
| Order Date | 1/5/2004 | 4/29/2004 | 2/24/2004 | 2/20/2004 |
| Order Total (Net) | $ 13,862.24 | $ 7,379.95 | $ 9,331.95 | $ 9,760.00 |
| Order Total (List) | $ 18,339.95 | $ 24,459.95 | $ 24,459.95 | $ 24,400.00 |
| Order Discount | 24.4% | 69.8% | 61.8% | 60.0% |
| Disclosed Discount | 25.0% | 0.0% | 0.0% | 0.0% |

(6)

| | Tier: $10,001 – $25,000 | | | |
|---|---|---|---|---|
| | **GSA** | **Commercial A** | **Commercial B** | **Commercial C** |
| Order Number | 6694100 | 6699314 | 6652126 | 6682956 |
| Order Date | 5/22/2002 | 5/30/2002 | 2/20/2002 | 4/29/2002 |
| Order Total (Net) | $ 15,150.00 | $ 9,272.00 | $ 4,309.95 | $ 10,065.00 |
| Order Total (List) | $ 20,039.95 | $ 23,180.00 | $ 12,239.95 | $ 18,300.00 |
| Order Discount | 24.4% | 60.0% | 64.8% | 45.0% |
| Disclosed Discount | 25.0% | 0.0% | 0.0% | 0.0% |

(7)

| | Tier: $25,001 – $50,000 | | | |
|---|---|---|---|---|
| | **GSA** | **Commercial A** | **Commercial B** | **Commercial C** |
| Order Number | 6829252 | 6843083 | 6818694 | 6814082 |
| Order Date | 5/15/2003 | 6/23/2003 | 4/15/2003 | 3/31/2003 |
| Order Total (Net) | $ 26,236.62 | $ 5,856.00 | $ 10,025.18 | $ 16,400.00 |
| Order Total (List) | $ 34,755.65 | $ 29,280.00 | $ 25,621.00 | $ 32,800.00 |
| Order Discount | 24.5% | 80.0% | 60.9% | 50.0% |
| Disclosed Discount | 25.0% | 5.0% | 5.0% | 5.0% |

(8)

| | Tier: $25,001 – $50,000 | | | |
|---|---|---|---|---|
| | **GSA** | **Commercial A** | **Commercial B** | **Commercial C** |
| Order Number | 6666730 | 6682782 | 6675785 | 6677748 |
| Order Date | 3/21/2002 | 4/29/2002 | 4/11/2002 | 4/16/2002 |
| Order Total (Net) | $ 36,966.00 | $ 12,958.80 | $ 16,808.87 | $ 23,912.00 |
| Order Total (List) | $ 48,839.95 | $ 46,360.00 | $ 36,601.00 | $ 48,800.00 |
| Order Discount | 24.3% | 72.0% | 54.1% | 51.0% |
| Disclosed Discount | 25.0% | 5.0% | 5.0% | 5.0% |

(9)

| Tier: $50,001 – $100,000 | | | |
| --- | --- | --- | --- |
| | GSA | Commercial A | Commercial B | Commercial C |
| Order Number | 6812344 | 6813288 | 6803084 | 6823535 |
| Order Date | 3/26/2003 | 3/28/2003 | 2/27/2003 | 4/29/2003 |
| Order Total (Net) | $ 73,932.00 | $ 19,032.00 | $ 11,414.79 | $ 43,920.00 |
| Order Total (List) | $ 97,639.95 | $ 95,160.00 | $ 54,657.00 | $ 97,600.00 |
| Order Discount | 24.3% | 80.0% | 79.1% | 55.0% |
| Disclosed Discount | 25.0% | 10.0% | 10.0% | 10.0% |

(10)

| Tier: $50,001 – $100,000 | | | |
| --- | --- | --- | --- |
| | GSA | Commercial A | Commercial B | Commercial C |
| Order Number | 6614583 | 6615719 | 6627125 | 6604379 |
| Order Date | 11/27/2001 | 11/28/2001 | 12/27/2001 | 11/2/2001 |
| Order Total (Net) | $ 53,025.00 | $ 6,889.00 | $ 13,081.06 | $ 20,496.00 |
| Order Total (List) | $ 70,000.00 | $ 63,440.00 | $ 67,100.00 | $ 58,560.00 |
| Order Discount | 24.3% | 89.1% | 80.5% | 65.0% |
| Disclosed Discount | 25.0% | 10.0% | 10.0% | 10.0% |

(11)

| Tier:$100,001 – $250,000 | | | |
| --- | --- | --- | --- |
| | GSA | Commercial A | Commercial B | Commercial C |
| Order Number | 6820282 | 6793768 | 6804331 | 6836416 |
| Order Date | 3/28/2003 | 1/31/2003 | 2/28/2003 | 5/31/2003 |
| Order Total (Net) | $ 138,006.40 | $ 35,594.99 | $ 48,312.00 | $ 57,133.15 |
| Order Total (List) | $ 195,239.95 | $ 122,039.95 | $ 161,040.00 | $ 146,401.00 |
| Order Discount | 29.3% | 70.8% | 70.0% | 61.0% |
| Disclosed Discount | 30.0% | 15.0% | 15.0% | 15.0% |

(12)

| Tier:$100,001 – $250,000 | | | |
| --- | --- | --- | --- |
| | GSA | Commercial A | Commercial B | Commercial C |
| Order Number | 6699197 | 6695499 | 6670446 | 6699787 |
| Order Date | 5/30/2002 | 5/23/2002 | 3/29/2002 | 5/31/2002 |
| Order Total (Net) | $ 93,696.00 | $ 39,650.00 | $ 21,143.24 | $ 69,540.00 |
| Order Total (List) | $ 146,400.00 | $ 158,600.00 | $ 141,862.60 | $ 231,800.00 |
| Order Discount | 36.0% | 75.0% | 85.1% | 70.0% |
| Disclosed Discount | 30.0% | 15.0% | 15.0% | 15.0% |

(13)

| | Tier: 250,001 – $375,000 | | | |
|---|---|---|---|---|
| | GSA | Commercial A | Commercial B | Commercial C |
| Order Number | 6635529 | 6652875 | 6670201 | 6641066 |
| Order Date | 1/18/2002 | 2/21/2002 | 3/29/2002 | 1/29/2002 |
| Order Total (Net) | $ 168,195.30 | $ 20,003.20 | $ 105,400.23 | $ 102,349.15 |
| Order Total (List) | $ 256,239.95 | $ 282,000.00 | $ 317,200.00 | $ 292,351.95 |
| Order Discount | 34.4% | 92.9% | 66.8% | 65.0% |
| Disclosed Discount | 35.0% | 20.0% | 20.0% | 20.0% |

(14)

| | Tier: 250,001 – $375,000 | | | |
|---|---|---|---|---|
| | GSA | Commercial A | Commercial B | Commercial C |
| Order Number | 6795113 | 6831000 | 6782734 | 6773606 |
| Order Date | 2/5/2003 | 5/20/2003 | 12/31/2002 | 11/27/2002 |
| Order Total (Net) | $ 222,040.00 | $ 78,770.00 | $ 127,734.00 | $ 136,978.90 |
| Order Total (List) | $ 341,679.90 | $ 280,600.00 | $ 319,335.00 | $ 331,919.90 |
| Order Discount | 35.0% | 71.9% | 60.0% | 58.7% |
| Disclosed Discount | 35.0% | 20.0% | 20.0% | 20.0% |

(15)

| | Tier: $375,001 – $1,000,000 | | | |
|---|---|---|---|---|
| | GSA | Commercial A | Commercial B | Commercial C |
| Order Number | 6821376 | 6832924 | 6835724 | 6804139 |
| Order Date | 4/23/2003 | 5/23/2003 | 5/30/2003 | 2/28/2003 |
| Order Total (Net) | $ 414,019.20 | $ 122,976.00 | $ 184,328.64 | $ 250,014.95 |
| Order Total (List) | $ 683,239.95 | $ 409,920.00 | $ 602,814.90 | $ 750,039.95 |
| Order Discount | 39.4% | 70.0% | 69.4% | 66.7% |
| Disclosed Discount | 40.0% | 20.0% | 20.0% | 20.0% |

(16)

| | Tier: $375,001 – $1,000,000 | | | |
|---|---|---|---|---|
| | GSA | Commercial A | Commercial B | Commercial C |
| Order Number | 6669525 | 6697132 | 6671074 | 6656106 |
| Order Date | 3/28/2002 | 5/28/2002 | 4/1/2002 | 2/26/2002 |
| Order Total (Net) | $ 354,522.39 | $ 61,362.26 | $ 128,219.65 | $ 130,725.14 |
| Order Total (List) | $ 585,020.50 | $ 403,181.45 | $ 419,673.90 | $ 383,159.90 |
| Order Discount | 39.4% | 84.8% | 69.4% | 65.9% |
| Disclosed Discount | 40.0% | 20.0% | 20.0% | 20.0% |

(17)

| Tier: $1,000,000+ | | | |
|---|---|---|---|
| **GSA** | **Commercial A** | **Commercial B** | **Commercial C** |
| Order Number | 6916248 | 6911066 | 6909291 | 6920280 |
| Order Date | 2/20/2004 | 2/5/2004 | 1/30/2004 | 2/29/2004 |
| Order Total (Net) | $   801,881.60 | $  1,741,549.24 | $   711,903.40 | $   549,977.04 |
| Order Total (List) | $ 1,561,659.95 | $22,101,245.05 | $ 6,765,016.70 | $ 3,720,977.50 |
| Order Discount | 48.7% | 92.1% | 89.5% | 85.2% |
| Disclosed Discount | 40.0% | 25.0% | 25.0% | 25.0% |

(18)

| Tier: $1,000,000+ | | | |
|---|---|---|---|
| **GSA** | **Commercial A** | **Commercial B** | **Commercial C** |
| Order Number | 6830349 | 6835959 | 6833974 | 6832920 |
| Order Date | 5/19/2003 | 5/30/2003 | 5/28/2003 | 5/23/2003 |
| Order Total (Net) | $ 1,436,916.00 | $   253,731.32 | $ 1,615,468.87 | $ 2,112,120.48 |
| Order Total (List) | $ 2,763,419.85 | $ 1,499,380.00 | $ 14,062,482.05 | $11,830,498.60 |
| Order Discount | 48.0% | 83.1% | 88.5% | 82.1% |
| Disclosed Discount | 40.0% | 25.0% | 25.0% | 25.0% |

## Count 1

**Violation Of The False Claims Act: False Claims (31 U.S.C. § 3729(a) (2006))**

100.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through

99 above, as if fully set forth herein.

101.    In violation of 31 U.S.C. § 3729(a)(2006), Defendants knowingly presented, or

caused to be presented, for payment or approval, false or fraudulent claims (i.e., invoices for

payment for Oracle products sold under the Contract) to the United States, from at least May 29,

2001 through December 31, 2006, which the United States paid.

## Count 2

**Violation Of The False Claims Act: False Statements (31 U.S.C. § 3729(a) (1) (B) (2009))**

102.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through

99 above, as if fully set forth herein.

103.    In violation of 31 U.S.C. § 3729(a)(1)(B)(2009), Defendants knowingly made,

used, or caused to be made or used, false records or statements material to a false or fraudulent

claim (i.e., invoices for payment of Oracle products sold under the Contract) and/or to get the

United States to pay or approve false or fraudulent claims, from at least May 29, 2001 through

December 31, 2006.

## Count 3

### Breach Of Contract

104.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through

99 above, as if fully set forth herein.

105.    By reason of the actions described above, Oracle materially breached the Contract

by billing in violation of the contractual terms from at least May 29, 2001 through December 31,

2006.

106.    Defendants further materially breached their Contract with the Government by

failing to furnish accurate, complete, and current data regarding commercial prices and discounts

in submissions made to GSA during the performance of the Contract, and by failing to comply

with the Contract's PRC obligations.

107.    By reason of these breaches, the United States has suffered damages in the amount

to be determined at trial.

## Count 4

### Constructive Fraud

108.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through

99 above, as if fully set forth herein.

109.    Oracle falsely represented its commercial pricing and discounting practices in its

submissions to GSA during the performance of the Contract from at least May 29, 2004 through December 31, 2006. Oracle knew that its representations were false when it made them.

110.     Oracle's false representations were made with the intent to induce GSA representatives to believe that the representations were accurate and with the intent that GSA would rely on Oracle's representations in 1) keeping the original contract terms in place during the performance of the Contract; and 2) modifying the Contract.

111.     By reason of its reliance on Oracle's false representations, the United States was damaged in an amount to be determined at trial.

<u>**Count 5**</u>

**Fraud By Omission**

112.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 99 above, as if fully set forth herein.

113.     Under the terms of the Solicitation and the Contract, Oracle had a duty to disclose "accurate, complete, and current" information regarding its commercial discounting and pricing practices to the GSA during performance of the Contract.

114.     Oracle concealed material facts from the GSA regarding its discounting and pricing policies during performance of the Contract from at least May 29, 2004 to December 31, 2006.

115.     At all times during performance of the Contract, Oracle knew that if it did not disclose its actual sales practices for sales to non-GSA customers, GSA would be unaware of those practices, would rely on the inaccurate and incomplete information that Oracle was providing, and would not request that Government purchasers receive these higher discounts.

116.     By reason of Oracle's concealment of certain discounts that it was providing to non-GSA customers, and the United States' reliance on the false commercial sales practices information that Oracle disclosed to the United States, the United States was damaged in an amount to be determined at trial.

## Count 6

### Payment by Mistake

117.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 99 above, as if fully set forth herein.

118.     Defendants caused the United States to make payments for Oracle products based upon the United States' mistaken beliefs that Oracle had 1) complied with the Contract; 2) provided the Government with "accurate, complete, and current" pricing and/or sales data; 3) submitted truthful certifications of compliance during performance of the Contract; and 4) was complying with its PRC obligations under the Contract.  In such circumstances, the payments made by the United States to Oracle were made by mistake.

119.     The Government paid inflated payments on claims arising from the Contract from at least May 29, 2001 through December 31, 2006 in reliance on Oracle's representations.

120.     Oracle's representations were material to the payments it made to Oracle under the Contract.

121.     As a result of those mistaken payments, the United States has sustained damages in an amount to be determined at trial.

**Count 7**

**Unjust Enrichment**

122.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 99 above, as if fully set forth herein.

123.    By reason of the Government's payments under the Contract from at least May 29, 2001 through December 31, 2006, Oracle received money to which it was not entitled and has thereby been unjustly enriched in an amount to be determined at trial.

**Prayer for Relief**

WHEREFORE, Plaintiff, the United States of America, prays for judgment against Oracle as follows:

A.    On Count 1, pursuant to the False Claims Act, for judgment against Defendants for statutory penalties and damages as provided in the False Claims Act and for such other relief as the Court deems just and proper;

B.    On Count 2,  pursuant to the False Claims Act, for judgment against Defendants for statutory penalties and damages as provided in the False Claims Act and for such other relief as the Court deems just and proper;

C.    On Count 3, for judgment against Defendants in an amount to be determined at trial.

D.    On Count 4, for judgment against Defendants in an amount to be determined at trial.

E.    On Count 5, for judgment against Defendants in an amount to be determined at trial.

F.   On Count 6, for judgment against Defendants in an amount to be determined at trial.

G.   On Count 7, for judgment against Defendants in an amount to be determined at trial.

## JURY TRIAL DEMAND

The United States demands trial by jury as to all issues so triable.

Respectfully submitted,

TONY WEST
Assistant Attorney General

NEIL H. MACBRIDE
United States Attorney

Dated: 11/16/2010

s/Richard Sponseller
RICHARD W. SPONSELLER
VSB: 39402
Assistant United States Attorney
United States Attorney's Office
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: 703.299.3700
Fax: 703.299.3898
Email: Richard.sponseller@usdoj.gov

s/David B. Wiseman
JOYCE R. BRANDA
SARA MCLEAN
DAVID B. WISEMAN
CHRISTELLE KLOVERS
MELISSA HANDRIGAN
Civil Division
U.S. Department of Justice
601 D Street, NW, Room 9032
Washington, DC 20004
Tel: 202.514.0132

-43-

Fax: 202.307.3852
Email: david.wiseman@usdoj.gov
Attorneys for the United States