IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

_____
                                                                    )
**UNITED STATES OF AMERICA**                )
*EX REL.* **FRASCELLA**                               )
                                                                    )
      Relator,                                             )    Case No. 1:07cv529 (LMB/TRJ)
                                                                    )
v.                                                                )
                                                                    )
**ORACLE CORPORATION, ET AL.**         )
                                                                    )
      Defendants.                                      )
_____)

**DEFENDANTS ORACLE CORPORATION AND ORACLE AMERICA, INC.'S
RESPONSE TO RELATOR'S NOTICE OF DISCOVERY DISPUTE**

Defendants Oracle Corp. and Oracle America, Inc. (collectively "Oracle"), by and through undersigned counsel, respectfully submit this Response to the Relator's Notice of Discovery Dispute That May Impact the Court's Consideration of Alternate Proposals in Joint Discovery Plan ("Notice").

**INTRODUCTION**

Without a shred of evidence, credible or otherwise, Relator asks the Court to rule that he has met the high burden necessary to establish a reasonable belief that lawyers helped Oracle engage in the allegedly fraudulent pricing practices that are now the subject of this case. The only evidence that the Relator points to is Oracle's acquisition of PeopleSoft in 2004, towards the end of the GSA contract period at issue in this case. What Relator neglects to tell the Court, which was widely reported in the press, is that the transaction was hostile and marked by bitter controversy and litigation for nearly 18 months, without any of the kind of cooperative information exchanges that normally occur with friendly acquisitions. Under the Relator's

argument, any time one company acquires another the buyer is subject to the crime-fraud exception solely because the seller was under investigation at the time of the transaction. This flight of fancy has no support in the case law.

As described below, the Relator's so-called "evidence" is false and misleading in all respects, other than that a transaction occurred. In addition to there being no pre-acquisition diligence related to the transaction, PeopleSoft's pricing and discounting strategy bore no resemblance to the allegations against Oracle, and the disclosures at issue in this case were submitted over seven years *prior* to the PeopleSoft transaction. Moreover, there was no Price Reduction Clause manipulation allegation in the case against PeopleSoft, which plays such a critical role in the government's allegations here and was the *only* allegation in the Relator's initial *qui tam* complaint. That the PeopleSoft transaction has no relevance to this case is established by the lack of even a single mention of it in the Government's First Amended Complaint in Intervention ("FACI"). Relator's effort to gain the Court's endorsement of a overbroad, burdensome discovery fishing expedition here should be rejected.

## FACTS

**A.     *United States ex rel. Hicks v. PeopleSoft*.**

In invoking the crime-fraud exception, Relator relies exclusively on Oracle's counsel's alleged knowledge of the *qui tam* action filed by Relator Hicks, and subsequently Intervenor United States, against PeopleSoft, Inc. ("PeopleSoft"). Accordingly, a brief background on *United States ex rel. Hicks v. PeopleSoft* provides important context for understanding and resolving the instant dispute.

In 1997, PeopleSoft negotiated a MAS contract with GSA for the sale of software licenses and related services. See Ex. 1 (Relator's Second Amended Complaint) at ¶ 19-20. In

February 2003, Hicks filed a *qui tam* complaint, under seal in the United States District Court for the District of Maryland, alleging violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, in connection with the negotiation and administration of PeopleSoft's MAS contract with GSA.  *See* Ex. 2 (Notice of Election to Intervene).  Specifically, Hicks alleged that PeopleSoft failed to disclose to GSA certain aspects of its discounting policy -- particularly, the Multiple Product Price Reduction ("MPPR") discounts -- it applied to certain sales to commercial customers.  *See* Ex. 1 at ¶¶ 14-15.  PeopleSoft allegedly offered these MPPR discounts to customers who ordered multiple, different products at the same time.  *Id*.  On October 22, 2003, Hicks filed an amended complaint, still under seal, adding allegations that PeopleSoft violated the FCA by failing to provide to its government customers certain cost savings that PeopleSoft received on travel charges incurred in connection with government purchases under the Contract.

On April 7, 2006, the United States intervened in the suit, contending that PeopleSoft knowingly failed to provide GSA with current, accurate, and complete pricing information concerning its sale of software licenses and related services during the negotiation of the contract and extensions thereof.  *See* Ex. 2 at ¶ 4.  The United States did not intervene on the allegations regarding travel expenses.

On April 17, 2006, on motion by the United States, the U.S. District Court for the District of Maryland unsealed the *Hicks qui tam* complaint.  *See* Order Unsealing Relator's Complaint, Dkt. No. 30, *United States ex rel. Hicks v. PeopleSoft*, *Inc.*, 8:03cv422-PJM (D. Md. 2006).

On October 10, 2006, Oracle, without admitting that PeopleSoft engaged in any fraudulent conduct whatsoever, and without admitting any liability for any of PeopleSoft's alleged conduct, settled the *Hicks qui tam* action with the federal government and Hicks and

obtained a complete release from the Government and the relator. *See* Ex. 2 at ¶ 5. The case was then dismissed with prejudice.

### B. The Unsupported Allegations in Relator's Notice.

Relator attempts to invoke the crime-fraud exception on the basis of the following fabricated allegations: (1) Oracle's counsel became aware of PeopleSoft's alleged fraudulent conduct, as well as the U.S. Department of Justice's ("Justice Department") pre-intervention investigation, during its "negotiations" with PeopleSoft prior to the December 2004 acquisition; (2) Oracle's counsel evaluated PeopleSoft's liability for its alleged conduct before making the acquisition; (3) Oracle's counsel must have compared PeopleSoft's alleged conduct to Oracle's 1997 disclosures and Price Reduction Clause monitoring, and then considered Oracle's potential liability for those disclosures and monitoring in negotiating the 2006 settlement of the *Hicks* case. Thus armed with the knowledge of PeopleSoft's alleged conduct, Oracle failed to make disclosures to the Government about its own conduct and continues to engage in fraudulent conduct even after settling the *Hicks* case. As we demonstrate below, Relator's theory has no basis in fact, is contrary to the evidence, and is replete with speculation and conjecture.

Contrary to the Relator's unsupported allegations, Oracle did not in 2004 "negotiate[] to buy a competitor, PeopleSoft Corporation, eventually concluding the purchase of PeopleSoft in December 2004 for over $10 billion." *See* Notice at 1. There were no months-long, protracted negotiations during which Oracle requested, obtained, or conducted any analysis of PeopleSoft's business, including its existing litigation, contingencies, and liabilities. Rather, in June 2003, Oracle launched an unsolicited tender offer to take over PeopleSoft, a move that was flatly

4

rejected by PeopleSoft. *See* Ex. 3 (Declaration of D. Kehring) at ¶ 2, 6.[1] For the eighteen months that followed that initial tender offer, Oracle continued its unsolicited efforts to acquire PeopleSoft -- efforts that were widely reported in the national press as a "hostile takeover." *See generally* Ex. 5 (Mylene Mangalindan, *PeopleSoft Chief Resigns as Oracle Prepares Takeover*, Wall Street Journal, Dec. 29, 2004; *Oracle Fires Top PeopleSoft Executives*, New York Times Company, Dec. 30, 2004; *Oracle Says Tendered Shares Give it Control of PeopleSoft,* Los Angeles Times, Dec. 30. 2004). The protracted battle finally ended on December 13, 2004, at which point Oracle reached an agreement with PeopleSoft's board to purchase PeopleSoft for $26.50 per share, a total purchase price of approximately $11.1 billion. *See* Kehring Decl. at ¶ 5.

Critically, because Oracle's acquisition of PeopleSoft was unsolicited and was resisted by PeopleSoft, there was no traditional due diligence process of the type engaged in when acquisitions are cooperative. *See* Kehring Decl. at ¶ 6. In fact, it was not until the days shortly before Oracle and PeopleSoft agreed on a preliminary purchase price in mid-December 2004, that Oracle requested and obtained certain limited non-public financial data provided by PeopleSoft. *Id.* at ¶ 7. During the course of the acquisition efforts, Oracle relied upon data that was made publicly available. *Id*.

The Relator asserts in his Notice that "[b]y at least as early as the summer of 2004, government counsel from the U.S. Attorney's Office in Maryland was in touch with PeopleSoft concerning the government's pre-intervention investigation." Notice at 2. This statement is also false and misleading to the extent it suggests that PeopleSoft or Oracle was aware no later than the summer of 2004 of the existence of a *qui tam* complaint that the Justice Department was

---

[1] On June 20, 2003, the Office of the Inspector General for GSA served a Subpoena Duces Tecum on PeopleSoft. The Subpoena did not disclose the existence of a *qui tam* complaint, and GSA's cover letter to the Subpoena stated only that its document requests concerned an inquiry into "overpricing under GSA MAS contracts." Petrillo Decl. at ¶ 2.

5

investigating. *See* Ex. 4 (Declaration of Joe Petrillo) at ¶ 4. PeopleSoft did not learn of the existence of the sealed *qui tam* complaint until December 21, 2004, when the Justice Department disclosed it to PeopleSoft's counsel, *after* PeopleSoft had agreed to be acquired. *Id*. Given this, it was not possible for Oracle to know of the *qui tam* action prior to December 21, 2004. *Id*.

The Relator's Notice asserts that "Government counsel in the Hicks case had on again off again settlement discussions with PeopleSoft and then Oracle for several years." Notice at 2. This statement is also inaccurate. As set forth above, PeopleSoft first learned of the *qui tam* complaint on December 21, 2004. *See id*. Approximately one month later, on January 28, 2005, Oracle's counsel attended a meeting with representatives of the Government regarding the allegations in the *qui tam* complaint. *Id*. at ¶ 6. Although the Government outlined its theories of liability at the meeting, it denied Oracle's request to obtain a copy of the *qui tam* complaint and neither the Justice Department, nor PeopleSoft, nor Oracle presented a settlement offer at that meeting. Indeed, the Justice Department indicated at that meeting that it required additional documents to assess the total potential damages incurred as a result of the alleged conduct by PeopleSoft. *Id*. PeopleSoft conducted its own internal investigation of the allegations and was not in a position to propose or evaluate any settlement offer until the fall of 2005.The Justice Department did not move to unseal the *qui tam* complaint until April 17, 2006. It was not until the unsealing of the *qui tam* complaint that anyone at Oracle or PeopleSoft actually reviewed a copy of the complaint.

The Relator's Notice states that "[i]t is virtually certain that PeopleSoft disclosed the District of Maryland's investigation to Oracle during the negotiations in 2004, and that Oracle and its counsel evaluated PeopleSoft's potential liability before making the acquisition." This statement is pure speculation. Again, Oracle's acquisition of PeopleSoft was the culmination of

an eighteen-month, widely reported unsolicited hostile takeover bid.  *See* Kehring Decl. at ¶ 2, 5; *see generally* Ex. 5.  There were no extensive negotiations, and PeopleSoft never produced non-public due diligence information before the acquisition.  *See* Kehring Decl. at ¶ 6-8.  Furthermore, and as previously stated, the Justice Department did not even disclose the existence of the *qui tam* action or its pre-intervention investigation to anyone at PeopleSoft until December 21, 2004, which occurred *after* Oracle had reached the agreement to purchase PeopleSoft.  *See* Petrillo Decl. at ¶ 4-6.

Relator also speculates that it is "virtually certain that Oracle and its counsel evaluated Oracle's potential exposure for the same kind of conduct that PeopleSoft was being investigated for, and considered that exposure when it conducted negotiations with the Government to settle the PeopleSoft case."  Once again, Relator fails to points to a single piece of evidence that supports this allegation and indeed, it is nonsensical.  The *Hicks qui tam* complaint alleged defective pricing and a failure to disclose certain cost savings related to travel expenses.  The multi-product discounting practices and the travel charges at issue in *Hicks* have no analog to Oracle's discounting policies and its PRC monitoring practices.  There is no allegation in the FACI about any type of MPPR discounting practice similar to PeopleSoft's.  Likewise, there were no allegations in the *Hicks qui tam* complaint similar to the allegations regarding Oracle's PRC compliance monitoring.  Finally, it is not at all clear how Oracle could use the advice of counsel to further an alleged fraudulent scheme simply by considering its own "potential exposure" when negotiating the settlement of an unrelated matter.

Relator next asserts that Oracle "also chose to continue its own fraudulent conduct after settling the PeopleSoft case."  This statement, in addition to being speculative, makes no sense because the *Hicks* settlement occurred on October 10, 2006, ten days <u>*after*</u> the eight-year term (as

7

extended) of Oracle's GSA contract expired. Obviously, the claims in this case – relating to Oracle's alleged failure to disclose pricing and discounting practices in 1997-98 and its PRC compliance between 1998 and 2006 – have nothing to do with settling the *Hicks* case.

Finally, Relator states that "allegedly privileged communications between Oracle and its counsel during the PeopleSoft acquisition, the PeopleSoft settlement negotiations, and during its ongoing submission of inflated invoices for updates and technical support 'bear[] a close relationship to the criminal or fraudulent scheme.'" *See* Notice at 4. Although this statement, as written, is nonsensical, Relator has once again not cited any evidence to support these conclusions. Furthermore, Relator has not articulated any connection between the furtherance of an alleged fraudulent scheme and any of the privileged communications regarding the PeopleSoft acquisition, the *Hicks* settlement negotiations, or the continued submission of invoices for updates and technical support.

## **LEGAL ARGUMENT**

As an initial matter, the attorney-client privileged materials Relator seeks are irrelevant to the claims and defenses of the parties. It is well-settled that the scope of permissible discovery is limited to non-privileged materials that are relevant to the claims and defenses of the parties, and not simply relevant to the subject matter of the litigation. *See* Fed. R. Civ. P. 26(b). To the extent this Court concludes that requested materials are irrelevant and exceed the scope of permissible discovery, the inquiry ends and Relator is not entitled to the production of the disputed documents.

Even if the Court finds the documents relevant, Relator has not met his burden to justify an *in camera* inspection or to compel the production of Oracle's privileged materials, if they exist. Before this Court may order an *in camera* inspection of privileged documents, Relator

8

must provide evidence sufficient to support a finding that (1) Oracle committed a fraud at the time it sought advice of counsel for the purposes of advancing a criminal or fraudulent scheme and (2) the privileged materials bear a close relationship to Oracle's existing or future scheme to commit fraud. *Chaudhry v. Gallerizzo,* 174 F.3d 394, 403 (4th Cir. 1999) (refusing to apply the exception where the party invoking the exception "produced no evidence addressing either element of the required showing"); *see also United States v. Zolin*, 491 U.S. 554, 571 (1989) (the party invoking the exception must show "'a factual basis adequate to support a good faith belief by a reasonable person' that *in camera* review of the materials may reveal evidence to establish that the crime-fraud exception applies.") (internal citation omitted); *Nedler v. Vaisberg,* No. *05-61* 13,2006 WL 2460892, at * 5 (E.D. Pa. Aug. 22, 2006) (concluding that an *in camera* review not warranted unless party invoking the exception meets its heavy *prima facie* burden).

The Supreme Court has expressly held that a litigant seeking to invoke the crime-fraud exception cannot rest on mere allegations, which is all the Relator has done here. *Clark v. United States*, 289 U.S. 1, 15 (1933) (holding that a mere allegation that a client consulted an attorney for advice to further a fraud will not "drive the [attorney-client] privilege away"). Instead, litigants face a heavy burden and must present "*prima facie* evidence that [the alleged misuse of advice of counsel] has some foundation in fact." *Id*. "There is no reason to permit opponents of the privilege to engage in groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents." *United States v. Zolin*, 491 U.S. 554, 571 (1989).[2]  Lower courts uniformly agree.[3]

---

[2]  The Supreme Court described the evidence needed to satisfy the *prima facie* standard as follows: "To drive the privilege away, there must be 'something to give colour to the charge' . . . 'evidence that has some foundation in fact.'" *Clark*, 289 U.S. at 15 (citation omitted).

[3]  *See, e.g., In re Grand Jury Subpoena*, 419 F.3d 329 (5th Cir. 2008) (holding that mere allegations are insufficient to make a *prima facie* showing that the crime-fraud exception
Footnote continued on next page

## I.   RELATOR HAS FAILED TO DEMONSTRATE HOW THE MATERIALS ARE AT ALL RELEVANT TO THE INSTANT ACTION.

Relator's requests for Oracle's privileged communications are objectionable as not relevant to the claims asserted in the Government's FACI, or Oracle's defenses thereto.  As amended in 2000, Fed. R. Civ. P. 26(b) restricts party-controlled discovery to matters that are relevant to *a claim or defense* in the lawsuit.  The rule states that: "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party."  Fed. R. Civ. P. 26(b)(1).  Rule 26 no longer permits "subject matter" discovery as a matter of course.  Instead, the rule requires a showing of "good cause" for a party to obtain subject matter discovery.  According to the Advisory Committee Comments to the 2000 Amendments to Federal Rule of Civil Procedure 26(b)(1), the changes were made to the rule for the following reason:

> The Committee has heard that in some instances, particularly cases involving large amounts of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the 'subject matter' involved in the action. . . . The amendment is designed to involve the court more actively in regulating the

---

Footnote continued from previous page

applies); *Chaudry*, 174 F.3d at 397 (refusing to apply crime fraud exception based on bare allegations that legal counsel was used to further a fraud); *Bumgarner v. Hart*, No. 05-3900 (RMB), 2007 WL 38700, at *4 (D.N.J. Jan. 4, 2007) ("Plaintiff has not produced a scintilla of evidence that defendant committed or intended to commit a fraud or crime . . . . A general allegation that [defendant set out to defraud [p]laintiff is not enough to pierce the attorney-client privilege . . . . Plaintiff must show that [defendant] possessed an independent intent to commit a crime or fraud and knowingly sought advice of counsel in furtherance of the crime or fraud."); *see also Constand v. Cosby*, 232 F.R.D. 494, 500 (E.D. Pa. 2006) (declining to invoke the crime-fraud exception where plaintiff "allege[d] that the information [sought] may lead to another defendant," reasoning that plaintiff failed to "'make out a prima facie case that the attorney was used in order to promote an intended, continuing criminal or fraudulent activity.'") (citation omitted); *Neuder v. Battelle Pacific Northwest Nat. Laboratory*, 194 F.R.D. 289 (D.D.C. 2000) (holding that to invoke the crime fraud exception, more is necessary than mere allegations of wrongdoing); *Am. Standard, Inc. v. Pfzer Inc.*, Civ. A. No. 83-834, 1986 WL 9713, at *8 (D. Del. Mar. 31, 1986) ("conclusory arguments neither satisfy [d]efendants' burden nor rebut [p]laintiffs' contention" regarding the alleged fraud on the PTO); *Lemelson v. Bendix Corp.*, 104 F.R.D. 13, 17-19 (D. Del. 1984) (plaintiff failed to demonstrate a *prima facie* case of fraud through the use of circumstantial evidence).

>breadth of sweeping or contentious discovery . . . [and] signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings.

Fed. R. Civ. P. 26, Advisory Committee Notes, 2000 Amendments. Fed. R. Civ. P. 26(b)(2). Magistrate Judge Paul Grimm of the District of Maryland has described the effect of the 1993 and 2000 changes to Fed. R. Civ. P. 26 as follows:

>The most recent revisions to the discovery rules imposed changes intended to reach lingering concerns about the overbreadth and expense of discovery, and remind the courts and litigants of the fact that in determining what discovery should take place in a particular case, Rule 26(b)(1) is but the first step, necessarily followed by balancing the Rule 26(b)(2) factors. Accordingly, the December 1, 2000 changes to Rule 26(b)(1) restricted the scope of discovery to unprivileged facts relevant to "the claim or defense of any party", unless the court determines that there is "good cause" to permit broader discovery relevant to the subject matter of the action, but not more directly connected to the particular claims and defenses. They additionally required that discovery of inadmissible facts that appear reasonably calculated to lead to the discovery of admissible evidence also must be within the scope of permissible discovery. Furthermore, they emphasize that "all discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii)," the cost-benefit balancing factors.

*Thompson v. Dep't of Hous. and Urban Dev.*, 199 F.R.D. 168, 171 (D. Md. 2001). *Id.* (internal citations omitted). Or, as Magistrate Judge William Web stated, "The 2000 amendments implicitly seek to farm out the 'fishing expeditions' previously allowed and serve as an attempt to reduce the broad discovery which has heretofore been afforded litigants in civil actions." *Quality Aero Tech., Inc. v. Telemetrie Elektronik, GMBH*, 212 F.R.D. 313, 315 n.2 (E.D.N.C. 2002).

These principles, applied here, compel the conclusion that Relator is not entitled to Oracle's privileged communications with its counsel. Relator has failed to demonstrate how the requested privileged materials he seeks are at all relevant to the claims and defenses of either party. *See* Fed. R. Civ. P. 26(b)(1). In this case, the Government alleges that Oracle provided false or fraudulent disclosures regarding its commercial sales and discounting practices in 1997,

11

and reaffirmed the accuracy of those disclosures during contract performance. Specifically, the Government identifies three allegedly false 1997 disclosures:

> 1) Oracle's discounts were based on distinctions between classes of customers;
>
> 2) Oracle offered "standard discounts" that fell within specified ranges to its non-GSA customers, and the "standard discount" for commercial end users was 15 to 20 percent off of list prices; and
>
> 3) "non-standard discounts are used in less than five percent (5%) of the total number of commercial transactions" and that "Oracle uses non-standard discounts [only] in unique situations where an individual transaction/contract size warrants additional considerations."

FACI ¶ 50. The Government also alleges that Oracle "manipulated" certain commercial transactions to avoid its obligations under the PRC. FACI ¶ 82.

In contrast, Relator in *Hicks* (and subsequently the government) alleged that PeopleSoft failed to disclose to GSA particular aspects of its discounting policies -- the Multiple Product Price Reduction ("MPPR") discounts -- it applied to certain sales to commercial customers. *See* Ex. 1 at ¶¶ 14-15. There is no MPPR discount allegation in the present case. Nor did *Hicks* allege "manipulation" of commercial transactions to circumvent PRC obligations. The only similarity between the two cases is that they both include "defective pricing" allegations. The defective pricing issues in *Hicks,* however, were unique to the PeopleSoft discounting policies and the PeopleSoft contract with GSA. Oracle's MAS contract with GSA, as indicated above, was a completely different contract. Furthermore, Oracle was not involved in the negotiation or administration of PeopleSoft's MAS contract with GSA. The defective pricing allegations upon which the instant matter is based -- Oracle's alleged fraudulent disclosures in 1997 -- occurred nearly *seven years before* Oracle even acquired PeopleSoft.

Despite the tenuous connection between the present case and the *Hicks* litigation, Relator has sought the following broad categories of documents in his requests:

**REQUEST NO. 1**: All documents related to Oracle's attempt to negotiate a release in the case of *United States ex rel. Hicks v. PeopleSoft* ("the PeopleSoft Case") that would preclude the United States from bringing claims against Oracle for any conduct by Oracle similar to that alleged against PeopleSoft in the PeopleSoft case, including but not limited to any documents discussing or analyzing the benefits to Oracle of such a release (not to include routine documents or correspondence that does not include a specific discussion related to the release issue), including but not limited to communications with counsel.

**REQUEST NO. 2**: All documents comparing Oracle's conduct to the conduct alleged against PeopleSoft in the PeopleSoft case, including but not limited to communications with counsel.

**REQUEST NO. 5**: In the context of Oracle's acquisition of PeopleSoft, all documents related to any indemnifications, deal terms, or accounting reserves related to the conduct alleged against PeopleSoft in the PeopleSoft case, including but not limited to communications with counsel.

**REQUEST NO. 6**:  All documents related to any advice received from counsel or any other persons advising Oracle to make voluntary disclosures and/or cease any business practices related to any conduct by Oracle similar to the conduct alleged against PeopleSoft in the PeopleSoft case, or alleged in the Complaint in Intervention.

**REQUEST NO. 7**: All documents related to any Oracle employees, officers, directors, supervisors, or counsel denying knowledge of any conduct by Oracle similar to the conduct alleged against PeopleSoft in the PeopleSoft case.

**REQUEST NO. 8**: All documents created before the unsealing of this litigation discussing, analyzing, or related to any calculation of potential damages that Oracle might owe or be compelled to pay (by settlement or judgment) to the United States for conduct by Oracle similar to the conduct alleged against PeopleSoft in the PeopleSoft case, including but not limited to communications with counsel.

*See* Ex 6.  The information sought in these requests is not relevant because the *Hicks* litigation involved a different MAS contract, a different discount practice, and different allegations raised by the Government.  Moreover, the PeopleSoft case was resolved through a settlement agreement, and includes a complete release; and the case was dismissed with prejudice.  There is

no valid reason to reopen that matter for discovery of privileged material.  For these reasons, Relator is not entitled to any of the requested materials.

## II.     RELATOR HAS FAILED TO SHOW THAT ATTORNEY-CLIENT COMMUNICATIONS WERE IN FURTHERANCE OF FRAUD

Even if the requests were within the scope of permissible discovery, Relator has failed to show that the privileged communications and documents he seeks were made "*in furtherance*" of the fraud alleged in the present *qui tam* complaint.  He has also failed to present any evidence to show how the requested privileged materials -- some of which relate solely to Oracle's counsel's involvement in settling the *Hicks* case -- bear a "close relationship" to an existing fraudulent scheme.  Rather than attempting to meet his burden, Relator relies exclusively on  speculation to justify the application of the exception.  Such unsupported conjecture cannot, as a matter of law, satisfy the burden of demonstrating *prima facie* evidence that Oracle used its counsel to further a crime or fraud.[4]

It is well-settled that "the crime-fraud exception has a narrow and precise application: It applies only when the communications between the client and his lawyer further a crime, fraud, or other misconduct. . . . To subject the attorney-client communications to disclosure, *they must actually have been made with an intent to further an unlawful act." United States v. Jacobs,* 117 F.3d 82,88 (2d Cir. 1997) (emphasis added); *see also In re BankAmerica Corp. Secs. Litig.,* 270 F.3d 639, 642 (8th Cir. 2001) ("There must be a specific showing that a particular document or

---

[4]     Relator has cited this Court's opinion in *Galaxy CSI, LLC v. Galaxy Computer Services, Inc.*, 1:04cv0007, 2004 WL 3661433 (E.D. Va. Mar. 31, 2004), which articulates the proper standard for applying the crime-fraud exception.  *See* Notice at 3.  In that case, this Court concluded that the Bankruptcy Court, after it reviewed non-privileged documents and deposition testimony indicating *prima facie* evidence of the use of counsel to further a fraudulent scheme, properly applied the crime-fraud exception to attorney-client communications.  The District Court also concluded that its own *in camera* inspection of the disputed documents supported the Bankruptcy Court's decision.  Critically, in contrast to the *Galaxy* case, Relator here offers *no prima facie* evidence that Oracle sought the advice of counsel to further a fraudulent scheme.

communication was made in furtherance of the client's alleged crime or fraud."); *Richard Roe,* 68 F.3d at 40-41 (holding that "a simple finding of relevance . . . does not trigger the exception."); *In re Grand Jury Proceedings,* 604 F.2d at 802 (purpose of the privilege is "frustrated if the client use[s] the lawyer's services *to further a continuing or future crime*"); *Frieman v. USAir Group, Inc.*, No. 93-3142,1994 WL 675221, at *8 (E.D. Pa. Nov. 23, 1994) (privileged communications "were intended in some way to facilitate or conceal the [fraudulent] activity").[5] Only those documents that are found to be "in furtherance" of the alleged fraud may be subject to the crime-fraud exception. *In re Grand Jury Subpoena*, 419 F.3d 329,343 (5th Cir. 2005) (holding that the proper reach of the crime-fraud exception does not extend to all communications made in the course of the attorney-client relationship, but rather is limited to those communications and documents that are in furtherance of the contemplated or ongoing criminal or fraudulent conduct).

Here, Relator has failed to make the required "specific showing that a particular document or communication was made in furtherance of the client's alleged crime or fraud." Rather, Relator asserts generalized and unsupported allegations regarding Oracle's counsel's participation in the PeopleSoft acquisition, settlement negotiations, and Oracle's submission of invoices to the government for updates and technical support, and then claims that counsel assisted Oracle in defrauding the government. *See* Notice at 2 - 4. As we demonstrated above (at pp. 4-7), these generalized allegations are unsupported fabrications – they fall far short of the required showing.

---

[5]  *In re BankAmerica Corp.,* 270 F.3d at 643 (vacating an order compelling production of privileged documents where the district court did not require an actual showing that the communications were made in furtherance of the alleged fraud); *United States. v. Bauer,* 132 F.3d 504,510 (9th Cir. 1997) (same); *Parkway Gallety Furniture, Inc. v. Kitlinger/Pennsylvania House Group, Inc.,* 116 F.R.D. 46,53-54 (M.D.N.C. 1987) (same).

Mere allegations are insufficient to invoke the crime-fraud exception and that is all Relator has here. *See supra*, n.3. Indeed, it is error to apply the crime-fraud exception based solely upon a generalized showing that a fraud occurred and an allegation that the requested materials are related to that fraud. *see also In re BankAmerica*, 270 F.3d at 643 (vacating an order compelling the defendants to produce allegedly privileged documents, where "[t]he district court focused only on plaintiffs' threshold showing of fraud. The court then assumed, without any further showing by plaintiffs, that all contemporaneous attorney-client communications 'could be construed' as in furtherance of the alleged fraud.").

Furthermore, although Relator references his requests for privileged materials in his Notice, he does not even articulate, must less demonstrate, how these materials bear a "close relationship" to an existing fraudulent scheme. *See* Notice at 4. He must come forward with some *prima facie* evidence indicating that Oracle sought the advice of counsel to further a fraudulent scheme, and that the requested materials bear some relationship to the existing fraudulent scheme. *See In re BankAmerica*, 270 F.3d at 642-43.

In sum, Relator has presented no *prima facie* evidence demonstrating that Oracle sought the advice of counsel to further a fraudulent scheme, or that the requested privileged materials bear a close relationship to the alleged fraudulent scheme. He has failed to identify any communications that satisfy the "in furtherance" requirement. For these reasons, the Relator has not justified the application of the crime-fraud exception. *See, e.g., Vandorn Golf Co., Inc. v. Karsten Mfg. Corp.*, 213 F.R.D. 528, 536 (N.D. Ill. 2003) (refusing to apply the crime-fraud because plaintiff failed to satisfy the "in furtherance" prong where plaintiff failed to show that counsel assisted the client in committing the fraud).

## **CONCLUSION**

For the reasons discussed herein, Oracle respectfully requests that this Court find that Relator has failed to meet his burden to invoke the crime-fraud exception to Oracle's attorney-client privileged communications. Oracle also respectfully requests that this Court find that Relator's request for documents related to the PeopleSoft acquisition, the *Hicks* case, and the *Hicks* settlement, including, but not limited to, Document Requests 1, 2, 3, 4, 5, 6, 7, 8, and 9 are irrelevant to the claims and defenses of either party and are therefore not subject to discovery and that there is no basis for any exception to the application of the attorney-client privilege.

Respectfully submitted,

| ARNOLD & PORTER LLP | ARNOLD & PORTER LLP |
|---|---|
| _____/s/_____ | _____/s/_____ |
| Kristen Ittig (VSB #70672) | John Nassikas (VSB # 24077) |
|  | Drew Harker |
| Suite 900 | 555 Twelfth Street, N.W. |
| 1600 Tysons Boulevard | Washington, D.C. 20004 |
| McLean, VA 22102-4865 | Telephone: (202) 942-5000 |
| Telephone: (703) 720-7000 | Facsimile: (202) 942-5999 |
| Facsimile: (703) 720-7399 | John.Nassiaks@aporter.com |
| Kristen.ittig@aporter.com | Drew.Harker@aporter.com |

*Counsel for Defendants Oracle Corporation and Oracle America, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of February 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Richard W. Sponseller
Assistant United States Attorney
United States Attorney's Office
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, VA 22314
Richard.Sponseller@usdoj.gov

Christopher B. Meade
LONDON & MEAD
1225 19th Street, N.W.
Suite 320
Washington, D.C. 20036
cmead@londonandmead.com

                                                                     /s/
                                     Kristen Ittig (VSB #70672)
                                     Suite 900
                                     1600 Tysons Boulevard
                                     McLean, VA  22102-4865
                                     Telephone:  (703) 720-7000
                                     Facsimile:  (703) 720-7399
                                     Kristen.ittig@aporter.com