**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>**ex rel. PAUL FRASCELLA**<br><br>**v.**<br><br>**ORACLE CORP., ORACLE AMERICA,**<br> **et al.**<br><br>**Defendants.** | **CASE NO. 1:07cv529 (LMB/TRJ)** |

**NOTICE/UPDATE IN SUPPORT OF RELATOR'S
MOTION TO COMPEL PRODUCTION OF COMPLETE ORACLE
SALES DATABASES FOR ENTIRE PERIOD OF MAS CONTRACT AT ISSUE**

At the Court's direction, counsel for the parties and some of their technical personnel held a teleconference Monday afternoon, February 28. Fortunately, Oracle's counsel had a court reporter transcribe the call. Relator's counsel ordered the rough copy and overnight delivery so that the Court could read Oracle's admissions for itself. The transcript shows that Oracle concealed information about its databases when it responded to an IG subpoena in 2008, when it answered discovery, and when it filed its opposition to Relator's motion to compel, and likely when it responded to an IG subpoena in 2008.

From the outset of discovery, Oracle has objected to the Government and Relator's requests for sales data by saying that it had already produced sufficient data in response to a GSA IG subpoena in 2008. The transcript of the call reveals that, at a minimum, when negotiating over what to produce in response to the IG subpoena, Oracle failed to inform the Department of Justice that it had readily available data in other database modules that would have been of great value in the Government's investigation.

Despite knowing that it had failed to produce crucial, readily-available data in response to the IG subpoena, Oracle told this Court last Wednesday that the IG subpoena production had everything the Government needed:

> In response to a subpoena issued by the General Services Administration Office of Inspector General ("GSA OIG") in 2008, Oracle provided the Government with an extract of Order Management fields containing U.S. commercial transactional data that is now also responsive to both the Relator's and Government's current discovery requests.  Prior to the meet and confer on February 14, 2011, the Government never complained that the earlier data provided, which it has had for over two years, was incomplete or otherwise lacking relevant information. . . .  Oracle has agreed to produce approximately 2-1/2 years of additional data beyond what Oracle provided pursuant to the GSA OIG Subpoena. . . .  <u>In light of the previous production of responsive data and Oracle's commitment to provide the information sought by the Relator and the Government, the request for Oracle's "complete database" is overbroad, not reasonably calculated to lead to discovery of admissible evidence, and not necessary.</u>

Opposition to Relator's Motion to Compel Production of Complete Oracles Sales Databases, Document 95, filed February 23, 2011, p. 2 (emphasis added).

Relator's Reply, filed Thursday, said:

> Maybe those 60 fields [Oracle proposed to produce] contain all the data that would make it easy to find deeply discounted deals to resellers, or deeply discounted contracts for renewals of support and maintenance, or deals where Oracle "amended" an expired price hold from old contracts so that Oracle could pretend that it didn't have to disclose those deals to GSA.  And maybe they don't.

Relator's Reply to Oracle's Opposition to Motion to Compel, Document 96, filed February 24, 2011, p. 1.

On Friday in court, Oracle never answered whether the fields it decreed as relevant contained that information.  It turns out that Oracle had data fields in a separate pricing module that would identify "price hold" transactions.  Oracle answered interrogatories saying that it could not readily identify "price hold" transactions, never told the Government about that separate pricing module, and had no intention of producing it until after Friday's hearing.  It turns out that Oracle had intended all along not to produce sales data for support renewals, which

comes from a separate database (called "OKS").  After the hearing, Oracle finally began the process of producing that information, which it now says will take 3-4 weeks to accomplish.

Relator has repeatedly asked for information about commissions paid to Oracle sales rep on deeply discounted sales through resellers, on the theory that when Oracle evaded its price reduction clause obligations by running deals through resellers, Oracle sales reps would still want to receive commissions for the deals.   It turns out that sales commission data is in a  separate module that Oracle did not intend to produce.

Oracle's game of hide and seek has rendered the current discovery schedule unmanageable.  Expert reports are due April 1.  Relator and the Government still don't have a list of Oracle's standard and flex data fields for all of its database modules relevant to sales.  During the call on February 28, Oracle finally committed to producing numerous critical items, but it will take weeks for Relator and the Government to get that information, determine if there are other data fields they need, and then analyze the information to create expert reports.

## I.      ORACLE'S DISCOVERY RESPONSES SAID THAT ITS
##         DATABASES DID NOT IDENTIFY PRICE HOLDS; THAT WAS NOT TRUE.

 Oracle's counsel have repeatedly told the Government that the only way to identify "price hold" transactions and e-Business migrations was to search individual job packets, the equivalent of searching for needles in a haystack.  The Government's Interrogatory No. 10 specifically asked Oracle to identify every contract from January 1997 through December 31, 2006 "that contained a price hold provision."  Oracle answered: "Such a task is not possible in the short discovery period ordered by the Court because it requires Defendants to review physical ordering and other documents ('job packets') that are imaged in a non-searchable

format.  Such information is not readily available in summary form and is not apparent from

Defendants' raw transactional data."

Not true.  It turns out that Oracle has a separate Pricing Module in its databases with

fields that identify price holds and migrations.  Oracle did not mention that Pricing Module or

those fields in its discussions with opposing counsel, or its pleadings in this Court.  Oracle did

not provide that Module or those fields when it produced its 60-plus data fields on Friday, April

25:  "MR. MEAD: On price holds and migrations there are fields we don't have yet that would

allow us to identify those. MR. MURRAY:  Yes."  (TR, 128:17-20) (Attached as Exhibit 1).

> MR. MEAD:  So are there any flex fields or customized fields that would help you
> identify the kinds of transactions that we've identified as being of interest, namely price
> holds, resellers, you know, limited term licenses, that sort of stuff?  Are there flex fields
> that would help us identify those?
> . . .
> MR. MURRAY:  In terms of the data, we have generated, the answer would be no.  I
> think we do have other capabilities related to the pricing system where we would capture
> information about details of the difference between the list price and the selling price
> which would include in some cases amounts attributable to price holds.
> MR. MEAD:  So we would like to request a description of that data what fields would be
> captured because obviously we are going to be interested and requesting that from you.
> How about for migration, same thing?
> MR. MURRAY:  Yes.

(TR, 32:15 – 33:14).

## II.    IN RESPONDING TO THE IG SUBPOENA, ORACLE DID NOT TELL THE GOVERNMENT ABOUT THE PRICING MODULE THAT IDENTIFIED PRICE HOLD TRANSACTIONS—IT JUST "DIDN'T COME UP."

> MR. MEAD:  I want to make sure I understand.  Is ORACLE's counsel now admitting
> that what's in your price detail module is information that is reasonably calculated to lead
> to the discovery of admissible evidence?
> MR. HARKER:  I think what we just said was that the QP discount reports that have just
> been described are things that we are prepared to produce to you.  And I think that is the
> information that you just asked for, and that's the information that we are going to give
> you.  If you look at request number 22, it requests information on list price and net price
> which was in the report that you got on Friday.

MR. MEAD:  ORACLE responded to an IG subpoena issued by the Department of Justice, did you inform DOJ and GSA about the existence of that data?

MR. CLANCY:  I'm not answering questions.

MS. MILLER:  I was the person who responded to the IG subpoena and we had a number of discussions about how to provide the government what would be most useful to them. And I don't know whether Eric Miller is on the line or anybody from GSA who had those discussions with me, so we reached agreement as to what was going to be provided in response to the subpoena which was an effort to provide something that was usable and understandable and readily available, as opposed to going back into all this masses of data. And we provided all the data that supported the KPMG report at that time.

MR. MEAD:  I want to ask the same question again.  Did you tell DOJ or GSA about the pricing detail modules or the other subject matters that we just discussed when you had those discussions?

MR. CLANCY:  Mr. Mead, you're questions are out of line and inappropriate.  This is not an inquisition for to you carry on and grandstand, so why don't you just step down. You were not part of the discussions with the IG, so step down.

MR. MEAD:  I want to make sure I understand.  We can report to judge Jones that ORACLE is unwilling to answer that question in this call.

MS. MILLER:  Mr. Mead, excuse me.  That question didn't come up in our conversation. You weren't part of those conversations.  We talked about what kind of data the government needs.  The subject of the QP report simply didn't come up.

MR. MEAD:  You're right.  I wasn't a party to those conversations.  That's why I'm asking the question.  So you are confirming to me that ORACLE did not inform DOJ or GSA when it responded to the IG subpoena about the existence of this pricing detail module, that's correct, isn't it.

MR. HARKER:  Asked and answered.  Let's move on.

MR. MEAD:  I understand the answer to be no, we did not tell them.  If anyone from ORACLE wants to contradict that for the record, please do so.

MS. MILLER:  We did not tell them because it never came up.  We never discussed all the sources of information where this might be found.  It simply didn't come up, Mr. Mead.  And I got to tell you, I object to your trying to twist this into some kind of wrongdoing.

(TR, 56:4 – 59:3).

**III.    RELATOR SPECIFICALLY ASKED IF ORACLE
WAS PRODUCING SUPPORT RENEWAL SALES DATA;
WE  LEARNED IN THE CALL THAT ORACLE HAD NOT
INCLUDED THAT DATA IN RESPONSE TO THE IG SUBPOENA OR
IN WHAT IT INTENDED TO PRODUCE BEFORE FRIDAY'S HEARING.**

MR. MEAD:  Were license renewals included on what you produced Friday.

MR. HARKER:  No, Chris.  But they are being collected now.

MR. MEAD:  Again in terms of responding to my document request and the government's, you took the position that that information was not reasonably calculated to lead to the discovery of admissible evidence.

MR. HARKER:  Not -- I think, well, I didn't participate in the meet and confer, so my impression was that from what I've seen in the, in our responses that we were working that issue through with you.  Moreover as you know, we took the position very openly that that information was not relevant, and the judge ruled on that on Friday and as I said, that information is being collected and will be produced to you.  My understanding from Wayne is that that's a, that that is not going to be an easy pull, not that the data that you got on Friday was an easy pull.  My understanding is that took about a week, but this is, you're probably looking at three to four  about you we are pulling that information for you.

MR. MEAD:  You only began that process Friday?

MR. HARKER:  Yes.  I mean we got our arms around it at the end of last week and so that, those scripts I think still need to be written and so on, right? Wayne is nodding his head yes.

MR. MEAD:  Basically that data will not be available before our expert reports are due.

MR. HARKER:  Look, I don't know.  I can't tell you now exactly when it will be produced.  I know talking to Wayne, he said it is a complicated data pull, and we'll obviously do what we can to expedite it.  The estimate that I had been given is a couple of weeks.  We'll obviously do what we can to accelerate it.  But I can't -- I know you have an expert report due on April 1st.  I understand that.  We'll do the best that we can to expedite getting you the information.

MR. MEAD:  In terms of what was produced in the IG subpoena, was there some express agreement between you all that you wouldn't produce support renewal data.

MR. HARKER:  You keep going back to the GSA subpoena.  I really don't understand that.

MR. MEAD:  You've taken the position repeatedly in our meet and confers that what you produced in response to the IG subpoena should be sufficient for the government's purposes, and is an important backdrop to your discovery compliance here, so I'm exploring what the government agreed to. I also think frankly it will be relevant with respect to ORACLE's intent at trial, what you told the government you had, and had easy access to and what in my view you appear to have concealed.

. . .

MR. MEAD: . . . Is it your position that GSA did not ask for license renewal data in response to the IG subpoena?

MS. MILLER:  Mr. Mead, there was a subpoena that asked for a lot of things.  We came to an agreement as to what the scope of the data was that ORACLE would produce and in terms of support, the support is the percentage of the first year license fees, and that's always been the way that we've discussed it with the government in the past.  The government did not require us to produce all of the support renewals or the support invoices in response to the subpoena, and in part because it is very complex and it's hard to pull that data, so we took the short cut of saying it's X percent of the original license fee and you can calculate over how many years that might be.  So that's the way we handled it.

MR. MEAD:  The difficulty is that won't your commercial data reveal that you gave renewals at much greater discounts than that assumption that you told the government about?

. . .

MR. MEAD:  I still don't have an answer to the question.  Is it ORACLE's position that the government did not request as part of data about commercial deals the licensed rules during the relevant time frame during which you produced commercial sales data.  I'd be surprised if the government agreed to that.  Correct me if I'm wrong.

MR. HARKER:  Asked and answered.

MR. MEAD:  It's been asked.  It has not been answered.

MR. HARKER:  Of course it was answered. You were told you were wrong.  You were told that there were negotiations between the government and ORACLE when the subpoena got issued and it was worked out what would be produced and what wouldn't be produced so you were told you were wrong.  You're just trying to invent an issue that doesn't exist. We are not concealing anything from you.  We just, I just told you that we, we have just told you jointly that it's in this database called OKS, and that you're going to get it.

MR. MEAD:  Up until Friday, you had no intention of producing it to us and you hadn't mentioned it to us.  We have been meeting and conferring over these issues and we've been asking about information and you've been telling us what you produced to the government back then should be more than enough for our purposes, and you haven't told us about this stuff, and we are now two months into discovery in the Eastern District of Virginia and you filed document responses in which you said that the 60 fields of data that you proposed to give us were the only things in your database that reasonably calculated to lead to the discovery of admissible evidence.  I have to tell you I'm amazed at what I'm hearing what you guys concealed.  I'm going to bring it to the Court's attention as rapidly as possible.  We are going to have to move for the extension of expert reports.  I'm really frustrated with this phone call. I agree that we should move forward to the fact gathering

(TR, 91:11 - 97:22)

## IV.    DIFFERENT DATABASES NOT MENTIONED BY ORACLE
HAVE SALES REP AND SALES COMMISSION INFORMATION.

MR. MEAD: Where are commissions captured?

MS. MAHON: Commissions are captured in our incentive compensation system.

(TR, 37:5-9).

MR. MEAD: So there is a primary sales rep field for each closed deal [in the opportunity management system]?

MR. YASAR:  Correct.  There is a primary sales rep at the header level at least, and sometimes at the line level you could add additional sales reps, but usually if it's at the header level there is one field rep that is responsible for that deal.

MR. MEAD:  So would the opportunity management system have the commission calculation for the primary rep on that deal?

MR. YASAR:  No.  Opportunity management does not tie to the incentive comp system.  Opportunity management is just for maintaining the account relationships, who is assigned to that account or what sales consultants might be on that account, etcetera.

(TR, 113:6 – 21).

## V.     THE PRICING MODULE ALSO CONTAINS SEPARATE FIELDS FOR STANDARD DISCOUNTS AND EXTENDED DISCOUNTS THAT ORACLE DID NOT INTEND TO PRODUCE UNTIL FRIDAY'S HEARING.

MR. MEAD:  There are two fields one is for standard discount, one is for extra fields?

MR. YASAR:  Correct.

MR. MEAD:  What are they called and where do we find them?

MR. YASAR:  They should be in, again I don't know how they were broken out in the pricing/QP but it is at the order header, order line level that information was derivable if it was properly entered.

MR. MEAD:  That will be in the pricing module that we don't have or Wayne, did we get those two fields in what you produced?

MR. MURRAY:  Yes.  We do propose to run report of the discount data and provide that to you and in this case, we would show you 10 percent in one column and as an E business discount and 10 percent in another column representing the extended discount and each of those 10 percent would apply to the same base, which I think is the question is whether those discounts percentages both apply to the same base and the answer generally is yes.

MR. WISEMAN:  Is this information we are talking about in the information that's already been produced to us, or it has not yet been produced.

MR. MURRAY:  Has not yet been produced.

MR. HARKER:  You've got the list price and the net price I think, right, Wayne?

MR. MURRAY:  Yes.

MR. HARKER:  It's in there.  It's just not captured in the way that you're describing it now. Right?

MR. MEAD:  It would certainly be helpful for us to identify standard discount versus extended discount, and it would also be helpful for us to identify the fact that those nonstandard discounts were easily access I believe by ORACLE management. We would like to get both of those fields.

MR. HARKER: And I think what I've heard from our data experts is that that you will get those.  But what I'm saying in answer to David's question is David you got list price and net price consistent with your request and that would, would not be calculated by way of discount percentages or standard versus nonstandard or anything like that but you'd be able to tell the discount.

MR. WISEMAN:  I understand.  I would echo Chris' request these additional fields we are talking about would be helpful.

- 8 -

(TR, 119:21 – 122:3).

**VI.   TWO MONTHS INTO DISCOVERY, ORACLE
STILL HASN'T ADDRESSED REQUESTS FOR
ALL INVOICES TO GOVERNMENT CUSTOMERS.**

MR. MEAD: I understand the issue. Do you have the ability to identify for us every invoice presented to the Federal Government on these contracts? December 1, 1998 through the end of the contract, October 2006, including support up to the present date?
MR. MURRAY: I think the data we've provided identifies every, I believe identifies every invoice on every transaction that's listed and whether it's Federal Government or not, those would be transactions which originated in the order management system. For OKS and GSR invoices, there would be a much greater volume, and the difficulty is identifying specifically being sure of the identification of every customer, which is Federal Government. The capability exists, the difficulty is in filtering the data and identifying with certainty all the customers which are Federal Government.
MR. MEAD: In other words, in the data that you provided other than the first year, the initial invoice for invoice and support -- I'm sorry, let me start again. Does the data have, that you provided to us on Friday have invoice information for invoices other than the initial invoice for license costs and first year support?
MR. MURRAY: No. It would only be those categories of information because those are the transactions that we are reporting on that data.
MR. MEAD: So for a subsequent invoice for support, even if it was at the same support price, is that part of order management, or is that now transferred to OKS?
MR. MURRAY: The invoice would be part of the accounts receivable system. The invoice, the transactions which triggered the invoice would have originated in GSR or OKS, depending on when.
MR. MEAD: So in other words, the OKS system tracks invoicing for any year of support past the first year basically?
MR. MURRAY: Yes.
MR. MEAD: So those invoices are not in OAS?
MR. MURRAY: They are not in order management.
MR. MEAD: We would have to go through and find those invoices separately with a Federal Government contractor.
MS. GLOSS: Not sure that's correct.
MS. MILLER: I think you meant to say Federal Government customer. I think we are getting mixed up here with invoices. The transaction is in OKS. The invoice as I understand it is generated out of accounts receivable.
MR. MEAD: Right. The difficulty is we need to find the business records that you keep that show that you presented an invoice to Department of Energy on such and such date in X amount because that would be part of our calculation of damages as an individual false claim subject to statutory penalty so we need to, you know I'm not, I don't believe, as long as you all agree that these are business records admissible in court, we don't need hard copies of the individual invoices, but we do need the business records as you

maintain them in the ordinary course of your business that would identify those invoices so how do we, how do we most efficiently gather that information?

MS. GLOSS: No one in this room seems to know. Our usual process to pull that information on a customer-by-customer basis, and my understanding is that there are so many government customers, different names, different entities, different organizations within organizations that I'm not sure how we could pool them all for each customer name.

MR. MEAD: We'd have a list from the data of government contracts, right? In other words, I believe in part because I've seen you sort it that way on the IG production that you sorted government sales versus commercial sales, right? So assume we could do a sort that captured the government contract from the data that Wayne provided on Friday. We could then for each of those government customers do a search for invoices, right? And presumably that search for invoices would have a contract number with it? Or yes. Let me ask a different question. There might be a contract number that would link, right? If you've got a contract number from the original license and support sale, maybe that contract number is in OKS and we could track the invoices that way. Is that possible?

MS. GLOSS: Are you saying could we look at transaction on OKS, look for a contract number and pull hundreds of thousands of invoices using that number?

MR. MEAD: Assume December 1999 you entered into a $200,000 contract with the Department of Energy. I assume that, I'm not talking about the MAS contract number, which would capture globally, but I'm kind of assuming that there would be some sort of identifier entered into your system with a number for that contract, right? So the December 1999 contract with the Department of Energy is contract or PO number 15238. That unique identifier might also be present in your OKS system when you do support renewal. I don't know the answer but it's --

MR. CLANCY: Chris, this is Mike. So we are already in the process of responding to a discovery request for all the IFF reports which GSA has all those reports, but we have been asked to produce them ourselves, and that's going to have, that's going to track every order that we paid IFF on, including support renewal orders. What you're interested from a damages perspective are GSA transactions, so that would give us a list of all government license and support renewal orders based on the IFF reporting and that would cover, and we are pulling the reports back to 1998, so we are pulling that data together to produce. So number one, the government has it. Number two, we'll be delivering it as well, so there will be two copies of the IFF data, and we'll have all the orders for license and support renewals from '98 through 2006.

MR. MEAD: They have got the absolute numbers in addition to the amounts? Is that it?

MR. CLANCY: It has the amounts because the IFF is based on a percent of the order.

MR. MEAD: Forgive me. I haven't seen your report. And --

MR. CLANCY: It's the standard GSA report.

MR. MEAD: Does it have literally the number of individual transactions or just a Global number? That's --

MR. CLANCY: I'm not sure what you're asking me.

MR. MEAD: The report could say in 1999 we entered into 300 license deals with government agencies for a total amount of X, or it could say in the year 1999 we entered into an unspecified number of contracts with global amount of X, and we owe you 1

percent of that. Same thing with support. It could say global amount of $5 million on support, we show you 1 percent, or it could say 325 separate support renewals for a global total of 5 million.

MR. CLANCY: I don't know. We'll check.

MR. MEAD: I understand your point. If you guys say if our IFF report specifies we had 325 different renewals for support, that means we submitted 325 invoices, the parties agree to proceed on that basis without having to pull the precise details of the invoices. I'm assuming I could live with that. I can't speak for the government. You're right. That might be a good shortcut. I don't know if the reports are the shortcut we need. I'm happy to discuss that. It makes sense. But if they are not the shortcut we need, I'd ask you to check whether the OKS data has any unique contract identifiers that would tie to the government sales on the data that Wayne has already produced to us that would allow us to search. I'm looking for a shortcut trying to save work for everybody.

MR. CLANCY: We'll have to take that under advisement. We just don't know enough about the OKS system to respond.

(TR, 131:8 -138:21)

## VII.   ORACLE STILL HAS NOT ADDRESSED THE SUMMARY DATA ABOUT DISCOUNTS AND PROFIT IT GENERATED FOR UPPER MANAGEMENT.

MR. MEAD: How would upper management keep track of what the sales force was doing in terms of practice?

MR. HARKER: That's not really a data question, is it?

MR. MEAD: I think so. In my experience most folks running an enterprise like ORACLE track that information literally day by day, week by week. That's a standard business management metric price maintenance when you're selling to a lot of folks and you got a sales force to manage.

MS. GLOSS: Are you talking at a summary level or detail level?

MR. MEAD: Summary level. Like on average giving the Federal Government 45 percent discount on average. We are giving national accounts a 75 percent discount. On average we are giving commercial end users 65 percent. We are giving state and local X percent.

MS. GLOSS: I don't think the folks on this call are going to know the answer to that.

MR. CLANCY: You were asking about profit margin. You want discount information or profit margin. Wayne was, you asked Wayne about --

MR. MEAD: In other words, I can't conceive that ORACLE's management isn't closely tracking how much our sales force has to give away to sell products. Where we stand.

MS. GLOSS: I don't think anybody is arguing that our management tracks the revenue of the company and margins. You kind of have changed the question a few different times, and I don't think, and I know that you can correct me if I'm wrong, because I don't claim to have a perfect memory, but I don't think that we had interrogatories that asked for those sorts of summaries, and so I don't know if there is anyone on this phone who is going to be capable of answering this question. We tried to anticipate you, but we are not 100 percent.

- 11 -

MR. MEAD: On the second page of my email, I asked the question we assume that management wanted discount averages by different periods of time and for different classifications of customers. How was such data gathered and reported, so I did flag it for you Friday night.

MR. CLANCY: Wayne answered no. As far as Wayne knows, the answer is no.

MR. MEAD: I mean, I'm not doubting Wayne's sincerity, but I am doubting that he can speak for the whole company because I literally cannot believe that she doesn't know what her margins are on different categories of her customers.

MR. HARKER: Chris, I never understood that this call was designed to speak for the whole company.

MR. MEAD: I'm trying to find if such reports are run, which I guarantee you they were, I'm just trying to find out how they are run because that's a crucial data management question. It is a shortcut for us. Shortcut for you.

MR. HARKER: It's a management issue. It's not a data issue as such. It's a management issue. It's what information Safra and Ellison and others needed to run the company, and we don't have either one of those two folks on the call because I thought this was a data call, so that's what we talked to the judge about. The technical people would talk to the technical people.

MR. MEAD: But managers need data. Somebody got the data to them.

MS. GLOSS: Chris, we are not arguing with you. We just said several times we don't have the right people on the call.

MR. MEAD: That's great. When do you think you can get me that answer?

MS. GLOSS: Since none of us knows the answer, we'll get back to you, we'll, let's follow up on this discussion. Can we move on with questions that are relevant to the witnesses whose time we are taking right now? And then I'm sure that we will have lots of follow up after this call among lawyers.

MR. MEAD: The short answer is until we get a complete list of flex fields, and particularly for your other systems that we talked about for GSR, OKS for pricing module and the other pricing thing what was it called again, QP --

MR. CLANCY: We agreed we would get you the QP report, which has the price adjustment field.

MR. MEAD: Standard and flex fields for all those modules, it's hard for me to ask the right follow up questions, but we'd like to get a description of those fields as soon as possible.

(TR, 139:9 – 143:12).

## VIII. UNTIL THE GOVERNMENT AND RELATOR GET A LIST OF THE STANDARD AND FLEX DATA FIELDS IN THE DATABASES THAT ORACLE DIDN'T MENTION UNTIL NOW, THEY CANNOT DETERMINE WHAT ADDITIONAL DATA THEY NEED.

MR. MEAD: Can we request, please, a current list of all your flex fields related to sales data and then whatever is easily retrievable in terms of the changes to those flex fields going back to the period of this complaint?

MR. HARKER: You mean can you submit an interrogatory or a document request to us?

MR. MEAD: No. What I meant was in compliance with Judge Jones' direction, could you please provide that to us quickly so that we can analyze what additional data we need to request from you?

MR. HARKER: What is your request, Chris?

MR. MEAD: A list of all of your customized flex fields. I assume that your technical manual has a complete list of the standard fields. So we need to understand what all the fields are that are available to us, and then a description of those fields so that we can understand what data is included in them, and then what's readily retrievable in terms of how the fields have changed over time. So that, for example, if there is historical data of a flex field that we would be interested in, we could request that.

MR. HARKER: You mean for the order management system? Or the -- specifically with respect to the order management system, order entry?

MR. MEAD: I don't want to limit it. Obviously what we are interested in is data that's relevant to sales orders. The difficulty is any time you say limited to the order management system, I get concerned, is there a flex field that we would miss that might be somewhere else that would be relevant. I mean, you know generally what we are looking for. I've set it out in terms of what data would be easiest for us to do the basic pass that we have to do. So any flex fields that are related to sales to a particular commercial customer and any flex fields related to sales to government customers I think we are going to need to understand, so that we can know what to request. And Wayne, I'm sympathetic with you. Nobody is trying to ask you to search for stuff that we don't need or is overly complicated. I think what the judge suggested was that we work together to try to make it manageable.

MR. HARKER: Okay. We hear your question.

(TR, 25:9 - 27:11)

MR. MEAD: The short answer is until we get a complete list of flex fields, and particularly for your other systems that we talked about for GSR, OKS for pricing module and the other pricing thing what was it called again, QP --

MR. CLANCY: We agreed we would get you the QP report, which has the price adjustment field.

MR. MEAD: Standard and flex fields for all those modules, it's hard for me to ask the right follow up questions, but we'd like to get a description of those fields as soon as possible.

(TR, 143:2 – 12).

## IX.    ORACLE ALSO NEEDS TO PROVIDE A PRODUCT ID GLOSSARY.

MR. MURRAY: Product ID is on the report, is in the data provided last Friday.

       MR. MEAD: Is there a glossary we could get. I know what we are talking about. There is a product ID field. But it's not self-evident to the reader without a glossary.
       MS. GLOSS: I will look for one. If I can find a glossary, we will share it with you.

(TR, 144:15 – 145:4).

## X.    ORACLE'S GAME OF HIDE AND SEEK HAS MADE THE DISCOVERY SCHEDULE UNWORKABLE.

The current discovery schedule requires expert reports by April 1.  It is clear from the transcript of the call between counsel that Oracle has concealed crucial data in its databases, and will take weeks to provide the additional data.  Oracle still has not even produced a complete list of its data fields related to sales with readable descriptions of those fields.  Relator requests that the Court discuss with counsel a new discovery schedule that will require Oracle to provide additional information and data as promptly as possible, and will give the Government and Relator's counsel adequate time to review the data and prepare expert reports.

## XI.    ORACLE SHOULD PAY A PRICE FOR ITS DISCOVERY ABUSES.

Oracle's strategy not to discuss the contents of its databases, and to provide only the fields that it decreed were relevant, has caused the Government and Relator to spin their wheels.  The costs run from small and discrete (the cost of ordering rough and overnight transcripts of the February 28 call) to large and indeterminate.  The Court will almost certainly have to extend the discovery schedule.  Relator's counsel have concluded that they cannot rely on Oracle to provide accurate and useable summary data, and are in the process of hiring experts to review and analyze Oracle's databases and calculate damages.  Relator's counsel and government counsel have had to meet and confer and file pleadings trying to get information out of Oracle that Oracle has concealed.  Perhaps modern litigation has reached the point where Oracle's tactics are

routine, not worthy of comment or sanction.  Relator's counsel hopes that this Court thinks otherwise.

Respectfully submitted,


_____/s/_____
Christopher B. Mead    VSB#39304
London & Mead
1225 19th Street, N.W., Suite 320
Washington, D.C. 20036
cmead@londonandmead.com
(202) 331-3334; (202) 785-4280 - facsimile

Of Counsel:
Mark London
London & Mead
1225 19th Street, N.W., Suite 320
Washington, D.C. 20036
mlondon@londonandmead.com
(202) 331-3334; (202) 785-4280 - facsimile

Counsel for Relator Paul Frascella